

**FILED**

**AUGUST 21, 2008**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION and its LOCAL 745L, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| TITAN TIRE CORPORATION OF FREEPORT, | ) ) ) |
| Defendant. | ) ) |

**08 C 50185**

Case No. _____

~~JUDGE KAPALA~~
**MAGISTRATE JUDGE MAHONEY**

## COMPLAINT

The Plaintiffs complain against Defendant as follows:

1.      The Plaintiffs in this case are labor unions.  The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW") is a labor organization as defined by 29 U.S.C. § 152(5).

2.      Defendant Titan Tire of Freeport is an Illinois corporation with its principal place of business in Freeport, Illinois.  Titan Tire operates a manufacturing facility in Freeport, Illinois, for the construction of agricultural and other off-road tires.

3.      The USW and Local 745L are parties to a collective bargaining agreement with Titan Tire.  The term of the collective bargaining agreement is from 2006 to 2010.  It is attached hereto as Exhibit A.

4.     This action is brought to enforce an arbitration award rendered pursuant to the provisions of the collective bargaining agreement.  This court has jurisdiction of this case pursuant to 29 U.S.C. § 185.

5.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b).

6.     Prior to 2006, the plant in Freeport was owned by Goodyear.  In 2006, the plant was sold to Titan Tire.  The collective bargaining agreement between the USW, Local 745L, and Titan Tire has extensive provisions which control the issue of which prior practices between Local 745L and Goodyear were to be observed in connection with the new 2006-2010 labor agreement.

7.     Article IV of the Collective Bargaining Agreement provides that a grievance is defined as any controversy between the Company and the Local Union or between the Company and its employees or any of them.  Article IV also provides a grievance procedure consisting of three steps.  If the grievance is not settled, either party may submit the grievance to the Impartial Arbitrator.  Under Section 4(c) of Article IV of the contract, the decision of the Impartial Arbitrator is "final and binding upon both parties and shall invoke immediate compliance by the parties."

8.     Under Article XI, Section 7, of the contract, a past practice between the Plaintiffs and Goodyear is binding upon Titan if the practice existed at least one day prior to the effective date of the collective bargaining agreement between the plaintiffs and Titan Tire.

9.     The grievance at issue in the instant case concerned the existence of a fire brigade at the Freeport plant.  In an arbitration award rendered on April 22, 2008, Arbitrator Alan J. Cook held that Titan Tire had an obligation to maintain the fire brigade under Article XI of the contract.  This award is attached as Exhibit B hereto.

10.     Arbitrator Cook's award was within his authority as an arbitrator.

11.     Arbitrator Cook's award draws its essence from the collective bargaining agreement.

12.     The Defendant has failed to comply with any portion of Arbitrator Cook's award.

WHEREFORE, Plaintiffs pray for the following relief:

(a)     That the Court declare the arbitration award to be final and binding.

(b)     That the Court direct the Company to implement the relief ordered by the award.

(c)     That the Court direct the Company to pay the reasonable costs and attorney fees of

bringing this cause of action.

(d)     Any other relief the Court deems equitable and just.

Respectfully submitted,

CORNFIELD AND FELDMAN


By:     /s/ Stephen A. Yokich
        Stephen A. Yokich
        Attorney Bar Number 6181707

Attorneys for Plaintiffs USW and its Local 745L

Dated:  August 21, 2008

CORNFIELD AND FELDMAN
Suite 1400
25 East Washington Street
Chicago, IL 60602-1803
(312) 236-7800
(312) 236-6686 (fax)

**FILED**

**AUGUST 21, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# Exhibit A

08 C 50185

# (Part I – thru Article X)

AGREEMENT BETWEEN

TITAN TIRE CORPORATION OF FREEPORT

AND

LOCAL NO. 745L

UNITED STEELWORKERS

AFL-CIO

EFFECTIVE January 1, 2006

#1202779

# TABLE OF CONTENTS

Agreement ................................................................................................. 1

Article I — Recognition And Scope Of Agreement ................................. 1

Article II — Function And Responsibility .............................................. 2

Article III — Union Shop And Check-Off ............................................... 4

Article IV — Grievance Procedure ........................................................ 9

Article V — Hours Of Work And Reporting Pay ................................... 16

Article VI — General Wage Provisions ................................................. 23

Article VII — Wage Application ............................................................ 29

Article VIII — Seniority ........................................................................ 38

Article IX — Vacation ........................................................................... 58

Article X — Engineering Maintenance .................................................. 67

Article XI — Miscellaneous Clauses ..................................................... 75

Article XII — Safety And Health ........................................................... 86

Article XIII — Cooperative Efforts ........................................................ 91

Article XIV — Cost Of Living ............................................................... 105

Article XV — Effective Date and Termination ...................................... 107

Schedule A - Job Departments, Classifications And Grades ................. 109

Schedule B - Pay Grades ....................................................................... 112

Letter #1 ................................................................................................ 114

Letter #2 ................................................................................................ 115

Letter #3 ................................................................................................ 117

i

Letter #4 ................................................................................................................ 117

Letter #5 ................................................................................................................ 117

Letter #6 ................................................................................................................ 118

Letter #7 ................................................................................................................ 119

Letter #8 ................................................................................................................ 120

Letter #9 ................................................................................................................ 121

# AGREEMENT

THIS AGREEMENT, made this 1st day of January 2006 by and between TITAN TIRE CORPORATION OF FREEPORT (hereinafter referred to as the "Company"), and THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION and its LOCAL UNION NO. 745L (hereinafter referred to as the "Union") representing the employees as hereinafter defined.

WITNESSETH, whereas the mutual desire of the Company and the Union is to continue to promote cooperation and harmony and to formulate rules to govern the relations between them, the parties hereto agree as follows:

# ARTICLE I - RECOGNITION AND SCOPE OF AGREEMENT

### Section 1—Recognition
The Company recognizes the Union as the exclusive bargaining agent for the production and maintenance employees of the Freeport Plant or any local expansion or extension thereof. The term "employees" for the purpose of this Agreement includes all hourly production and maintenance employees, but excludes office clerical employees, professional employees, guards, supervisor, management trainees, salaried quality control inspectors and control laboratory operators. Further, the Company will bargain with the Union on all matters pertaining to hours of work, wages, and other conditions of employment.

The automation of jobs in the bargaining unit will not be used as a basis for changing such jobs from bargaining unit status to non-bargaining unit status.

### Section 2—Laws Supersede Contract
In the event that any of the provisions of this contract are found to be in conflict with any valid Federal or State Law now existing or hereinafter enacted, it is agreed that such law shall supersede the conflicting provisions without any way affecting the remainder of these provisions.

1

# ARTICLE II - FUNCTION AND RESPONSIBILITY

# ARTICLE II - FUNCTION AND RESPONSIBILITY

**Section 1—Management Clause**
The management of the business and the operation of the plant and the authority to execute all its various duties, functions and responsibilities incident thereto is vested in the Company, except as such authority is limited by the conditions of this Agreement.

**Section 2—Non-Discrimination**
The parties agree to the principal that there will be no discrimination in regard to wage rates and working conditions by reason of sex, color, race, age, religion, nationality, or disabilities as covered under the Americans with Disabilities Act.

Where the masculine pronoun is used in this Agreement, it shall refer to both genders.

**Section 3—Productivity Clause**
(a)    The Union recognizes that a high level of wages can be maintained only by a high level of productivity. Therefore, the Union and its members agree to cooperate in attaining, as high a level of productivity as is consistent with the health and welfare of the employees.

(b)    No employee will be laid off as a result of improvements or suggestions made through the employee involvement process. Plant improvements, as a result of the E.I. process will not cause employees to be laid off from work. Instead, the Company will assign them meaningful work until such time as permanent vacancies become available. The surplus employees will then be used to fill these vacancies per the provision of the labor Agreement.

Improvement to plant performance through the E.I. process will not result in employees being laid off from work. It could, however, result in a reduction in total plant manning, but this would be accomplished through attrition and not through a layoff.

**Section 4—No Strike-No Lockout Provision**
(a)    The Union agrees that it will not encourage, sanction or approve any strike, stoppage, slowdown, or other interruption of work growing out of any dispute arising under the terms of this Agreement and which is subject to the Grievance Procedure including the Impartial Arbitrator.

(b)    On the contrary, the Union and its officers and members will actively discourage and will take whatever lawful steps are necessary to prevent any strike, stoppage, slowdown or other interruption of work in violation of this Agreement.

2

# ARTICLE II - FUNCTION AND RESPONSIBILITY

(c)    The Company recognizes the right of the Local Union to strike on any issue not subject to the jurisdiction of the Impartial Arbitrator. On any such issue, however, the Union will not encourage, sanction or approve any strike, stoppage, slowdown or other interruption of work until at least ten (10) days of negotiations have proved unsuccessful, provided that the Company does not refuse to negotiate or provided the Company, upon request of the Local Union to negotiate the subject matter of such issue, does not unnecessarily delay. If the parties are unable to satisfactorily conclude such negotiations, this Agreement may be canceled by either party upon giving a 60-day written notice to the other. All terms and conditions of this Agreement will remain in effect during such 60-day period during which time the parties will attempt to negotiate a satisfactory settlement. But failure to amicably settle the issue concerned shall terminate and cancel this contract upon the expiration of such 60-day period unless there is a mutually agreed upon extension. If the right to strike is exercised by the Union at the expiration of the 60-day period and upon such termination of the Agreement and subsequently the parties have amicably settled the issue in dispute and the strike has ended, this Agreement will be reinstated and will become effective and all its terms and provisions shall continue in full force and effect until the termination date of the Agreement and through any extension period, subject to the termination and reopening provisions of this Agreement.

(d)    The Company agrees that in consideration of the carrying out of the responsibilities placed upon the Union and its officers in paragraphs (a) and (b) of this Section, the Company will institute no action for monetary damages against the International Union or the Local Union or its officers for breach of said paragraphs (a) and (b).

(e)    The Company agrees that neither it nor its representatives will put into effect any lockout during the term of this Agreement.

(f)    Any employee who violates the principles set forth in this Section may be subject to discipline.

3

## ARTICLE III - UNION SHOP AND CHECK-OFF

## ARTICLE III - UNION SHOP AND CHECK-OFF

**Section 1**

(a)  Any employee who is a member of the Union in good standing on the effective date of this Agreement shall maintain his membership in the Union as a condition of his continued employment for the life of this Agreement to the extent of paying periodic membership dues uniformly required by the Local Union pursuant to the Constitution of the United Steelworkers. Such employee may have his membership dues deducted from his earnings by signing the Dues Authorization and Deduction Form as hereinafter provided, or if no such authorization is in effect, he must pay the periodic membership dues directly to the Union.

(b)  Any employee hired on or after the effective date of this Agreement or transferred into the bargaining unit, shall become a member of the Union not later than thirty (30) days following his hire or transfer into the bargaining unit, and as a condition of his continued employment shall maintain his Union membership as provided in paragraph (a) of this Section.

(c)  On the 30th day following the effective date of this Agreement, all employees in the bargaining unit who are not members of the Union may sign the following form and as a condition of continued employment shall tender or pay to the Union the amount of periodic dues uniformly required as a condition of acquiring or retaining Union Membership:

Company....................................................

Plant ........................................................

Date........................................................

MEMBERSHIP APPLICATION UNITED
STEELWORKERS -AFL-CIO

On this ........................................ day of....
20. . . . I hereby make application for membership
in the United Steelworkers , and I promise to pay
dues uniformly required by the local Union
pursuant to the Constitution of the United
Steelworkers.

Signature of Applicant ................................

Clock Card No. ...........................................

Dues Deduction...........................................

Authorization .............................................

Signed Yes .........................No ...................

Month's Dues.............................................

First Month's Dues .....................................

Rejoining Member ......................................

........................................................................

Signature of Local or International Representative

4

# ARTICLE III - UNION SHOP AND CHECK-OFF

(d)    The provisions of Paragraph (a), (b), and (c) of this Section shall not apply to any employee in the bargaining unit to whom membership in the Union is denied or whose membership therein has been terminated for reasons other than the failure of such employee to tender the aforesaid payments.

(e)    Any employee who fails to maintain his obligations under the provisions of paragraphs (a) and (c) of this Section, shall not be retained in the employ of the Company, provided that the Union shall have notified the Company and the employee in writing of such default and said employee shall have failed to remedy the same within thirty (30) days after receipt of such notice.

## Section 2

(a)    The Local Union will furnish the Company with the names of all members paying dues direct to the Local Union within thirty (30) days following the effective date of this Union Security Agreement.

(b)    Any dispute arising as to an employee's membership in the Union shall be subject for the Grievance Procedure, including arbitration.

(c)    "Member of the Union" where used herein means any employee who is a member of the Union and is not more than ninety (90) days in arrears in the payment of dues. "Employee" where used in this Article means an employee of the Company in the bargaining unit represented by the Union.

## Section 3

(a)    For the convenience of the Local Union and its members, the Company, during the life of this Agreement and subject to all the provisions of this Section, shall deduct from the pay of those employees in the bargaining unit who have executed or who shall execute an assignment and authorization in the form hereinafter provided, all Union dues, uniformly required by the Local Union pursuant to the Constitution of the United Steelworkers. Further, if at any time during the life of this Agreement it is finally determined that initiation fees and general assessments may be legally deducted from the pay of those employees in the bargaining unit from whom the Company holds the aforesaid authorization, the Company shall make such deductions for all initiation fees and general assessments levied in accordance with the Constitution of the United Steelworkers and the by-laws of the Local Union. The Local Union shall indemnify the Company against any claim or loss arising out of the Company's deduction of dues, initiation fees, and general assessments levied in accordance with the Constitution of the United Steelworkers and the by-laws of the Local Union, and the Local Union will make refunds direct to all employees for such wrongful deductions.

(b)    The Local Union shall submit to the Company on or before five (5) days prior to the pay ending from which deductions are made, a list of its new members and the amount of

## ARTICLE III - UNION SHOP AND CHECK-OFF

deductions for dues to be made from the pay of each member for the month. Subject to the provisions of this Section, the Company shall deduct such amount from the pay earned in the first pay period of each month of each of those employees whose name has been furnished by the Local Union as provided above, and from the pay of those employees whose authorization cards are on file with the Company, and remit as directed by the Local Union President. Union dues will be deducted on a weekly basis. This procedure may be modified by mutual agreement.

(c)     The assignment, once executed, shall be irrevocable for a period of one (1) year from the date of execution or until the termination of this Agreement, whichever occurs first. At the end of the original period of irrevocability and each renewal period of irrevocability, the assignment shall be automatically renewed and be irrevocable for a like period of one (1) year or until the termination of the then current agreement between the Union and the Company, whichever occurs first, unless the executing employee gives notice revoking his assignment during the 10-day period immediately following the end of such a period of irrevocability. The assignment shall be in the following form:

### CHECK-OFF AUTHORIZATION
### FOR UNITED STEELWORKERS

Pursuant to this authorization and assignment, please deduct from my pay each month while I am in employment with the collective bargaining unit in the Company, and irrespective of my membership status in the Union, monthly dues, assessments and (if owing to me) an initiation fee each as designated by the International Secretary/Treasurer of the Union.

The aforesaid payment shall be remitted promptly by you to James D. English, or his successor, International Secretary/Treasurer of the United Steelworkers, or its successor, Five Gateway Center, Pittsburgh, Pa. 15222.

This assignment and authorization shall be effective and cannot be canceled for a period of one (1) year from the date appearing above or until the termination date of the current collective bargaining agreement between the Company and the Union, whichever occurs sooner.

I hereby voluntarily authorize you to continue the above authorization and assignment in effect after the expiration of the shorter of the periods above specified, for further successive periods of one (1) year from such date. I agree that this authorization and assignment shall become effective and cannot be cancelled by me during any of such years, but that I may cancel and revoke by giving to the appropriate management representative of the plant in which I am then employed an individual written notice signed by me and which shall be postmarked or received by the Company within fifteen days following the expiration of any such year or within the fifteen days following the termination date of any collective bargaining agreement between the Company and the Union covering my employment if such date shall occur within one of such annual periods. Such notice of revocation shall become effective respecting the dues for the month following the month in which such written notice is given; a copy of any such notice will be given by me to the Financial Secretary of the Local Union.

6

# ARTICLE III - UNION SHOP AND CHECK-OFF

While contributions or gifts to the USW are not tax deductible as charitable contributions for Federal income tax purposes, they may be tax deductible under other provisions of the Internal Revenue Code.

Local Union No. ................................................
United Steelworkers
Signature .............................................................
Clock No. ............................................................
Witness................................................................
Ledger No. ..........................................................

(d)    At the request of the Local Union and in the absence of a revocation by the individual employee, the Company will continue to deduct Union membership dues for those employees who have heretofore so authorized the Company in writing.  The Union shall submit to the Company properly executed assignments on the form herein provided for those employees who in the future may desire to participate in the check-off program.

(e)    The Company agrees to provide forms for the assignment and authorization of dues deduction.

(f)    The Company will not be responsible for dues, initiation fees, rejoining fees, or assessments which are not collected due to clerical errors of the Union or due to the fact that the employee did not have sufficient earnings in the pay period in which deductions are made as herein provided to cover such Union dues, initiation fees, rejoining fees, and assessments after deduction for taxes, or due to the fact that an employee's name for any reason has been removed from the Company's payroll prior to the last complete period of the month.

(g)    Any disagreement arising out of wage deductions as provided in this Section shall be subject to the grievance procedure, including the Impartial Arbitrator, whose decision shall be final and binding upon all the parties, including the Company, the Union, its officers and members, and any employee.  In case of any disagreement, no deduction will be made from the pay of the employee in question until after the dispute is settled.

(h)    No deductions under this Section shall be made from the pay of any Union member employee who is not working at an operation which is within the bargaining unit.  Should an employee member, by changing work assignments, be permanently transferred to an operation outside the bargaining unit, his name will be stricken from the check-off list until such time as he returns to work within the bargaining unit.  Upon his return, such employee's name shall be replaced upon the check-off list.

**Section 4**

The Union shall indemnify and save the Company and/or the Trustee under the Supplemental Unemployment Benefits Plan harmless from any claims, suits, judgments, attachments, and from

## ARTICLE III - UNION SHOP AND CHECK-OFF

any other form of liability as a result of the Company and/or the Trustee making any deductions in accordance with the foregoing authorization and assignments.

# ARTICLE IV - GRIEVANCE PROCEDURE

# ARTICLE IV - GRIEVANCE PROCEDURE

## Section 1—Representation

(a)    A grievance is defined as any controversy between the Company and the Local Union, or between the Company and its employees or any of them.

(b)    For the purpose of representation and adjustment of grievances, the employees in each department or group of departments under one Area Manager or the equivalent shall be represented by a Department Steward each shift. The employees in all departments shall be represented by one Chief Steward each shift. In the absence of a Department Steward the Chief Steward may serve as Department Steward. The Union Bargaining Committee shall constitute the Union Grievance Committee.

(c)    The President of the Union, the Human Resources Manager, or their duly accredited representative shall be accorded the right at any time to participate in any conferences or negotiations between the Company and the Union.

(d)    The Union agrees to keep on file with the Company at all times an up-to-date list of its accredited representatives and will promptly notify the Company of any changes or additions. No employee will be recognized as a Union representative until and unless the Company has been notified in writing by the Union that such employee has been selected to act in such capacity. Each month the Company will furnish the Union a list of their representatives who are to be recognized as such in the steps provided in the grievance procedure, and will promptly notify the Union of any changes.

(e)    In cases where accredited Union representatives are required to leave their jobs in order to handle grievances, the representatives will be relieved as soon as possible, so that production will not be retarded during the representative's absence. Supervisors will provide representatives with a filled-in pass noting time of departure from job. Representatives will submit all passes to their Supervisor at the end of the shift.

The representative may be required to show this pass at any time as authority to be away from their job. Accredited representatives, when handling grievances, shall notify the Supervisor of any department or section in which it becomes necessary to contact employees before they contact the employees involved.

(f)    The Company will issue an annual pass to the Union President, Vice President, Recording Secretary, Financial Secretary, Treasurer, Local Union Time Study Engineer, and Grievance Committee in order to facilitate the investigation and handling of grievances. When entering the plant for this purpose, the above named shall notify the Human Resource Manager on day shift, and appropriate Supervisor on later shifts, of reason for the visit and the destination, and shall register at the Gatehouse.

# ARTICLE IV - GRIEVANCE PROCEDURE

(g)     The Company, upon request of the Union, will permit an International Union Representative to participate in 3rd step grievance meetings and arbitration.

## Section 2—Responsibility

(a)     The parties of this Agreement recognize that grievances should be settled promptly and as close to the source as possible.  Further, both parties will endeavor to present all the facts relating to the grievance at the first step of the grievance procedure in order that an equitable solution may be achieved.

(b)     A written decision at any step of the grievance procedure shall be considered as final unless the grievance is appealed to the next step within fifteen (15) working days thereafter.

(c)     The parties recognize that any employee who feels he is aggrieved should submit such grievance claim within ten (10) working days of the incident.

(d)     If at any time during the existence of this Agreement there occurs an unauthorized strike, sit down, or other curtailment of work in violation of the No Strike Clause of this Agreement neither party shall negotiate upon the subject of said dispute until such illegal activity has ceased.

## Section 3—Grievance Procedure

(a)     The procedure for presentation of a grievance is as follows:

Step 1:     The employee, or in company with his Department Steward, may discuss the grievance with his immediate Supervisor, who must respond within two (2) working days.

(1)     If not settled at the above verbal discussion, the grievance will be reduced to writing, signed by the grievant and/or Union, and presented in duplicate to the Supervisor by the Department Steward within ten (10) working days.  The Supervisor will provide a written answer to the grievance, based from the discussion held above.

Exceptions:     Grievances pertaining to base and/or hourly rates, manning, workloads, or standards not settled at the above verbal discussion, will be reduced to writing and appealed directly to the 2nd step with the Area Manager and Union Time Study Engineer present at this meeting.  If necessary, a joint time study will be completed before being appealed to the third step.  Grievances pertaining to job postings, awards,

10

# ARTICLE IV - GRIEVANCE PROCEDURE

surplus labor, layoffs, recall and employee benefits will be referred to the Employment Department.

Step 2: If not settled in Step 1, the grievance may be appealed to the Area Manager in Production departments and Division Maintenance Manager or the equivalent by the Division Committeeman or Chairman of the Grievance Committee. If a meeting is necessary, it will be held within five (5) working days, or as mutually agreed.

Step 3: If not settled in Step 2, the grievance may be appealed to the Human Resources Manager by the Chairman of the Grievance Committee. The notice of appeal must be in writing and must indicate those grievants, witnesses and Union Representatives requested to appear at the hearing. A meeting will be held within thirty (30) days from the date the notice of appeal is received, or as mutually agreed.

(b) The Company shall give a written answer to the written grievance, with a copy to the President of the Union, as soon after the meeting or discussion as possible, but not later than three (3) working days, at Step 1, five (5) working days at Step 2, and ten (10) working days at Step 3, unless extended by mutual consent. If the written answer is not given within the time allowed, and in the absence of an extension, the Union may take the grievance to the next step without delay.

(c) If a controversy arises of a nature so general as to affect a large number of employees, such issues of this nature need not be subject to the entire grievance procedure, but may be initiated at a step prior to the Impartial Arbitrator by agreement of the Local Union President and the Human Resources Manager.

(d) At the written steps of the grievance procedure, the Company and the Union may call any witnesses whose testimony is necessary to the proper consideration of the grievance, or grievances, to be considered at any particular meeting.

(e) Henceforth, from the date of this agreement no decision, written or oral, made at the first step of the grievance procedure will be considered to have any precedent setting value.

## Section 4—Impartial Arbitrator

(a) Should negotiations between the Company and the Union at the final step of the grievance procedure fail to bring about an agreement between the parties with respect to any grievance which properly comes under the jurisdiction of the Arbitrator, as hereinafter defined, either party may, within thirty (30) days, but no longer except by mutual agreement, after the final answer at the last step, as outlined above, submit the issue to the Impartial Arbitrator. It is understood that a copy of the issue submitted will be furnished to the other party at the same time.

# ARTICLE IV - GRIEVANCE PROCEDURE

(b)     On a date set by the Impartial Arbitrator, the parties shall at the time and place appointed by the Impartial Arbitrator, appear and present for his consideration a statement of the issues involved, either in writing or orally, as each party may desire. The Impartial Arbitrator shall schedule hearings of grievances in the order in which such grievances are submitted to him, unless the Company and the Union agree on a different order. The place of hearing shall be restricted to Freeport, Illinois, unless otherwise agreed upon.

(c)     The Impartial Arbitrator shall render a decision on the grievance within thirty (30) days following the hearing date of a grievance. At the close of a hearing, the parties may request an award. The Arbitrator shall make any request for additional time in writing and if the parties agree to the additional time, the Arbitrator will be so notified in writing.

    (1)     For the purpose of this section an award means the disposal of the grievance without a statement of reasoning leading to the conclusion reached. Henceforth, awards will not be regarded as having precedent value.

The decision of the Impartial Arbitrator shall be final and binding upon both parties and shall invoke immediate compliance by the parties. If such decision directs a retroactive wage payment the Company will notify the Union without delay of the date on which payment can be made to the employees affected. The Union will be notified in writing of the amount, to whom paid, and the date paid.

(d)     The expense and compensation of the Impartial Arbitrator shall be borne equally by the Company and the Union.

The parties to this agreement have agreed upon a panel of three arbitrators to be selected as set out in the arbitration protocol.

Within five (5) days following a request made by either party for the submission of an issue or issues to an Impartial Arbitrator, the President of the Local Union or his designated representative shall meet with the representative of the Employer for the purpose of selecting an Arbitrator from the panel listed above. In the event a selection cannot be made at such meeting by mutual agreement, the selection shall then be made by the Employer's representative and the Local Union representative alternately striking one name from the list until one name remains who shall be designated as the Arbitrator to hear the issue or issues to be submitted.

(e)     The Impartial Arbitrator shall not have the power to make any award changing, amending, or adding to the provisions of the Agreement. Specifically, the Arbitrator shall not have the power to arbitrate general wage levels.

# ARTICLE IV - GRIEVANCE PROCEDURE

(f)     In the event one of the Arbitrators named on the panel either dies, becomes incapacitated, or refuses to act, a replacement will be selected in accordance with paragraph 6 of the arbitration protocol.

(g)     By agreement at the local plant, a Board of Arbitration may be substituted for the Impartial Arbitrator herein provided. The Board of Arbitration shall be composed of a person selected by the Employer and a person selected by the Local Union, and the Impartial Arbitrator named herein who shall serve as chairman. The persons selected by the Employer and Local Union shall be permanently assigned and shall have final and complete authority to act for their respective parties. Each party shall name an alternate person to serve in the event the regular appointee is unable to serve. The use of the Board of Arbitration may be terminated at any time upon thirty (30) days written notice by either party in which case the Impartial Arbitrator shall serve alone. The authority of the chairman of the board shall be the same as that provided for the Impartial Arbitrator and his award or decision shall be rendered after deliberations with the Board, unless the representatives of the parties agree on a disposition of the case.

## Section 5—Union Time Study Engineer

(a)     Upon written request of the Local Union to the Human Resources Manager the Company will permit a time study engineer approved by the Local Union or the International Union to enter the plant for the purpose of making studies. A signed secrecy pledge will be required before entry is permitted. The Supervisor will provide a filled-in pass as authority for the time study engineer to be away from the job, as coordinated by the Human Resources Manager. A Company time study engineer shall be present during such studies or observations by the Union time study engineer.

(b)     The Company shall cooperate with the Local Union in the training of a Local Union Time Study Engineer, and at the request of the Local Union shall permit practice studies to be taken on any operation approved by the Company. One Union designated employee will be trained or in the training process at all times. One-half the cost of time lost from his regular shift, up to a maximum of twenty (20) hours per week will be paid by the Company to the employee designated as a time study trainee for the Local Union during his training period. The rate of pay shall be Pay Grade of his classification.

## Section 6—Disciplinary Action

(a)     When an employee is directed by the Supervisor to appear in the office to discuss a matter which might likely result in a suspension or discharge, or when a disciplinary letter or derogatory notation is to be placed on his record, the employee will be reminded of his rights to bring his Union representative into the discussion at that time. If the employee requests Union representation, he may remain silent until the representative is present. The Union representative shall be paid for time

# ARTICLE IV - GRIEVANCE PROCEDURE

lost from his regularly scheduled shift in accordance with Article VII, Section 19 (a) of this Agreement.

(b) In cases involving disciplinary action, the Department Stewards may request Chief Steward assistance. In cases involving a possible suspension, discharge, Loss of Value Letter, Last Chance Letter or initiation of 48 hour investigation period, the appropriate Division Committeeman will be notified prior to the meeting.

(c) The decision to terminate an employee will not be made until a minimum of forty-eight (48) hours has elapsed from the time of the infraction. This time may be extended beyond forty-eight (48) hours by mutual agreement. This time will be used for a thorough investigation of all facts relevant to the matter. Prior to the conclusion of the forty-eight (48) hour period, Company and Union representatives will meet to discuss and share such relevant facts and evidence. An employee shall be informed when the Company is imposing the 48-hour investigation period. At the same time, the employee will be informed of the time to return for case disposition.

In the event a termination decision is not made, concluding the forty-eight (48) hour period, the employee shall be compensated for the time lost, less pay for any penalty time decided upon.

(d) If an employee feels he has been unjustly disciplined; i.e., derogatory notation, letter, suspended, or discharged, he shall have the right to appeal his case through the grievance procedure, including the impartial arbitrator.

In cases of discharge or suspension, the written grievance must be filed with the Area Manager or the equivalent, within ten (10) days from the date of discharge or suspension, excluding Saturdays, Sundays and Holidays. If such discharge or suspension is found to have been unjustified, the employee shall be reinstated to his former job with all rights and privileges restored, and shall be compensated at the Pay Grade of his classification for the time lost, less pay for any penalty time decided upon. In the event a Union representative is not present when the employee is notified that he is discharged, the President of the Union or his authorized representative will be notified of such discharge within twenty-four (24) hours.

## Section 7—Derogatory Write-Ups

(a) Whenever an employee is to receive a derogatory write-up that will be part of his record, a copy of that write-up, including notations, will also be given to the President of the Local Union. If the notation is the result of poor workmanship, the employee shall be shown the poor work or the results of the poor workmanship.

(b) All derogatory write-ups, except those recording suspensions or discharges, will be destroyed one year after issuance if the same offenses have not been committed during the preceding twelve (12) months.

# ARTICLE IV - GRIEVANCE PROCEDURE

Letters recording suspensions will be disregarded and destroyed in the administration of discipline after twenty four (24) months provided the same offense(s) has not been committed during that period.

A suspension letter for absenteeism will be destroyed twelve (12) months after issuance if further disciplinary action has not been taken.

For the purpose of this paragraph 7(b), time will be working months rather than calendar months. Periods of layoff, employment roll or approved leaves of absence of two (2) weeks or more will extend the time for which the disciplinary action remains on the employee's record by the period of time the employee was off work.

(c)     An employee may review his departmental record at a time other than on his regularly scheduled shift or during his personal time on his regularly scheduled shift, provided he makes such a request to his supervisor in advance.

(d)     In addition, the employee may review his medical file under the same guidelines and may also review his personnel file or worker's compensation file with permission and advance notification of the Human Resource Manager.

15

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

**Section 1—Standard Work Day And Standard Work Week**

(a)     The standard work day shall be eight (8) consecutive hours in a twenty-four (24) hour period.   When practicable, the standard work week shall be five (5) consecutive work days starting on Monday. The work week and the timekeeping week shall begin with the starting hour of third shift (11:00 p.m.) on Sunday night. Exceptions may be made in case of emergency, such as machinery breakdown, fire, or when necessary to fill orders within a specified time or to adjust production schedules.   Whenever possible advance notice shall be given the President of general changes from the current operating schedule.

(b)     The timekeeping day for computation of double-time pay for Sunday and triple-time pay for holiday work shall commence at 11:00 p.m. the day before and end at 11:00 p.m. on Sunday or holiday.

(c)     The standard work week will not apply to the Powerhouse employees.

(d)     Shifts other than those named above may be established if necessary, to meet production requirements. Exceptions necessary will be discussed with the Union before implementation.

**Section 2—Reporting Pay**

(a)     If an employee reports for work at the start of his regular shift or at a time appointed by his Supervisor without having previously been notified not to report and no work is made available to him, he shall be paid his rate of pay for his current Pay Grade for the full number of scheduled hours of the shift.  If other work is made available to him, he shall be paid his current hourly rate up to Pay Grade of job assigned, whichever is greater.

If an employee is sent home because of lack of work before he has completed the scheduled hours of the shift, he shall be paid what he earned plus his rate of pay for his current Pay Grade for the remaining scheduled hours of the shift.   If the Company offers the employee the choice of other work or going home and he elects to go home, he forfeits his rate of pay for his current Pay Grade for the remaining scheduled hours of the shift not worked.

Payment under the foregoing conditions will be made at time and a half if after 40 hours in any one pay period, at double time on Sundays, and triple time on holidays.

(b)     Notification not to report for work may be handled as follows:

(1)     Verbal instruction to the employee.

16

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

(2)     A notice posted on the department bulletin board with notification to the Department Steward, at least one hour prior to the end of the last shift scheduled for the employees involved.

(3)     Telephone notification to an employee prior to the time he normally leaves home for work.

(c)     An employee who does not have a current telephone number as required under Article XI, Section 5, listed with the Company will not be eligible for report to work pay. An employee with a telephone number listed but who cannot be reached by telephone will not be eligible for report to work pay.

(d)     Reporting pay will be paid in cases of general emergency shutdown of the plant caused by fire, flood, failure of power supply, or similar conditions beyond the control of the employer unless the employer notifies the employee not to report prior to the start of their scheduled shift. Notification will be made through the following radio stations in Freeport, Galena, Illinois and Monroe, Wisconsin:

> Freeport
> WFPS - 92.1 FM
> WFRL - 1570 AM
> WXXQ - 98.5 FM
>
> Galena
> WJOD - 107.5 FM
>
> Monroe
> WEKZ - 1260 AM/93.7 FM

**Section 3—Working Time**

(a)     Employees are not to enter their work area earlier than necessary to report at their regular places at their regular starting time. They shall not remain in their departments, after the close of their regular shift, except for periods of authorized overtime.

(b)     All employees are to work to the end of their shift, and those employees on continuous operations are to remain on their jobs until relieved at the end of their shifts. If an employee working on a continuous operation is not relieved by an employee scheduled to work the following shift, the Company will attempt to secure relief as soon as possible, or at a time mutually satisfactory. Except for short periods of time while relief is being secured on continuous operations, employees in the production departments will not be required to work more than eight (8) hours in a normal day.

# ARTICLE V - HOURS OF WORK AND REPORTING PAY

**Section 4—Distribution of Work**

(a)    Daily vacancies and other work may be filled with available labor on the shift on which the vacancy or other work occurs before employees from other shifts are offered the work on an overtime basis. Preference will be given to available labor in the classification, within the department, on the shift on which the vacancy or other work occurs; then, to other available labor within the department provided they are qualified, on the shift on which the vacancy or other work occurs.

Thereafter, vacancies and other work may be filled with any available labor on the shift on which the vacancy or other work occurs before employees from other shifts are offered the work on an overtime basis.

(b)    All regular time (less than the standard work week), overtime, double-time and triple-time shall be distributed as follows:

    (1)    When less than a full number of employees are needed in a classification for a portion of a shift and no other work is assigned, the employees whose unit or operation is shut down will be short-shifted.

        Employees will be offered the opportunity to be short-shifted on a seniority basis or forced to be short-shifted in reverse seniority order, provided that it makes no difference from a production standpoint which particular unit or operation is shut down. The result of following this procedure will not require significant reassignment of employees to the remaining operating units or operations.

    (2)    When less than a full number of employees are needed in a classification for a full shift during the standard work week, the work will be offered by seniority in the order of preference listed below:

        1.    In classification on shift
        2.    In classification off shift
        3.    Qualified out of classification on shift
        4.    Qualified out of classification off shift
        5.    Qualified out of department on shift
        6.    Qualified out of department off shift

If an insufficient number of volunteers is obtained, the remaining need will be filled by scheduling (forcing) employees in reverse seniority in the following order:

        1.    In classification on shift
        2.    Qualified out-of-classification on shift in department
        3.    Qualified out-of-classification on shift out of department

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

Employees may sign Short Work Week Sign-up Sheets in classifications other than their own. Employees must be qualified in the classifications they express desire for work.

(c)    A sign-up system for all daily overtime work will be utilized as follows:

A computerized sign-up system will be utilized in the department for the first three (3) hours of each shift. An employee wishing to work daily overtime may sign up to work any of the three (3) shifts listed. The employee is to indicate willingness to work either four (4) or eight (8) hours of overtime. Supervisor will then schedule the qualified employees who have volunteered to work by seniority in the following order of preference:

(1)    To senior, low-houred employee in classification on retiring shift, four (4) hours or eight (8) hours, as appropriate.

(2)    To senior, low-houred employee in classification on oncoming shift, four (4) hours or eight (8) hours, as appropriate.

(3)    To qualified employees out of classification, on the retiring or oncoming shift, four (4) hours or eight (8) hours, as appropriate.

(d)    A computerized sign-up system for all Saturday work will be utilized as follows: During the first three days of the standard work week, a sign-up system for possible Saturday work in specified classifications shall be available in the departments.

An employee wishing to work Saturday may sign up to work any of the three (3) shifts listed. The employee may also indicate willingness to work four (4), eight (8), twelve (12) or sixteen (16) hour periods.

Supervision will then schedule the qualified employees who have volunteered to work by seniority in the following order of preference:

Qualified employees in classification, on shift.
Qualified employees in classification, off shift.
Qualified employees out of classification, on shift, in department.
Qualified employees out of classification, off shift, in department.
Qualified employees out of classification, on shift, out of department.
Qualified employees out of classification, off shift, out of department.

Employees will not be scheduled off shift or out of classification if their seniority is such that they would be forced to work in their regular classification and on their own shift. If the number of employees who signed up is insufficient to accomplish the necessary work, the least senior employees in the classification will be scheduled to work by shift. Twelve (12) or sixteen (16) hour periods will not be awarded to signers until other signers have been offered work, however in

19

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

classification employees are still to be awarded work before out of classification employees are awarded work.

Efforts will be made to fully utilize such eligible signees before forcing employees to work on a Saturday, particularly considering work assignments not relating directly to the production process.

When it is previously believed that no Saturday production will be scheduled in a classification and such plan is changed during a Friday work shift, the Company will utilize the Saturday sign-up sheets to obtain necessary labor to perform the scheduled work only if a minimum of four hours of Saturday work is scheduled in the classification, and only if the Company has, by 11:00 a.m. Friday, notification from Production Control that such scheduling is required. In the event of reported absences, more than four hours before the start of the Saturday shift, the next senior employee eligible to work on the sign-up sheet is to be contacted. If the absence becomes known less than four hours before the shift starting time, the work is to be offered to the senior in-classification employee immediately available that is working.

    (1)    In the event it becomes necessary, after the Saturday shift has started to short-shift employees; the offered opportunity will be by classification to the senior employee in the following order:

        (a)    Senior in-classification employee
        (b)    Senior in-department employee working out-of-classification
        (c)    Senior out-of-department employee

(e)    A computerized sign-up system for all Sunday and Holiday work will be utilized as follows:  During the first three (3) days of the standard work week, a sign-up system for possible Sunday work in specified classifications shall be available  in the departments.  Similarly for Holidays, during three (3) days of a standard work week beginning five (5) working days prior to the Holiday, a sign-up system will be available.  This system will be by specified classifications within each department.  An employee wishing to work Sunday or on a holiday may sign up to work any of the three (3) shifts listed.  The employee may also indicate a willingness to work four (4), eight (8), twelve (12) or sixteen (16) hours on the subject Sunday or holiday.  Employees requesting work will be scheduled as follows:

    (1)    To low hour employee in classification or if the hours are equal to the senior employee, eight (8) hours.

    (2)    To the senior low hour employee in classification, four (4) hours if a matching four (4) hour signer is available.

**ARTICLE V - HOURS OF WORK AND REPORTING PAY**

(3)     To the senior qualified employees out of classification, except in maintenance, where apprentices of the classification will be offered work opportunities before going to qualified employees out of classification.

In the application of the foregoing paragraph, with reference to the maintenance department only, no in-classification employee will be allowed to work the second eight (8) hours until the apprentice of the classification has had an opportunity to work eight (8) hours. Further, preferred shift assignments will be given to the in-classification employee prior to making assignments to the apprentice.

An employee offered work will not be bumped from his regular shift by an employee from another shift. An employee is not considered to have been offered work until such time as he would have been eligible for the work on the basis of the hours of work chart and seniority.

Hours will be charged to those accepting work and to those who refused work made available to them and hours not able to work because of previous hours worked. If the desired number of employees is not obtained in a classification to complete the work, only those employees who refuse work made available will be charged.

(1)     In the event it becomes necessary, after the Sunday shift has started to short-shift employees; the offered opportunity will be by classification to the senior employee in the following order:

   (a)     Senior in-classification employee
   (b)     Senior in-department employee working out-of classification
   (c)     Senior out-of-department employee

(f)     Hours of work charts will be maintained in the department or on the computer for all classifications, until such a time that it is no longer viable to maintain charts on the computer. All hours will revert to zero the first Monday of January. When an employee is transferred or hired into a classification or permanently moves to another shift in the same classification, he shall be assigned the number of hours equal to the highest in the classification on the shift to which he is assigned.

(g)     When practicable all out-of-classification overtime hours will be first offered to in-department employees before offering such hours to out-of-department employees.

(h)     Notwithstanding the provisions of sub-paragraphs (d) and (e) of this section 4, shut-down and start-up hours of two (2) hours or less in production and three (3) hours or less in engineering maintenance or the Stores Attendant classification will be offered to the employees within the classification on the adjacent shift.

(1)     The adjacent shift will be defined as those in-class employees assigned to the adjacent shift.

21

## ARTICLE V - HOURS OF WORK AND REPORTING PAY

    (2)    If the assignments are not filled, those vacancies will be offered to the senior in-class employees working.

    (3)    Out-of-classification most senior qualified employee assigned on the adjacent shift.

    (4)    Senior in-class employees, off-shift.

The distribution of start-up and shutdown work for in-classification is a rotation by seniority. The rotation will start over with the most senior employee the first Monday of the year.

(i)    In the event errors occur in the scheduling of work, and the errors are promptly reported and can be corrected, such errors will be corrected at the first opportunity.

(j)    No employee shall work in excess of sixteen (16) hours in a twenty-four (24) hour period, except in an emergency.

# ARTICLE VI - GENERAL WAGE PROVISIONS

# ARTICLE VI - GENERAL WAGE PROVISIONS

**Section 1—Holiday Pay**
The following days will be recognized as holidays under this Agreement:

> New Year's Day
> Easter Day
> Memorial Day
> Independence Day
> Labor Day
> Thanksgiving Day
> Day After Thanksgiving
> Christmas Eve
> Christmas Day
> New Year's Eve

Optional Holiday to be determined by local Agreement.

The above holidays may be changed to other days by mutual agreement. Holidays will be scheduled to minimize plant shutdowns. All schedules will be posted, denoting the beginning and ending of each holiday.

The following days shall be considered holidays:

| 2006 | Day | Date |
|---|---|---|
| New Year's Day | Monday | January 2 |
| Good Friday | 1st & 2nd shift  Friday | April 14 |
| Easter | 3rd shift Monday | April 17 |
| Memorial Day | Monday | May 29 |
| Independence Day | 1st & 2nd shift Tuesday | July 4 |
|  | 3rd shift Wednesday | July 5 |
| Optional | Friday | September 1 |
| Labor Day | Monday | September 4 |
| Thanksgiving | Thursday | November 23 |
| Day After Thanksgiving | Friday | November 24 |
| Christmas Day | Monday | December 25 |
| Day After Christmas | Tuesday | December 26 |
| **2007** |  |  |
| New Year's Day | Monday | January 1 |
| Day After New Year's | Tuesday | January 2 |
| Good Friday | Friday 1st & 2nd Shifts | April 6 |
| Easter | Monday 3rd Shift | April 9 |
| Memorial Day | Monday | May 28 |
| Independence Day | Wednesday | July 4 |

23

## ARTICLE VI - GENERAL WAGE PROVISIONS

| Optional Day | Friday | August 31 |
| Labor Day | Monday | September 3 |
| Thanksgiving Day | Thursday | November 22 |
| Day After Thanksgiving | Friday | November 23 |
| Christmas Eve | Monday | December 24 |
| Christmas Day | Tuesday | December 25 |
| New Year's Eve | Monday | December 31 |

**2008**

| New Year's Day | Tuesday | January 1 |
| Good Friday | Friday 1st & 2nd Shifts | March 21 |
| Easter | Monday, 3rd Shift | March 24 |
| Memorial Day | Monday | May 26 |
| Independence Day | Friday | July 4 |
| Optional | Friday | August 29 |
| Labor Day | Monday | September 1 |
| Thanksgiving Day | Thursday | November 27 |
| Day After Thanksgiving | Friday | November 28 |
| Christmas Eve | Wednesday 1st & 2nd Shifts | December 24 |
| Christmas Day* | Thursday | December 25 |
| | Friday 3rd Shift | December 26 |
| New Year's Eve* | Wednesday | December 31 |

**2009**

| New Year's Day | Thursday | January 1 |
| Good Friday | Friday 1st & 2nd Shift | April 10 |
| Easter | Monday 3rd Shift | April 13 |
| Memorial Day | Monday | May 25 |
| Independence Day | Friday | July 3 |
| Optional Day | Friday | September 4 |
| Labor Day | Monday | September 7 |
| Thanksgiving Day | Thursday | November 26 |
| Day After Thanksgiving | Friday | November 27 |
| Christmas Eve | Thursday | December 24 |
| Christmas Day | Friday | December 25 |
| New Year's Eve | Thursday | December 31 |

**2010**

| New Year's Day | Friday | January 1 |
| Good Friday | Friday 1st & 2nd Shifts | April 2 |
| Easter | Monday 3rd Shift | April 5 |
| Memorial Day | Monday | May 31 |
| Independence Day | Monday | July 5 |
| Optional Holiday | Friday | September 3 |
| Labor Day | Monday | September 6 |

24

# ARTICLE VI - GENERAL WAGE PROVISIONS

*In the event the Company declares a shutdown for December of 2008 the following changes shall occur. First, there will be no "split" Christmas Holiday and New Year's Eve shall be celebrated on January 2, 2009.

Wage payment for employees reporting early for startup on a split holiday, and only when the work period is in two different pay periods, will be paid consistent with the first sentence of Article VI, Section 3 (a).

The Company will pay at straight time to each hourly employee who does not perform work for the Company on such holiday an amount equivalent to the employee's standard work day multiplied by his current hourly rate, plus the night shift differential to which his scheduled shift of such week would entitle him, subject to the following conditions:

(1)    (a)    When one or more of the above holidays falls within the period an employee is on vacation, and he is absent from work because of such vacation, the employee will be paid for such holidays.

        (b)    An employee who is not actively at work when a holiday occurs, will be paid the difference between holiday pay as stated in this paragraph and any Federal, State, or Company compensation he receives for such day, subject to the following conditions:

            1)    Employees who leave work pursuant to an approved leave of absence during the week in which a holiday falls, or in the week previous to it or return to work after such leave during the week a holiday falls or in the succeeding week, shall be paid for such holiday.

            2)    Employees who leave work pursuant to an approved sick leave or a leave of absence for disability due to pregnancy, or who leave the employment of the Company to enter the Armed Forces up to thirty (30) calendar days prior to a holiday, or who return to work after an approved sick leave, or a leave of absence for disability due to pregnancy, or are reinstated from the Armed Forces within thirty (30) calendar days of a holiday, shall be paid for such holiday.

            3)    Employees who leave-work pursuant to absence because of an occupational injury or an occupational illness up to thirty (30) calendar days prior to a holiday, or who return to work within thirty (30) calendar days of a holiday, shall be paid for such holiday.

            4)    Employees who are laid off within fourteen (14) calendar days prior to a holiday shall be paid for such holiday. Employees who are recalled and return to work in a work week in which a holiday falls, or within fourteen (14) calendar days after the holiday, shall be paid for such holiday.

## ARTICLE VI - GENERAL WAGE PROVISIONS

(2)    An employee shall not be eligible for such payment if on his last regularly scheduled shift prior to or first regularly scheduled shift after such holiday, he is absent from work without being previously excused by his Supervisor or without presenting evidence that his absence was justified and reasonable. In the event of two consecutive holidays, an employee shall not be eligible for pay for the first of the two holidays if he is absent from work on his last regularly scheduled shift prior to the holidays or shall not be eligible for pay for the second holiday if he is absent on his first regularly scheduled shift after the second holiday without being previously excused by his Supervisor or without presenting evidence that his absence was justified and reasonable. The restrictions in this paragraph do not apply in respect to Paragraph 1. (a) and (b) above except when the holiday falls on the first or last normal working day of the period during which the vacation falls, or the first day of leave or layoff. As used in this paragraph, "absent from work" is defined as being absent for all or any part of the shift.

(3)    Employees who would not otherwise be scheduled to work on the day a holiday falls will be paid for such holiday subject to the other provisions contained in this article.

(4)    (a)    Employees who are working on jobs which by the nature thereof must be continued in operation on a seven (7) day basis, and employees who rotate thereon, shall be paid holiday pay if the holiday falls on their regularly scheduled day off. If such employees are scheduled to work on a holiday and absent themselves from scheduled work, they shall not receive holiday pay unless their absence was justified and reasonable.

(b)    When maintenance work essential to the continued operation of the plant must be done while the plant is not in operation, and such maintenance work is scheduled for a holiday, then holiday pay will not be paid employees who refuse to work on such holiday when requested to do so, unless the refusal to work is justified and reasonable.

In application of this paragraph, if such work is necessary, at least three days' notice will be given maintenance employees, except in cases of emergency. When less than the full number of employees in a classification are needed, qualified employees in the classification will be scheduled for the work utilizing the overtime holiday sign up system. If this does not produce the number of employees needed, the least senior employee in the classification needed will be required to work.

(c)    Any employees who accept work assignments on a holiday and/or the day preceding or following the holiday and who absent themselves on any of these days will not be eligible for any payment for the holiday unless the absence was justified and reasonable.

# ARTICLE VI - GENERAL WAGE PROVISIONS

(d)    In no event shall premium or overtime pay apply to holiday hours paid for but not worked.

(e)    An employee who is eligible to receive holiday pay and who is required to serve on a municipal, county or federal jury, or grand jury, on such holiday will not have jury duty pay deducted from his holiday pay.

However, such employee may elect to defer the time off for the holiday(s) until his first scheduled shift(s) immediately following the jury duty provided he notifies his Supervisor of his desire to do so in sufficient time for the Supervisor to secure a replacement.

(f)    When a holiday falls on a Friday, the following Saturday shall not be considered a regularly scheduled work day.  When a holiday falls on a Monday, the preceding Saturday shall not be considered a regularly schedule work day.  This provision does not apply to employees who accept work assignments on a Saturday following a Friday holiday or on a Saturday preceding a Monday holiday.  This provision does not apply to operations which are normally scheduled on a seven-day basis.

(g)    When an employee works overtime on a holiday for the purpose of closing down or starting up an operation, he shall be paid at the rate of triple-time, and such time, up to a maximum of four (4) hours, shall not be deducted from the holiday pay herein provided.  All other time paid for at the rate of triple-time shall be deducted from the hours on which such holiday pay is based.

(5)    Probationary employees will not be eligible for holiday pay for any holiday(s) falling within the first 30 calendar days of their employment.

(6)    Employees participating in the plant's Summer Work Program in Department 057 will not be eligible for holiday pay during their first year of employment.

## Section 2—Premium Pay

All work performed on Sundays shall be compensated at the rate of double time.  All work performed on holidays shall be compensated at the rate of triple time.  In no event shall time and one half be paid in addition to double time or triple time.

## Section 3—Overtime Pay

(a)    Time worked in excess of eight (8) hours in any twenty-four (24) hour period or in excess of forty (40) hours in any one pay period week will be compensated at the rate of time and one half.  Overtime hours paid on a daily basis shall not be included in paying for overtime on a weekly basis.  All time worked (whether at straight time, double time, or at triple time), and time paid for, exclusive of the no-

## ARTICLE VI - GENERAL WAGE PROVISIONS

strike clause of this Agreement, shall be credited as hours worked for the purpose of computing overtime pay. The term "all time worked" shall include time paid for in taking a scheduled vacation. Also included in the term "all time worked" for the above purposes:

(1)     Scheduled hours lost by employees while serving on a jury and for which the Company pays in accordance with Article VII, Section 16.

(2)     Scheduled hours lost by employees due to being subpoenaed, except when the employee is a plaintiff or a defendant or in any case involving the Company or the Employer.

(3)     Scheduled hours lost by employee for funeral leave and for which the Company pays in accordance with Article VII, Section 18.

(4)     Paid holiday hours falling within the standard work week, but not worked.

(5)     Scheduled hours lost by employee for which the Union pays. The Union will provide the Company advance notice in writing, the names, plus the dates and hours paid for by the Union as situations arise.

(6)     Scheduled hours lost by employee due to an injury caused in the plant covered by Worker's Compensation.

(7)     Scheduled hours lost as a result of an employee returning from lay-off will be credited toward the computation of weekly overtime payment.

(b)     An employee reporting for work and being required to work a portion of his scheduled shift, if then sent home through no fault of his own, except in case of labor disturbance as provided in Article II, or except conditions beyond the control of the Company such as fire, flood, severe weather conditions, or failure of power supply, shall receive credit for the number of hours scheduled for the shift toward the computation of weekly overtime hours.

(c)     Hours of the regularly scheduled work shift not made available during the first five (5) days of the week shall be considered as hours worked for the purpose of computing weekly overtime payment. Hours not available to employees because of a violation of Article II, Section 4, will not be considered as hours worked for such purpose.

# ARTICLE VII - WAGE APPLICATION

# ARTICLE VII - WAGE APPLICATION

**Section 1**

(a)     In the establishment of a pay rate for any new or combined job, such pay rate shall be arrived at by the use of standard job evaluation practice. A copy of the job evaluation plan shall be furnished the Local Union by the Company.

(b)     Rates of pay shall be established in accordance with paragraph (a) and shall be calculated on a full work load even though it is known at the time of establishment that a full work load cannot be assigned at that time. In the event it may be necessary to establish a rate of pay before the job is fully developed, the rate of pay shall be established on the proper evaluation of job content or job requirements as contemplated in the permanent job insofar as can be foreseen at the time such rate of pay is being calculated.

(c)     Any items of job content or job requirements considered in the rate of pay calculation shall be fully described in the job evaluation record regardless of whether or not such work is being performed at the time.

(d)     In the event such items are included and given proper weight in the rate of pay calculation before they actually appear in the actual performance of the job, the subsequent appearance of such items in the work requirements of the job shall not form the basis for an increase in the rate of pay.

(e)     When job evaluations have been completed, the representative designated and maintained on file with the Company by the Local Union, shall be advised as to what the rate of pay will be as far in advance as possible, but not less than one day before they are to be come effective, excluding Saturdays, Sundays, or holidays, unless a shorter time is mutually agreed to. The Company will make available to the representative for his inspection, complete data showing the basis upon which the rate of pay was determined.

(f)     The Company will give advance notice of at least three (3) days to the Union of any changes in performance expectations and would review the data supporting such changes with the Union Time Study representative prior to implementation of the proposed change.

(g)     Nothing in this Agreement shall be so interpreted as to require employees to perform work loads that are not fair and reasonable.

**Section 2**

(a)     Pay Grade as used in this Agreement refers to the hourly rate established on the standard job evaluation procedure.

# ARTICLE VII - WAGE APPLICATION

(b)   Experienced Employee refers to an employee who is permanently assigned on an operation and is qualified to do the job and has demonstrated ability to perform the work satisfactorily.

(c)   Learning time established for each job classification indicates the maximum number of working days a newly hired employee may require to attain a satisfactory performance on the assigned job. An employee may be removed from the assignment before the expiration of the maximum learning time if satisfactory progress is not shown. The learning time may be extended by the Area Manager or the equivalent if in his opinion, an extension is justified.

(d)   Learning time is defined as the maximum time period outlined on the Pay Grade sheets.

(e)   Hourly rates, for machine operations and non-equipment operations are established on the basis that employees are required to work to the end of their shift, excluding normal lunch and personal breaks at a fair and reasonable pace.

(f)   Short Work Week Average Hourly Earnings, for calculation of SUB benefits as provided in Article II, Section 1 and 2 of the SUB Agreement, will be Pay Grade for the classifications.

**Section 3**

For employees hired before January 1, 2006 who transfer from one classification to another classification, the employee will be paid their current hourly rate up to 90 percent of the Pay Grade of the job transferred to unless the employee has maintained that classification on his qualified list which would allow transfer at the rate of the new Pay Grade. The employee's rate of pay will be increased up to the Pay Grade of the job at the rate of at least twenty cents per hour per week provided the employee worked at least three (3) days in the preceding week. The Employee's rate of pay may be advanced more than learners scale provided their proficiency warrants it.

For Employees hired after January 1, 2006 who transfer from one classification to another classification, the employee will be paid the rate of pay of the job transferred to at the rate the employee's seniority entitles him to receive in Schedule B.

For employees hired before January 1, 2006 who are involuntarily transferred to a lower paid classification, the employee will continue to receive the Pay Grade of the higher classification until the employee transfers to a different classification as a result of a voluntary bid. Once the employee transfers to a different classification as a result of a voluntary bid, the employee will receive the Pay Grade of the classification to which the employee bids.

30

# ARTICLE VII - WAGE APPLICATION

**Section 4**

(a)     When an experienced employee is temporarily assigned to a job in another classification the employee will be paid the Pay Grade of his regular assigned job, or the Pay Grade of the job to which assigned, whichever is greater.

     (1)     Employees temporarily assigned to another job for the purpose of lunch or personal relief will be paid in accordance with the above.

     (2)     Employees temporarily assigned to write Objective Based Training Programs will be paid the rate of the Training Center Labor Trainer or their hourly Pay Grade, whichever is greater.

**Section 5**

If an employee is given extra work over and above his regular eight-hour day or regular weekly departmental schedule on a job other than his regular job, he shall be paid the Pay Grade of the assigned job.

**Section 6**

(a)     When an employee is assigned to a job for the purpose of taking inventory, he will be paid the Pay Grade of Production Service. Employees assigned to trucking during inventory will be paid the rate of the job assigned.

(b)     When an employee is assigned to paint with a spray gun, he will be paid the Pay Grade of the Painter for the period of time assigned.

(c)     When employees are assigned to work with Squad trainees, they will be paid labor trainer rate if higher than their own.

**Section 7**

(a)     All production employees hired after January 1. 2006 shall receive the rates of pay as described in Schedule B.

     (1)     For Grades 1 & 2, there will be a 30 month progression with $.50 increases at 12 months and 18 months with the final increase of $.50 at 30 months.

     (2)     For Grades 3 & 4, the starting rate will be 70% of the maximum rate and shall be increased over a 5 year progression in accordance with the percentages in Schedule B.

     (3)     For Grade 5 positions (other than electricians and powerhouse employees) the starting rate will be 85% of the maximum rate and will be increased in accordance with the percentages in Schedule B.

31

# ARTICLE VII - WAGE APPLICATION

If an employee transfers during their first five years on the active payroll, they will be paid the rate of pay their seniority entitles them to receive in the classification to which they transfer.

(b)     The hiring and work rate for summer vacation relief help will be capped at the New Hire Grade 1 Rate for the life of this Agreement.

## Section 8
The probationary period for all new employees shall be 60 days worked.

## Section 9
A night shift differential of $.300 will be paid for all hours worked between 3:00 p.m. and 7:00 am.

## Section 10
(a)     Employees will be allowed twenty (20) minutes for lunch and will be paid their current hourly rate for this time.

     (1)     Employee works less than his scheduled eight (8) hour shift. Allowance or payment for lunch period will be made only if the employee works in excess of four (4) hours on his regularly scheduled shift.

     (2)     Employees working on overtime must work in excess of four (4) hours before being eligible for a lunch payment or allowance.

(b)     Two 10-minute break periods will be scheduled for employees working a scheduled eight (8) hour shift on non-continuous operations, provided such schedule does not hinder production.

(c)     Employees assigned overtime (two hours or more) will be allowed ten minutes personal time immediately prior to the start of the next scheduled shift.

## Section 11
(a)     A carbon black premium wage payment of $2.00 will be paid for each day applicable as provided in this section.

(b)     The premium pay will be paid one time per day to eligible employees, except when employees leave the plant and return in any twenty-four (24) hour period.  At no time will premium pay be made for consecutive hours worked on adjacent shifts.

(c)     Employees Eligible:

# ARTICLE VII - WAGE APPLICATION

Department 320 - Banburys
1.        All department 320 employees.

Department 119 - Maintenance
1.        Maintenance employees, assigned by supervision and working:

(a)    On a breakdown in the black system.
(b)    On the main body of the Banbury (mezzanine floor).

(c)    On repairing Banbury automatic oil system on the
       platform above the mezzanine floor.
(d)    On replacing or repairing the complete pellet system.
(e)    On repairing fork trucks assigned to Departments 320 and
       200 and floor sweepers used in Departments 320 and 200.
(f)    On loading, hauling and unloading carbon black at the
       disposal site behind the plant.
(g)    On changing bags in Dept. 320 dust collectors.

Department 200 - Receiving
1.        Receiving employees, assigned by supervision, and performing the
          operation of:

(a)    Connecting or disconnecting "boots" on carbon black cars.
(b)    Unloading and transporting bag black from boxcars or trailers.
(c)    Waste and scrap handling.

## Section 12

(a)    Employees injured in the factory, or who suffer from occupational illness, during
       their work shift and report the fact at the time of its occurrence and are
       subsequently treated in the dispensary, doctor's office, or hospital and sent home,
       shall be paid their current hourly rate for the balance of the shift.  However, it is
       recognized in some instances the employee may not be sent home on the day of the
       injury, but on a subsequent day to be treated in the dispensary, doctor's office, or
       hospital and sent home, in which case he shall be paid in the same manner specified
       above.  In no event shall an employee be paid for hours not worked on two (2)
       different days for the same injury.

       If employees return to work on the same shift after being treated in the dispensary,
       doctor's office, or hospital and are unable to work on their regular operation they
       shall receive their current hourly rate for the balance of the shift.

       The above provisions of this item (a) are likewise applicable to the first day of an
       employee's return to work from absence of a week or more due to an injury in the
       factory or to occupational illness.

33

# ARTICLE VII - WAGE APPLICATION

Employees injured in the factory or who suffer from occupational illness and who are required to spend time receiving medical treatment furnished them by the Company, shall be paid their current hourly rate for the time they must lose from their regular shift for such treatment. If the attending physician certifies that such treatment must be scheduled prior to the employee's regularly scheduled shift and that the treatment caused the employee to lose time from that shift he shall be paid for the time lost from that shift. The provisions of this paragraph also apply to an employee who must lose time from his regular shift because of a medical examination for purposes of a Worker's Compensation evaluation requested by the Company. If the employee is eligible for compensation for that day under either State Worker's Compensation law or the Supplemental Worker's Compensation Section of the Current Benefits Agreement such compensation will be deducted from the payment for time lost.

Employees who, at the request of the Company, are required to receive such medical treatment in Chicago, Illinois (or any other location of comparable distance from Freeport) will be compensated for up to eight (8) hours upon presenting adequate certification of the time and date that the treatment was given. It is understood that this paragraph merely establishes guidelines for wage payment and any exceptions to this guideline will be judged on an individual care basis.

Payment for time under this item (a) will be made at time and one-half when it occurs after forty (40) hours in any one pay period week, at double time on Sundays, and triple time on holidays.

(b)     Employees who are treated in the dispensary, doctor's office, or hospital for an injury in the factory, and return to work, shall be paid their current hourly rate for the time involved.

(c)     Employees who become ill (non-occupational) in the factory and are sent home will be paid their actual earnings for the time worked only.

(d)     An employee temporarily assigned other work as the result of the Medical Department's recommendation following an occupational injury or illness will be paid their current hourly rate for the balance of such assignment. In making such assignments, consideration will be given to preventing further aggravation of the injury or illness.

(e)     An employee temporarily assigned other work as the result of the Medical Department's recommendation following a non-occupational injury or illness will be paid his current hourly rate up to 90 percent of his Pay Grade for the duration of such assignment.

**Section 13**

# ARTICLE VII - WAGE APPLICATION

Employees who are requested by the Company to attend meetings during working hours will be paid their current hourly rate for the time lost during their regular shift.

**Section 14**
An employee called in for work shall be guaranteed four (4) hours of work at his current hourly rate up to his Pay Grade. This provision shall not apply when the work is performed in continuity at either end of employee's regular shift.

**Section 15**
In the event of a violation of Article II, Section 4 of this Agreement, which adversely affects the earnings of other employees, the Company will not be required to pay minimum wage guarantees, hourly rate guarantees, and bonus payments.

**Section 16**
(a)    An employee with thirty (30) days' service who is required to serve on a municipal, county, or federal jury or grand jury, shall be paid the difference between the amount paid for such service and his current hourly rate for each day lost from his regularly scheduled work shift by reason of such service, subject to the following provisions:

(1)    Employees must notify their Supervisor within twenty-four (24) hours after receipt of notice of selection for jury duty.

(2)    In order to be properly paid for jury duty, employees must obtain a jury duty form from the Human Resources Department and have it completed and signed by the appropriate court official of the days and times of duty, the hours of release, and the amount of pay received. This form must be turned in to the Human Resources Department at the end of each week.

(3)    An employee on vacation who is required to serve on jury duty may extend that vacation period by the number of days he is required to serve during such vacation period provided he notifies his Supervisor in sufficient time for the Supervisor to secure a replacement.

**Section 17**
An employee with thirty (30) days' service, who is a member of the National Guard or the reserve component of the Armed Forces, who is required to enter upon active annual training duty, temporary special service, or weekend training shall be paid the difference between the amount of pay he received from the Federal or State Government for such duty and normal weekly earnings calculated on the basis of his current hourly rate multiplied by the number of his regularly scheduled hours per day (based upon not more than six (6) days per week) for the time lost while on such duty, up to a maximum of 160 hours per year.

# ARTICLE VII - WAGE APPLICATION

Such items as subsistence, rental, and travel allowance shall not be included in determining pay received from the government. In order to receive military make-up pay, the employee must obtain a form from the Human Resources Department. This form must be properly completed and returned to the Human Resources Department after the employee completes his military training.

## Section 18

(a)    An employee with thirty (30) days' service, who suffers a death in the immediate family shall be entitled to funeral pay in accordance with the following:

If an employee is absent from work because of the death of their spouse, parent, child, dependent residing in household, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother, sister, brother-in-law, sister-in-law, grandchild, grandparent, great-grandchild, great-grandparents, or the grandparents or great-grandparents of the spouse, they shall be paid at their current hourly rate plus night shift differential for the time lost from their regularly scheduled work shift (including accepted shifts of Sunday work which will be paid on a straight-time basis) by reason of such absence during a period of three (3) consecutive working days, one of which is the day of the funeral. The employee may elect to take three (3) consecutive calendar days, for up to a total of twenty-four (24) regularly scheduled hours, one of which is the day of the funeral as their funeral leave. The above categories of relatives include step-relatives, half-relatives, and legally adopted children. In the event of delayed notice of death of a relative named above, the funeral leave will be the next three (3) consecutive work or calendar days from date of notice.

(b)    In the application of this clause with respect to in-laws, payment for any such relationship will be limited to those resulting from the employee's current marital status. Where a marriage has been terminated and there has been no subsequent remarriage, the in-law relationship will be recognized.

(c)    In the event an employee is on vacation and it becomes necessary for them to attend the funeral of a relative as provided under Funeral Leave Pay, their vacation scheduled shall be extended by the number of days they are eligible for payment under said provision, provided they notify their Supervisor promptly of the funeral and in sufficient time for the Supervisor to secure a replacement. In the application of this paragraph an employee will be considered to be on vacation at the completion of their last scheduled shift prior to the beginning of their vacation.

## Section 19

(a)    An employee who is a designated Union representative shall be compensated at his current hourly rate for time lost from his regular shift as a result of attending scheduled grievance meetings with the Company. The maximum number of hours

## ARTICLE VII - WAGE APPLICATION

to be paid by the Company as provided in this paragraph shall be determined for each week on the basis of fifteen (15) hours per week for one hundred (100) employees. The number of employees in the computation shall be the number of employees on the active payroll in the bargaining unit and the number of employees on sick leave or leave of absence not included on the active payroll, in the first full week of the month, rounded to the next even hundred. If the total number of hours paid by the Company in a week is less than the maximum, the remaining hours shall be added to the maximum number of hours computed for the following week.

(b)     The Union President will be furnished a monthly summarization of all hours paid by the Company under this Section.

**Section 20**
The Company agrees to pay twenty-five (25) cents per hour to employees for time worked on the carbon black tower, outside oil storage tanks or outside conveyors at a height of twenty-five (25) feet or more above ground or roof level.

**Section 21**
Wages shall be paid weekly by check or by direct deposit into the financial institution of the employee's choice. Checks or direct deposit receipts shall be delivered to employees in their respective departments by the end of their shift on pay day. Second shift employees shall be paid on Thursday. First and third shift employees shall be paid on Friday. In the event that a contractual absence falls on payday the check or direct deposit receipt shall be delivered to the employee on the last scheduled workday for that week, if available.

To the extent practical, the final paycheck each year includes year-end totals for all deductions. It is understood that this may not be possible in all cases due to the amount of space on the checks and the number of deductions.

# ARTICLE VIII - SENIORITY

## ARTICLE VIII - SENIORITY

### Section 1—Definition

(a)     Seniority is preference or priority by length of service with definite rights qualifying employees for employment when work is available. The purpose of seniority is to provide a declared policy of work security measured by length of service.   Seniority shall be based on continuous service with the Company compiled by time actually spent on the payroll, plus properly approved absences or time laid off as specified in the terms of this article.  For the purposes of this provision, "Company" shall mean time with Titan Tire Corporation of Freeport and its predecessor Kelly Springfield Tire Company.   Said time with the predecessor shall include any time accrued under the Collective Bargaining Agreement between Kelly Springfield and USW Local 745L dated April 7, 2004.

(b)     Reasons for termination of seniority include the following:

(1)     Resignation for any reason.
(2)     Discharge for cause.
(3)     Overstaying a leave of absence.
(4)     Failure to answer recall within specified time.
(5)     Accepting other employment while on leave of absence.

### Section 2—General Provisions

(a)     A new employee shall have no seniority status until he has completed a probationary period of sixty (60) days worked, after which his seniority dates from the date of hire. The Company will not be obligated to recall employees laid off before completing such probationary period, but if such employee is rehired within ninety (90) days from date of layoff, he shall be credited with service for the actual time spent on the payroll during such period. The date of hire is the date the employee is first scheduled to work.  Employees with identical service dates will use their age as the determining factor the older employee being considered the one with the most seniority. Employees with the same service dates and birth dates will be assigned seniority alphabetically according to their last name at date of hire. The Company shall be responsible for all seniority records.

(b)     An employee in a supervisory or other position, outside of the bargaining unit, who was once a member of the bargaining unit as defined, will have until January 1, 1993, to return to their previous bargaining unit position.  Employees returning under this provision will have seniority accumulated through September 21, 1985. After January 1, 1993, employees will only be permitted to return to the bargaining unit during periods of salary personnel reductions.  Those employees will retain their accumulated seniority through September 21, 1985.  If such employee does not have sufficient seniority to return to the last classification held in the bargaining

## ARTICLE VIII - SENIORITY

unit, they will bump into a job for which they can qualify by starting with the least senior employee in the plant.

Such employees will retain their company service for pension rights and vacation allotment purposes.

Restrictions imposed by this provision will not apply to a bargaining unit employee temporarily assigned to positions outside the bargaining unit for periods of ninety (90) cumulative days within a calendar year, effective January, 1999. Employees in salary positions who were members of the bargaining unit as defined may return to the bargaining unit because of a physical or mental condition certified, by a physician and approved by the Company and will exercise no seniority privileges.

In the event the Union challenges the validity of the condition of such an employee, the Company and the Union will select a physician who will examine the employee. The doctor's findings will decide the question. The expenses of such physician shall be borne jointly by the Company and the Union.

In no event shall a salary employee be permitted to return to the bargaining unit when hourly employees are on layoff; neither shall a salary employee be allowed to return to the bargaining unit as long as a salaried position exists compatible with the final physician's opinion.

(c)     An employee who leaves the employment of the Company to enter the Armed Forces, either by enlistment or draft under any existing Federal Legislation, or which may be passed, shall be reinstated upon application, provided he can qualify under the seniority rules, and further provided his discharge from the Armed Forces was other than dishonorable, and he applies for re-employment within ninety (90) days thereafter, and further provided that the employee is physically capable of performing the work required. The Company will make every effort to place employees who may become handicapped during such service. Seniority will accumulate during the full period of the employee's initial enlistment only.

(d)     An employee who leaves the employment of the Company as the result of being elected or appointed to public office shall be reinstated upon application provided he can qualify under the seniority rules, is physically capable of performing the work required, and applies for re-employment within thirty (30) days after the end of his tenure in such office.

The employee shall notify the Company in writing of his intention of accepting such office and shall inform the Company of his status. Such employee shall accumulate service not to exceed a total of two years for any or all such periods.

(e)     An employee who leaves the employment of the Company in order to attend an accredited college or university, or a recognized trade or vocational school shall be reinstated upon application, provided he can qualify under seniority rules, is

39

## ARTICLE VIII - SENIORITY

physically capable of performing the work required and applies for re-employment within thirty (30) days after leaving the college, university, or school. This eligibility for rehire can be made at any time but is limited to one (1) opportunity per employee unless he has returned to full time employment for a minimum period of two years. In no situation may an employee rehire under this provision more than twice. The only exception is granted for an employee returning as part of the Summer Work Program when this program is offered by the Company.

Trade or vocational school for purpose of this clause is one which provides training or a course of study related to jobs performed in the local plant. The employee, upon reinstatement, shall be given the service he had when he left the Company. The employee shall notify the Company in writing of the name of the school, the date of entry, and the expected length of the course of study. He shall confirm the continuation of his school attendance at annual intervals thereafter.

**Section 3—Leaves Of Absence**
(a)    Employees requesting leaves of absence for more than seven days shall make application in writing to their Area Manager or the equivalent on a form provided for that purpose.

(b)    Leaves of absence may be granted for personal reasons when justified, for a period not to exceed ninety (90) days, upon written application of the employee when the services of the employee are not immediately required, and there are employees available and capable of doing his work. Special consideration shall be given to the granting and duration of leaves occasioned by illness in an employee's immediate family. A copy of approved leaves of absence will be furnished the employee concerned at or before the time the leave is granted or extended.

To comply with the requirements of the Family and Medical Leave Act of 1993 (FMLA), it may be necessary to provide eligible employees up to and including twelve (12) work weeks of leave for the reasons outlined in the FMLA.

(c)    An employee who becomes ill or is injured and whose claim of illness or injury is supported by satisfactory evidence shall be granted a leave of absence to cover the period of such illness. Seniority will accumulate for the first two years of such leave.

In the event there is a disagreement between the Company's physician and the employee's physician regarding the medical evidence presented to support the employee's return to work, the question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician after examination of the employee and consultation with the other two physicians shall decide such question. The expenses of the third physician shall be borne jointly by the Company and the employee.

## ARTICLE VIII - SENIORITY

Employees drawing Worker's Compensation shall accumulate seniority during the period covered by compensation payments. If, at the end of such period, he is physically unable to return to work, he shall accumulate seniority for any additional period during which he shall furnish satisfactory evidence of continuing disability to the Company.

(d)     An employee who becomes disabled because of pregnancy and whose claim of disability is supported by satisfactory evidence shall be granted a leave of absence to cover the period of such disability. Seniority will accumulate for the first two (2) years of such leave.

In the event there is a disagreement between the Company's physician and the employee's physician regarding the medical evidence concerning the disability due to pregnancy, the question shall be submitted to a third physician selected by such two physicians. The medical opinion of the third physician after examination of the employee and consultation with the other two physicians shall decide such question. The expenses of the third physician shall be borne jointly by the Company and the employee.

An employee returning from such leave shall be granted the same privileges as provided in paragraph (i) of this section.

(e)     An employee elected, selected, or appointed for duty as an officer, representative or employee of the International Union or of the Local Union, or of the AFL-CIO as such, or for any State, County, City or Local Union Council of the AFL-CIO, or to an office in a Local Union cooperative enterprise serving Company employees, which assignment will take him from his employment with the Company, shall upon written request of the International Union or Local Union receive a leave of absence for the period of his service. If such service is for more than three years, the leave of absence must be renewed each three years. Seniority shall accumulate throughout the period of his leave of absence.

(f)     If the reasons and circumstances upon which an employee's leave of absence was granted change substantially while he is on leave, he must immediately report to the Company to be reinstated or to request continuation of his leave based on the changed conditions. If he fails to so report, or falsifies his report, his service with the Company may terminate.

(g)     Leaves of absence may be extended when requested, upon approval of the Company.

(h)     Seniority will accumulate for the duration of approved leaves of absence except as specifically limited in this section.

(i)     An employee returning from sick leave, leave of absence, or light duty shall be reinstated to the classification he had at time leave was granted, provided there are

# ARTICLE VIII - SENIORITY

employees working there with less seniority. If there are no employees with less seniority on such classification, or if the job has been eliminated, he shall be sent to the employment office and handled as permanent surplus labor.

## Section 4—Absences Without Leave

(a)    It is the duty of employees who are unable to work at their regularly assigned periods to report to the Company in advance. Such report is to be given to the employee's Supervisor, by telephone when possible, and should include the employee's department, clock card number, name, reason for absence, and probable return to work date. Whenever the employee's department is not working, such report is to be given to the Guard at the Gatehouse. Employees shall be furnished with cards identifying the number to call in the event they are unable to work their regularly assigned shift. Said cards shall also be available in the Personnel Department.

(b)    An employee who is absent for a period of five (5) working days or more, without notifying the Company and making arrangements for a sick leave or leave of absence, or who overstays such leave without arranging for an extension thereof, shall be considered as having resigned without notice, and his seniority will terminate. Such leaves may be arranged for by other means than written application.

An employee whose service is so terminated shall be reinstated only if he supplies evidence that his failure to comply with the terms of this provision was justified by reasonable excuse.

## Section 5—Shift Preference

(a)    The President, Vice-President, Local Union Time Study Engineer, and the Union Bargaining Committee shall hold top seniority rating during their terms of office for shift preference only.

When an employee no longer qualifies for top seniority as provided by this paragraph, he may return to the shift he would have acquired, had he not held top seniority. The Company will keep records which will indicate such appropriate shift.

An employee removed or withheld from their preferred shift as a result of top seniority will have the first opportunity to return or acquire to that shift once the top seniority individual leaves their union position or transfers to another job classification, provided the affected individual is still in that classification.

(b)    All other employees will remain on the shifts on which they are permanently assigned, subject to paragraph (a) above and (c), (d), (e), (f) below. As an exception, employees in the same classification may be permitted, with the

42

# ARTICLE VIII - SENIORITY

supervisor's approval, to temporarily trade shifts for a maximum period of time of two (2) weeks for personal reasons. This period may be extended for not more than 3 months, 1 semester or 1 quarter, whichever is shorter, for educational reasons or for 3 months for medical emergencies in support of immediate family. If the employee withdraws, drops or terminates the class or classes that justified the shift trade or if the medical emergency ends, the shift trade will be discontinued. When such shift trades are permitted, each of the two employees involved in the shift trade will assume the other's overtime hour's record, and continuous service date for scheduling and canvassing purposes only, for the duration of the trade. Shift trades will not be approved which circumvents shift preference.

    (1)    A one day shift trade on Saturday is permissible, provided that the trade does not generate additional cost and that both employees requesting the one day trade are in the same classification and both are scheduled in classification on the sixth day (Saturday).

(c)    An employee shall have shift preference when a permanent vacancy occurs on his next preferred shift within his classification according to his seniority. Each employee shall sign a shift preference card stating their first, second and third choices of shift preference. Such cards will be on file in each department office. Shift preference assignments will be made from these cards. It shall be the employee's responsibility to initiate any changes in his preferences.

When jobs are posted in accordance with Section 6 of this Article, the posting will designate the shift on which the vacancy will occur. Changes in shift preference cards will be honored until the time of posting. If the job is not filled as a result of that posting, or when it is not necessary to post a job, changes in shift preference cards will be recognized and honored for a particular vacancy up to the time that the Employment Department has made a commitment to a person to fill a vacancy, either to a new hire or to an employee being offered a job outside the bidding procedure.

An employee awarded a job and awaiting physical transfer will be considered for shift preference according to his seniority on any subsequent vacancies within the classification based on his shift preference card.

Shift moves will be made on the first scheduled work day in the week following the week in which the replacement has completed his learning time.

(d)    An employee transferring from one classification to another classification shall be placed on the shift vacancy remaining after employees on the job, or employee's physically awaiting transfer as outlined in paragraph (c) of this section, have exercised their rights.

(e)    Learners shall be assigned to the shift on which their training may best be handled for the duration of the learning period only.

43

# ARTICLE VIII - SENIORITY

(f)    Employees who have gained their preferred shift shall not be removed from their shift by other employees, except when employees with more seniority are transferred to a job due to being surplus labor, or an employee returns to his regular shift from a leave of absence, or when it becomes necessary to balance employees on shifts because of changes in production schedules.

(g)    Surplus labor as described in (f) refers to:
      (1)    An employee removed from their job as a result of a permanent surplus of labor on one operation or group of operations.
      (2)    An employee removed from a job as a result of being displaced by another surplus employee.
      (3)    An employee removed from a job as a result of being displaced by another employee exercising rights under Article VIII, Section 8.

(h)    Permanent shift trades will be allowed provided seniority and shift preference are adhered to and that no employee is displaced from their preferred shift as a result of the trade. The trade will be considered permanent, involve the next most senior employee in line to obtain their preferred shift, and must be approved by Management.

## Section 6—Filling Of Vacancies Other Than Maintenance

(a)    Permanent vacancies or new jobs shall be posted at designated locations throughout the plant and will remain posted for four (4) consecutive working days. Employees who wish to apply for the posted vacancy will complete the job vacancy application form in its entirety within the posting period. The application form must be signed by the employee with the original copy deposited in the locked box provided for this purpose, located at the front entrance of the plant. The employee copy is to be retained by the employee.

      (1)    When it becomes evident that the duration of an employee's sick leave, leave of absence, or light duty will be beyond six months, his job will be filled by the filling of vacancy procedure. Said period may be extended by mutual agreement of the parties.

(b)    Posted vacancies shall be filled by eligible and qualified bidders in the following manner:

      (1)    First preference for the posted vacancy will be given to the senior employee in the plant who has been removed from the job previously because of being surplus labor, and who has not had a previous chance to return to the job. Such employees must have been permanently assigned to the job and satisfactorily completed the learning time to be eligible to return to the job where they were surplus.

# ARTICLE VIII - SENIORITY

a)     Employees on medical layoff will be considered for recall to jobs for which they retain surplus rights and for which they can still qualify within their current medical restrictions under paragraph 1 above with other employees with surplus rights.

(2)     Next preference for the posted vacancy will be given to the senior eligible employee in the plant who can meet employment qualifications for the job.

(3)     Next preference for the posted vacancy will be given to the senior qualified employee that is surplus labor or on layoff from any bargaining unit job, without the requirement to fill out job bid application.

(c)     Employees awarded a position above will be transferred to the new position within thirty (30) days.   Exception to this provision may be made when unusual circumstances arise and the Union will be advised.

Transfers are to be made effective on the first scheduled workday in the work week. However, when the first days of a work week are holidays, transfer will not be made effective until the first scheduled work day following.

Likewise, a transfer will not be made so that it becomes effective while an employee is on vacation.  (This also could effect an employee's holiday pay if a holiday fell during vacation.)

(d)     It is understood that only one vacancy caused by following the procedure outlined in this section will be posted (a maximum of two postings).  After results of the final posting are known, or if there are no successful bidders after following the procedure outlined in paragraph (b), the vacancy remaining will be offered to eligible employees, in the plant or on medical layoff, by seniority, who were previously surplused from the job.  If an employee does not accept such offer to return, the employee's surplus rights are nullified.  If no surplused employee exists in that vacancy, the vacancy remaining will be filled by the senior qualified employee on layoff, or if none on layoff, by hiring from the outside.

(e)     Any given job that has been posted will not be posted again until seven calendar days has elapsed.  Any vacancy arising during this period shall be offered to the next preference employee of the last posting as out-lined in paragraph (b) above.

(f)     Employees will not be eligible to transfer under the bidding procedure as outlined in this section until they have met the following requirements:

(1)     They have worked twelve (12) months from date of hire or latest award on a job with less than eight (8) weeks learning time.

(2)     They have worked eighteen (18) months from date of  latest award on a job with eight (8) weeks or more learning time.

45

# ARTICLE VIII - SENIORITY

(3)     They have worked twenty-four (24) months from date of hire on a job with eight (8) weeks or more learning time in order to transfer to another job.

These restrictions do not apply to the following:

(4)     Employees working on a job as a result of being surplus labor.

(5)     An employee removed from a job as a result of being displaced by another surplus employee.

(6)     An employee removed from a job as a result of being displaced by another employee as a medical or disqualified placement.

Employees placed under the above numbers 4, 5, and 6 will have bidding eligibility restored.

(7)     Employees assigned to a temporary job, or a sequence of temporary jobs, if combined time on the temporary assignments and time on previous job is in accordance with this paragraph (f).

(g)     Temporary vacancies will not be posted.  This includes vacancies caused by absentees, temporary jobs, leave of absence, sick leave under six (6) months or periods of vacation four (4) weeks or more, and exists until the exit vacancy is filled.  Such temporary vacancies may be filled by temporary transfer, or by hire.

When a temporary vacancy exists in a classification for 30 days or more and the vacancy has been filled, one employee in the classification may fill the existing vacancy by exercising his shift preference as provided in Article VIII, Section 5 (c) above.  When the temporary vacancy is being filled with a new hire, employees within the classification will be allowed to exercise their shift preference by seniority.  When cause of the temporary vacancy ceases to exist any labor hired for such vacancy will be surplus labor.

An employee who has exercised his shift preference will be returned to his permanent shift.  It is understood that no department employee will be laid off as long as there is need for coverage for temporary vacancies in that department.  The least senior employees in a department retained because of the need to fill temporary vacancies will be considered as on notice of layoff and will be laid off upon the return of regular employees.

Such retention shall be limited to thirty (30) days unless mutually agreed to extend the time.

If a temporary vacancy occurs within a crew operation, a qualified employee may be offered the more highly skilled operation.  Preference will be given to members

46

# ARTICLE VIII - SENIORITY

of the crew involved.  Any vacancy left by such move may be filled in like manner or as provided above.

(h)     Prior to establishing a job on a trial basis, the Company will meet with the Local Union.  Such trials shall be no more than four (4) months.  The Area Manager of the department involved would hold a meeting with the interested representatives of the Local Union to discuss the proposed trial.  Follow-up meetings, for updating purposes, would be held each month for the duration of the trials.  How the labor for the trial would be supplied would also be discussed at the meetings with the emphasis on the use of balance crew personnel to the extent possible.  It is understood that the trial period should impact the normal operation of the department to the minimum level possible.

(i)     Nothing in the seniority provisions shall be so construed as to require the placement of employees on jobs for which they are not qualified.

## Section 7—Exceptions To Bid Procedure

(a)     Production Balance

     (1)     Production Balance employees may be maintained for the purpose of balancing production in cases of absentees, emergencies, temporary vacancies, sick leaves, vacations, experimental work, and assigned when needed to work as regular employees.

     (2)     Production Balance employees will be assigned to shifts in accordance with the applicable provisions of Article VIII, Section 5 of this Agreement with the understanding that they may frequently change shifts in order to balance production as described in (a) above and in consideration of each other's qualifications to perform the required work.

     (3)     Overtime available to Production Balance employees will be distributed as equally as practicable among those on the same shift, considering each other's qualifications to perform the available work.

          i)     Production Balance employees are considered as in-department employees for the department to which they are assigned at the beginning of the shift during which the daily overtime requirement occurs.

          ii)     Production Balance employees will be considered for daily out-of-classification overtime in the job assigned at the beginning of their regular shift prior to the overtime opportunity going to other out-of-classification signers.

     (4)     Production Balance classification will be filled by appointment, and a Production Balance employee may be removed at the Company's option.

## ARTICLE VIII - SENIORITY

An employee so removed will be considered disqualified from this classification and shall be placed as outlined in Article VIII, Section 8 (a). The Company will follow the established "Company Appointment" guidelines for selection of employees to the Production Balance classification.

Production Balance employees will be eligible for transfer subject to the Filling of Vacancies provisions in Article VIII, Section 6.

Except for departments where there are recognized job groupings, Production Balance transfers from department to department will be considered as a bid for the purpose of determining subsequent bidding eligibility as outlined in Article VIII, Section 6.

(5)    Temporary shift assignments made to a less preferred shift should be made for the reasons outlined in paragraphs (a) and (b) above. In all cases the subject Production Balance person is to be qualified to perform all aspects of the job.

(b)    Labor Trainer
The Company will follow the established "Company Appointment" guidelines for selection of employees to the Labor Trainer classification.


**Section 8—Disqualification**
(a)    Other than medical:

When an employee with seniority rights fails to qualify on his regularly assigned job for reasons other than physical disability, he will be referred to the Employment Department for placement in the following order:

(1)    Fill an available vacancy.
(2)    If there are no vacancies, bump into the first job for which he can qualify in line with his seniority by starting with the least senior employee in the plant.

Insofar as shift preference, an employee placed under this section will be initially assigned to the shift vacancy remaining.

Prior to pursuing a disqualification, a thorough investigation of the case will be completed including evaluation, investigating, and documentation of the facts ensuring proper disposition. In questionable cases, disposition by some other means than disqualification may be required. In cases where the employee has been disqualified for the third time in a one (1) year period, Company and Union officials will meet to discuss possible alternatives for disposition which would include termination of employment.

48

# ARTICLE VIII - SENIORITY

(b)     For medical reasons:

    (1)     An employee who is no longer able to perform his regular job because of physical disabilities, as certified by the Company physician, shall be referred to the Employment Department for placement on a job for which he qualifies and is physically able to perform, in the following order:

        a)     Fill an available vacancy.

        b)     If there are no vacancies within the applicable medical restrictions, bump into the first job for which he can qualify in line with his seniority by starting with the least senior employee in the plant.

    Insofar as shift preference, an employee placed under this section will be initially assigned to the shift vacancy remaining. Under no circumstances will a medically restricted employee be allowed to fill a vacancy or bump into a classification that he is not physically able to perform. These moves shall be made on the recommendation of the medical information and subject to mutual agreement by the Union President and the Human Resources Manager or their designees. This move will be considered a trial and will not be counted in the bumping restrictions if the trial is an unsuccessful placement. Insofar as workstation preference, one workstation preference move will be allowed on-shift before the employee is assigned a workstation following a successful trial.

    (2)     In cases where an employee may be bumped by the medically restricted employee, the medical placement will be given sufficient time to acclimate to the job before the affected employee is bumped.

    An employee removed from their job as a result of a medical placement will be given the option to either:

        a)     Fill an available vacancy, or

        b)     Bump into their previous job classification seniority permitting.

    If the employee is unable to be placed under the above options, they will bump into the first job for which they can qualify in line with their seniority by starting with the least senior employee in the plant.

An employee who is placed under this provision by use of their bumping privilege will not be eligible to bump again under the provisions of this paragraph (b) until a one-(l) year period has elapsed. Employees unable to bump will be treated as medically restricted awaiting suitable placement and will be handled under the appropriate terms of the S.U.B. Agreement in effect at that time.

# ARTICLE VIII - SENIORITY

### Section 9—Medically Restricted Placements

In the event it becomes necessary to make a placement of an employee with permanent medical restrictions, it shall only be into a job classification which they are physically able to perform. Such placements will be consistent with the trial language used for placing medically disqualified employees in Section 8 of this Article. If the placement is unsuccessful, the employee will retain all surplus privileges they had prior to the start of the trial. A successful placement of the employee will not change surplus privileges, which were available prior to the new placement.

### Section 10—Surplus Labor And Layoffs

(a)     When there is a permanent surplus of labor on one operation or group of operations, employees shall be removed from such jobs in reverse order of seniority. Employees so removed from their jobs shall be referred to the Employment Office to fill available vacancies. If there are none, or they cannot qualify for the vacancy, employees with at least one (1) year's service will be given the opportunity to bump the least senior employee on the last job on which the surplus employee has been permanently assigned and satisfactorily completed the learning time, providing they have greater seniority than the least senior employee in the classification; or bump into a job for which they can qualify by starting with the least senior employee in the plant. An employee with less than one (1) year's service or any employee with seniority who is removed from his job as a result of being bumped by surplus employees will be given the opportunity to bump into a job for which they can qualify by starting with the least senior employee in the plant. If no vacancies exist and in lieu of bumping, an employee with seniority may take a voluntary layoff. If the surplus employee is unable to bump, he shall be laid off and be subject to recall as provided in Section 12 of this Article.

During the six months following a Company declaration of a surplus condition, if in any 30 day period the Company staffs any one of the surplused positions an average of more than four hours per day worked, that surplus condition will be considered reversed and affected employees will be given the opportunity to return to the classifications and shifts assigned at the time of the transfers due to surplus. Persons who elect to return to their position, will be returned to the position. If a person declines to return to the position, the job will be posted and the person who declines to return will remain in his present position.

After six months, if during any 30 day period the Company staffs any one surplused position an average of more than four hours per day worked, the Company will post the job for bid. The restriction provided by this provision may be waived by mutual agreement between management and the Union.

(b)     When a group of employees are surplused at the same time, the senior employee shall be handled first in the Employment Office.

# ARTICLE VIII - SENIORITY

Notwithstanding the provisions of paragraph (a) above, when there is a permanent surplus of labor on one operation or group of operations (excluding bump situations) which would otherwise result in the layoff of employees with one (1) or more years of seniority, an equivalent number of senior employees on that operation or group of operations will be permitted upon their request to take an optional layoff.  The appropriate division committeeman will be notified by the Company of a surplus of labor condition and requests from eligible senior employees who are interested in taking an optional layoff (and thereby waiving any layoff notice) must be received by the Area Manager or the equivalent within forty-eight (48) hours after the Company's notice.

When an employee elects to return from optional lay-off, after having been on layoff for ninety (90) days or more, and a permanent surplus labor condition exists as described above, another senior employee on that operation will be permitted to take an optional layoff.

(c)     When employees with seniority may be subject to layoff due to curtailment of production, the Company will give three (3) days' advance notice to said employees, and provide work for said three (3) working days, or pay in lieu of work for that part of three (3) days for which work is not made available.  Any employee who has not been notified during absence from work will not be entitled to notice, provided such employee has been absent for three (3) working days.  An employee on an excused absence the day of notification will be notified under the same conditions as Article V, Section 2 (c), reporting pay.

(d)     A written list of the names, department numbers, classifications and seniority dates of employees processed to layoff will be given to the Union President.  This list will be provided to the Union President at the time employees are notified of the intention to process them to medical or other layoff.

(e)     If an employee is laid off and at the time of layoff is performing his job in an acceptable manner despite some previous injury or disability, and when recalled to work, a physical examination reveals his condition to be no worse than it was at the time of layoff, the fact that he had been previously disabled shall not in any way prejudice his recall.

(f)     Notwithstanding the provisions of this Agreement, the Company may, without the requirement of making a layoff of employees in accordance with the layoff procedure, reduce the schedule due to production requirements for a classification, department or departments to not less than twenty-four (24) hours per week, or may reduce the scheduled hours below twenty-four (24) for not more than two (2) consecutive weeks, or for not more than two (2) weeks in any six (6) week period.  The foregoing shall not be construed to require reducing the number of scheduled hours below the number of hours in the standard work week before laying off employees in accordance with the layoff provisions of this Agreement.

# ARTICLE VIII - SENIORITY

If an employee is ineligible for a Short Work Week Benefit and is serving a State System "waiting week" during one of the weeks of such reduced schedule and such week is not a week of layoff in accordance with the layoff procedure, said week will be deemed to be a temporary layoff out of line of seniority in conformance with Article 1, Section 1 (b) (4) of the Supplemental Unemployment Benefit Agreement.

(g)    **Short Term Layoff Alternatives**. To the extent feasible the company will seek to avoid short term layoffs of less than eight (8) weeks. Employees will be entitled to utilize existing optional layoff provisions for all layoff situations, including a short-term layoff. The need for the Company to reduce schedules for inventory adjustment purposes was recognized and is not affected by this provision. Emergency situations caused by unplanned or unexpected events may create exceptions to the obligation of the parties to try to avoid short term layoffs.

In an effort to avoid or minimize a short term layoff the Union and Company may develop work sharing methods not to exceed eight (8) weeks. The parties may agree to such means to avoid or minimize the short term layoff as labor pools, special training or education sessions, inordinate temporary transfers, the performance of meaningful normally unassigned work, adjusting vacation schedules when feasible, shared jobs, etc. These listed examples in no way are intended to restrict the suggestions or ideas of the parties.

## Section 11—Preferential Hire

(a)    An employee on regular layoff with recall rights from a tire plant covered by a collective bargaining agreement between the USW and Titan will be given preference in hiring at another tire plant covered by a collective bargaining agreement between the USW and Titan where all eligible laid-off employees have been recalled and new employees are being hired for work on which the laid-off employee has qualifying experience. A laid-off employee desiring to exercise his preferential hiring rights under the conditions of this paragraph shall make written application for employment at other plants covered by a collective bargaining agreement between the USW and Titan during the period of time he continues to accumulate service for recall purposes at the plant from which he was laid off with recall rights.

(b)    Any laid-off employee who is hired will be hired as a new employee without service credit for seniority purposes. For all other purposes, he will be credited with the amount of continuous service he had at the time of his layoff and, in addition, will receive credit for the amount of service credit for which he would have been eligible under Article VIII, Section 12(b), as if he were being recalled from layoff.

(c)    All such laid-off employees shall be required to satisfactorily complete a physical examination prior to hire. The physical examination will be the same type given to employees being recalled from lay-off except those employees laid-off more

## ARTICLE VIII - SENIORITY

than two (2) years will be required to satisfactorily complete a physical examination of the same type given to new hires. Application of this paragraph does not preclude preferential hire of an employee to a job he was able to perform with a physical disability at his former plant prior to lay-off, provided his disability has not worsened.

(d)    An employee exercising preferential hiring rights will be granted pay-in-lieu of time off for any vacation eligibility after the employee has been continuously employed for thirty (30) days at the new plant. An employee with residual vacation eligibility will be paid pay-in-lieu of time off by the employee's former plant. Consistent with production requirements and local plant practices, new preferential hires will, upon their request, be granted 100 hours of time off without pay during the current calendar year. Application of this paragraph does not affect the application of Article VIII, Section 3 (b).

(e)    Should a laid-off employee who has applied for preferential hire refuse a job for which he is qualified, preferential hiring rights will be terminated. Such refusal will not prejudice the employee's right to benefits under the Supplemental Unemployment Benefits Plan and the Benefits Agreement, provided the employee is eligible for such benefits.

(f)    A laid off employee who preferentially hires will be eligible for recall to the former plant after 12 months have elapsed since the date of preferential hire. An employee who has retained recall rights to the former plant will be eligible for recall at any time if the recall list has been exhausted and a job is to be filled with a new hire at such former plant.

In the application of Article VIII, Section 11 (b) of the Collective Bargaining Agreement, an employee who accepts recall to his former plant will have neither his former plant seniority date nor his pension service date adversely affected in relation to other employees at that plant as the result of the application of the first paragraph of this Article VIII, Section 11 (f).

An employee who preferentially hires will receive a Relocation Allowance in accordance with Paragraph (k) of this Section each time he preferentially hires to another plant and forfeits all eligible recall rights in writing. Likewise, a preferentially hired employee who has recall rights to a plant that is later shutdown will receive a Relocation Allowance once per shutdown occurrence in accordance with Paragraph (k) of this Section .

An employee exercising preferential hiring rights who is eligible for recall, may answer or refuse recall to his former plant. If recall is refused, the employee will be bypassed until he notifies the former plant to the contrary. Once the former plant has been notified and recall again is offered, the employee must terminate employment at the new plant and report for work at the former plant or lose recall and seniority rights at that plant. When the recall list at the employee's former

# ARTICLE VIII - SENIORITY

plant is exhausted and recall occurs, the employee must answer the recall or lose any seniority rights held at the former plant.

(g)    An employee who answers recall to work at a former plant may be retained on his current job for a maximum of 45 calendar days. A good faith effort will be made to release the employee as soon as possible. After accepting recall, if retained by the present plant, an employee will not lose bargaining unit rights at his former plant while awaiting release from his job.

Vacancies created by preferentially hired employees accepting recall to their former plant will not be subject to the job posting procedure.

(h)    An employee with recall rights who resigns from the plant in which the employee was preferentially hired, must provide at least two (2) weeks written notice. Failure of such employee to provide notice shall result in loss of recall rights at all other plants and the employee will be terminated.

(i)    Notwithstanding the provisions of Article VIII, Section 11(b), an employee who had two years or less of service at the time of layoff and who is hired under the preferential hiring provisions of this Article VIII, and who retained recall rights will receive service credit, if recalled, at his former plant, provided his total service at such former plant at the time of layoff and any service accumulated at the new plant(s) exceeds two years.

(j)    An employee who is released from employment as the result of the complete and permanent closure of a local tire plant covered by a collective bargaining agreement between the USW and Titan, who makes written application for employment at other tire plants covered by a collective bargaining agreement between the USW and Titan within sixty (60) days of such release from employment, will be given preference in hiring over new employees in such other plants for work on which he is qualified, provided such employee has not assumed the status of a retiree, accepted a Special Distribution. A complete plant closure, for the purpose of this Agreement, the Benefits Agreement and the Supplemental Unemployment Benefits Plan means the complete discontinuance of product manufacturing. Notwithstanding, following the date of complete plant closure, there may be employees continued in non-manufacturing duties at the plant site.

Any such former employee who is hired will be hired as a new employee without service credit for seniority purposes. For all other purposes, he will be credited with the amount of continuous service he had at the time of his release from employment or layoff and, in addition, will receive credit for the amount of service credit for which he would have been eligible under Article VIII, Section 12 (b), as if he were being recalled from layoff.

If such employee refuses a job for which he is qualified, his preferential hiring rights specified above shall be terminated. Such refusal will not prejudice the employee's right to benefits under the Supplemental Unemployment Benefits

# ARTICLE VIII - SENIORITY

Plan and the Benefits Agreement, provided the employee is eligible for such benefits.

At the time of hire, an employee exercising preferential hiring rights under this provision will forfeit his preferential hiring rights at other plants and his rights to benefits under the S.U.B. Plan and the Benefits Agreement due to termination caused by the plant closure, except that such prior rights shall be reinstated if he is laid off due to a reduction in force prior to the completion of thirty (30) calendar days' continuous service.

An employee who is preferentially hired under the terms of this paragraph will receive a Relocation Allowance in accordance with Paragraph (k) of this Section.

(k)     An employee who accepts a job offer after the effective date of this Agreement under the terms of Article VIII, Section 11(f) or Article VIII, Section 11(j) will be eligible for a Relocation Allowance after the completion of forty-five (45) calendar days continuous service at the new location, provided he is employed, or laid off from a plant, or plants, to which he has preferentially hired.

No Employee will be eligible for a Relocation Allowance until application is made in accordance with the procedure established by the Company. Only one Relocation Allowance will be paid to a family living in the same residence.

The amount of the Relocation Allowance shall be $1500.00 and will be paid within two (2) weeks after application for such allowance in accordance with the provisions of first paragraph of this Paragraph (k).

The amount of the Relocation Allowance will be reduced by the amount of any relocation allowance or equivalent to which the Employee may be entitled under any present or future legislation only in the case of a plant closure situation.

(l)     In the event of a complete plant closure the Local Union Benefit Representative, upon written request from the Local Union, will be paid his regular rate up to a maximum of forty (40) hours per week for a maximum of six (6) consecutive weeks immediately following the closure for the purpose of assisting former plant employees on benefit matters.

(m)     When considering an employee requesting preferential hire, in order for consideration of a consistent review of their work records, the process will be as follows:

(1)     Each applicant for preferential hire should have their work record reviewed at the time of layoff.

(2)     The "sending" plant is responsible for the determination of whether an applicant is "acceptable" or "not acceptable" for preferential hire.

(3)     Applicants will be determined "not acceptable" for preferential hire for one of the following reasons:

a)     Work record contains a current or active Last Chance Letter.

## ARTICLE VIII - SENIORITY

b)     Work record contains any suspension for absenteeism, including a waived suspension, within the last twelve months prior to layoff.

In the event an employee loses employment as a result of a permanent plant closure and applies for preferential hire, the restrictions contained in this section 3 above are hereby waived.

(4)    If the applicant has any current disabling restrictions on his or her record, the applicant will be deemed "acceptable" if he or she is capable, with or without reasonable accommodations, of performing the essential functions of the job.

(5)    Disciplinary records of preferential hires will transfer to the new location.

### Section 12—Recalls

(a)    An employee without seniority rights who is laid off will have no recall rights and will not accumulate any seniority while on layoff. A laid-off employee with seniority will be eligible for recall provided he notifies the Company by letter, telegram, telephone, or personal interview of changes in his address.

(b)    A laid-off employee with seniority with two years or less of service at the time of layoff, and who is recalled within five years from the date of his layoff, shall be given his previous service plus service credit for the time laid-off provided such service credit will not exceed his actual service at time of layoff.

A laid-off employee with more than two years of service at the time of layoff, and who is recalled at any time, shall be given his previous service plus service credit for the time laid off provided such service credit will not exceed two years for any single period of layoff.

(c)    Laid-off employees will be considered, for the purpose of recall only, to accumulate service credit as defined by the terms of this provision during their period of layoff rather than having such service credit deferred to such time as they may be recalled.

(d)    Employees shall be recalled by certified mail in accordance with seniority.

An employee who is on an optional layoff will be placed on an optional layoff list and will be recalled in reverse seniority order to the operation or group of operations from which he took an optional layoff, seniority permitting. In the event that a vacancy on the operation or group of operations from which an employee has taken an optional layoff does not become available after all employees on regular layoff status with more than one (1) year of seniority have been recalled and before any employees with less than one (1) year of seniority are recalled and before new employees are hired, such employees on optional layoff shall immediately be recalled to any vacancy in the plant for which he can qualify. The least senior of

## ARTICLE VIII - SENIORITY

such employees will be recalled first, but all employees on optional layoff are subject to recall before employees with less than one (1) years seniority and before new employees are hired.  Upon written request, an employee on optional layoff will be placed on the regular recall list and recalled in accordance with regular recall provisions.

After an employee has been on optional layoff for ninety (90) days or more, he may return, seniority permitting, to work by notifying the Employment Department at least two weeks prior to date of return.

Employees returning from optional layoff to the classification from which they exited will be placed on the shift they would have achieved had they not left.  When movement occurs within a classification, employees on optional layoff will be moved on paper in accordance with Article VIII, Section 5(c) to their next preferred shift according to their seniority.  Temporary moves of active employees will then be allowed in accordance with their shift preference to positions only occupied on paper.  Any posting in a classification with employees on optional layoff will reflect the shift that remains open as a result of such movement.

When an employee on optional layoff is recalled to a classification different than the classification the optional layoff occurred, the employee will be afforded the opportunity (seniority permitting) to return to the former classification.   The employee may elect the new job position and if so, will not have first preference rights to any subsequent job vacancy.  Also, the employee will start a new time period for establishing bidding eligibility.

(e)     An employee so recalled must notify the Company of his intentions within forty-eight (48) hours and report for work within five (5) working days.  Should he fail to so notify the Company of his intentions, but reports within thirty (30) days from date of recall, and presents a valid excuse for his failure to report earlier, he shall retain his relative position on the recall list, but must await the next available vacancy.

(f)     Employees recalled who report but are unable to return to work because of illness or injury, or who report and cannot qualify for available jobs, will retain their relative position on the recall list.

(g)     Any employee who is recalled and does not respond in accordance with the provisions of this section, or cannot be reached because of his failure to notify the Company of his change of address, or who responds but refuses to accept an available opening for which he is qualified will be removed from the recall list and his seniority terminated.

# ARTICLE IX - VACATION

## ARTICLE IX - VACATION

**Section 1—Eligibility**

(a)    Employees will be entitled to two weeks' vacation with pay after completing one year of continuous service. Employees will be entitled to three weeks' vacation with pay after completing five years' continuous service. Employees will be entitled to four weeks' vacation with pay after completing ten years' continuous service. Employees will be entitled to five weeks' vacation with pay after completing twenty years' continuous service. Employees will be entitled to six weeks' vacation with pay after completing twenty-five years' continuous service.

(b)    The vacation period shall be on a calendar basis from January 1 to December 31 inclusive. Employees will become eligible for vacation with pay on the first anniversary date of their employment. Thereafter, employees shall become eligible for vacation on December 31, except that they become eligible for the additional week of vacation on their fifth (5th), tenth (10th), twentieth (20th), and twenty-fifth (25th) anniversary dates.

(c)    Employees must be on the payroll and working during the calendar year in which their vacation is due in order to be eligible for vacation pay. This clause shall not be construed to prevent an employee from taking vacation for two (2) calendar years in one (1) continuous period over the year end in which event his pay for the second vacation shall be withheld until after he resumes work in that calendar year. When approved by the Company, a vacation may be taken before the employee has worked in the calendar year, and the employee may be given an advance against wages due or vacation pay for that calendar year.

(d)    Employees who leave the payroll after having qualified for vacation in that year, and later complete an anniversary date which would otherwise entitle them to an additional week of vacation in that year, and return in that year or in a subsequent year will be paid such additional week of vacation upon their return to work.

(e)    Employees who are returned to the payroll on or after December 1, up to and including December 31 of each calendar year, and who meet the foregoing continuous service requirements, will have their vacation privileges restored during the ensuing calendar year.

(f)    Employees entitled to vacation who resign with or without notice, or are discharged before they have taken their vacation, shall be entitled to vacation pay at time of exit; and employees laid off shall also be entitled to vacation pay at the time of exit. Vacation pay received at time of layoff is in lieu of vacation time off. If the laid off employee is returned to the payroll during the same calendar year, he may be given, upon request, a leave of absence for his vacation time off.

## ARTICLE IX - VACATION

(g)    In the event an employee who is entitled to a vacation dies before he has taken the vacation, only the person designated as beneficiary of his life insurance benefits provided by the Company to such employee shall be entitled to his accrued vacation pay.

(h)    An employee may receive, upon request, vacation pay in lieu of time off for all eligible vacation weeks, except ten (10) days. Such vacation payment will be made to the employee as soon as practicable after the request is made and eligibility established.

(i)    An employee may at the time of the vacation canvass elect to defer two (2) weeks vacation until the following year, but no longer. The deferred week(s) may not be scheduled during the following years designated thirteen (13) week preferred vacation period.

(j)    An employee who is absent from work due to illness or injury may, upon his request, receive one week's vacation pay for each full week not worked due to such injury or illness up to his maximum number of weeks of vacation eligibility, without taking additional time off. After the 1st week of disability, the employee may also draw day-at-a-time vacation if all weekly vacation is exhausted. Vacation payment will be made at such time that the employee produces satisfactory evidence that his absence was for acceptable reasons.

     (1)    A request may also be made within thirty (30) days of the employee's return to work.

(k)    An employee will be entitled to a vacation in the year in which he retires on pension based upon the applicable percentage of the previous calendar years' earnings. The minimum vacation is applicable only to those employees who have been continuously employed for a period of thirty (30) days in the year previous to the year in which he retires.

(l)    In addition to any vacation to which an employee is entitled through the above eligibility provisions, an employee who retires on pension or who is released as the result of a plant closure and who is entitled to a special distribution under, or a separation payment, or the surviving spouse of an employee who dies, provided such surviving spouse is the beneficiary of the life insurance benefit made available by the Company for such employee, will be entitled to vacation pay based upon the applicable percentage of the employee's earnings in the current calendar year. The minimum vacation is not applicable to this additional vacation pay.

### Section 2—Pay For Vacations

(a)    Vacations will be paid at the rate of 2% of the previous calendar year's earnings for each week of vacation to which the employee is entitled. The minimum pay for a

# ARTICLE IX - VACATION

week of vacation shall be forty (40) hours times the employee's hourly rate at the time the vacation is taken.

(b)    Employees who return to the payroll with seniority after having served in the Armed Forces, and whose vacation pay would be reduced by virtue of that service, shall have as their minimum vacation pay for each week of vacation an amount equivalent to their hourly rate for the week prior to the beginning of their vacation multiplied by the number of their regularly scheduled hours (based on not less than five or more than six days per week.)

(c)    Vacation checks will be distributed before the start of the employee's vacation week.

(d)    Employees who elect pay in lieu of vacation under Article IX, Section 1 (h), shall be paid as soon as practicable after the request is made and eligibility established. Employees who do not take all of their scheduled vacation by December 15, will be paid for all unused vacation.

**Section 3—Scheduling Of Vacations**

(a)    If the Company anticipates a shutdown of all or part of the plant for vacations for up to ten days (10), and posts a notice not later than December 1, those employees not scheduled to work during the shutdown who are entitled to a vacation shall consider the shutdown period as vacation. Each day of the vacation shutdowns shall be considered as day at a time vacation. Such shutdown period shall be during the months of June, July (adjacent to Independence Day Holiday) and December (between the Christmas and New Year's Day Holidays) when local schools are recessed. If a vacation shutdown is scheduled for December, it will not carry over into the following vacation year. The Company may schedule the vacation shutdowns up to, but on no more than ten (10) consecutive days during the summer and no more than three (3) consecutive days in the winter. In no event shall the total vacation shut down be more than a total of ten (10) days. In the event of a shutdown in December of 2008, the Company may use one of the summer shut down days for a four (4) day shut down in December of 2008. Consecutive days shall mean consecutive work days and exclude Saturdays, Sundays and Holidays.

(b)    As an exception to Paragraph (a), employees eligible for vacation may schedule their vacation at a time other than the plant shutdown period, for an acceptable valid reason (commitments made for travel, accommodations, etc.), but will be considered on a leave of absence without pay during the shutdown period, if no work is made available to them.

(c)    Employees who are ineligible for vacations during the shutdown period will be considered on layoff if no work is made available to them.

# ARTICLE IX - VACATION

(d)     Vacation selections will conform to the principle of seniority. Selections are limited, by shift, in a department, classification, and crew for each week in accordance with the Company's decision as to the number of employees they may schedule in a given week. Canvassing of employees for vacation preference by the Company will be conducted during the month of December.  Vacations will be scheduled from January 1 through December 31.  Employees who are on vacation, or hospital pass, or for other reason not available at the time of canvass, must make their vacation preference known to their department prior to the actual canvass. Any employee not designating an available week when canvassed will be bypassed and the canvass will continue to be made.  When an employee who has been bypassed desires to assert his preference, his choice will be limited to the weeks available at the time he asserts his preference.

(e)     A posting will be made annually notifying employees of the date the annual vacation canvass is to begin.  This notice will include the names of the canvassers in each area.  Efforts will be made to contact employees not at work at the time of canvass who did not previously leave a list of vacation preference with their department.

(f)     The Company will agree to post open vacation weeks that may arise during the vacation period.  Once a week of vacation occurs in a week that was previously full, that week's opening will be posted in the department for seven (7) calendar days.  The senior eligible employee signing the posting will be awarded the open week.

## Section 4—Vacation Day-At-A-Time

Employees will be offered the opportunity to take any or all of their vacation, one day at a time providing the provisions of Article IX, Section 3 are fulfilled.  The scheduling of a vacation one day at a time must be with management's approval, not in conflict with production requirements, and scheduled not more than eleven (11) calendar days or less than forty-eight (48) hours in advance.  Requests less than forty-eight (48) hours in advance will be considered, production scheduling requirements permitting, but will not be given preference over timely requests.

(a)     Deferred vacations will not be considered for day-at-a-time vacation.

(b)     A week of vacation, one-day-at-a-time, consists of five (5) days; however, any of the six (6) days, Monday through Saturday (or Sunday for Powerhouse Department 160 only,) may be prescheduled as outlined above as a vacation day.

(c)     The rate of pay per day of vacation will be calculated by dividing two percent of the previous year's earnings by five (5) days per week.  The minimum vacation pay provisions as outlined in Article IX, Section 2(a) are applicable to this calculation. The daily rate will also apply in the event Saturday (or Sunday for Powerhouse, Department 160 only) is used as a day of vacation.

61

# ARTICLE IX - VACATION

(d)    Employees who take a day's vacation during the week will have that day credited for payment of time and one-half for hours worked on the sixth day, as provided under Article VI, Section 3(a).

(e)    The advance scheduling of the vacation day will be handled directly through the employee's immediate Supervisor and must be approved by the Supervisor. Answers to requests will be given the next working day after the request. If a vacation day is granted, the employee will be given a vacation receipt so indicating.

(f)    Vacation, one-day-at-a-time, when granted, will be granted in the order in which the requests are made. If two or more employees make the request on the same shift on the same day for the same vacation day, and a vacation day is granted, it shall be granted in order of seniority. Vacation days once scheduled cannot be canceled.

(g)    It is permissible to request and receive two or more consecutive days of vacation with the understanding that each day must be individually requested and each day is individually approved by the supervisor.

(h)    In determining the timeliness of a request, the beginning of the employee's regularly scheduled shift is to be used as the reference point in time.

    (1)    If an individual makes a request for a day of vacation at a time other than during his regularly scheduled shift, in order to meet the 48-hours-in-advance criterion, such request will be considered with any other requests that were made during his last previous regularly scheduled shift. For example, if a first shift employee makes a request for a Friday day of vacation at 6:45 a.m. on Wednesday (prior to his regularly scheduled Wednesday shift), technically he meets the 48-hour-in-advance criterion. However, that request should be considered with any others that were made for the Friday during the regularly scheduled first shift on Tuesday. By doing this, the language which stipulates "if two or more employees make the request on the same shift on the same day for the same vacation day and a vacation day is granted, it shall be granted in order of seniority," can be accommodated.

    (2)    Employees requesting a day of vacation prior to the start of their Friday shift but after the weekend schedule was posted, the day of vacation will be granted for Saturday provided all other vacation scheduling requirements are met and there is another on-shift, in-classification person that can be scheduled.

(i)    When a day of vacation is granted the employee will be considered on vacation for the full 8 hour period starting with the beginning of their regularly scheduled shift. The employee will not be eligible to work during that 8 hour period. Employees

# ARTICLE IX - VACATION

desiring to work overtime must sign for such work. It is then the employee's responsibility to confirm their schedule.

(j)     The day paid as vacation will be incorporated with the week's earnings during which the partial vacation falls.

(k)     An employee's intent to take vacation, one-day-at-a-time, must be expressed at the time of employee canvass for the current vacation year.  However, in cases of immediate family illness, one week of weekly vacation may be converted to day-at-a-time vacation.  This will be done with the Area Manager's approval.  Calendar year for day-at-a-time vacation will be January 1 through December 31.

(l)     Employees taking day-at-a-time vacation on Thursday and Friday will consider Saturday as a voluntary work day unless the allocation for Saturday is full.  If the allocation is full, then Saturday must be considered a scheduled work day.  Employees desiring to work Saturday overtime must sign for such overtime.  It is then the employees' responsibility to confirm their schedule for that Saturday.

(m)     For scheduling purposes, employees may schedule, in order of seniority, day-at-a-time vacation as follows:

Day-at-a-time vacation weeks will be totaled by department or groups of departments, following the annual vacation canvass.  Total day-at-a-time weeks will be divided by fifty (50) weeks to determine the number of associates that will be allowed off for any given work day.  In the calculation, fractional days will be rounded up to the next whole day.  A minimum of one (1) per day will be granted to each department or group of departments.  Using the above procedure for day-at-a-time allotments does not preclude the Company from discontinuing daily vacation scheduling during the 13-week summer period if conditions arise to warrant such a discontinuance.

**Section 5—Vacation Weekly**

(a)     One (1) employee per department will be allowed weekly vacation in departments with less than five (5) employees.

(b)     A minimum of two (2) employees per department will be allowed weekly vacation in departments with five (5) or more employees.

(c)     During years when a summer shutdown is scheduled, to determine the number of employees permitted off on vacation for each department the total number of shutdown weeks will be subtracted from the department's total weeks.  To determine the shutdown weeks, round to the nearest whole number of week(s) for each of the summer and winter shutdown periods, but never more than a total of two (2) weeks.   Divide the department's remaining weeks to be equally distributed among the weeks of the year

# ARTICLE IX - VACATION

Examples:

(4 DOV's) Summer – One Week Shutdown

| Dept. | Total Weeks | Total Shutdown Weeks | Weeks Remaining | Remainder of Year | Rounded |
|---|---|---|---|---|---|
| 320 | 417 | 94 | 323 | 51 | 6.33 or<br>7 per week for 17 weeks<br>6 per week for 34 weeks |

(4 DOV's) Summer & (3 DOV's) – Two Week Shutdown

| Dept. | Total Weeks | Total Shutdown Weeks | Weeks Remaining | Remainder of Year | Rounded |
|---|---|---|---|---|---|
| 320 | 417 | 188 | 229 | 50 | 4.58 or<br>5 per week for 29 weeks<br>4 per week for 21 weeks |

    (1)    A minimum of one (1) employee per department will be allowed weekly vacation during weeks other than the designated shutdown periods.

(d)    During years when no summer shutdown is scheduled, the prime thirteen (13) week summer vacation period from June through August of each year, a calculation of at least 35% vacation liability for each department will be utilized.

The Company will allow at least 35% of a department's total vacation weeks to be scheduled during the designated thirteen-week preferred vacation period.

| DEPT | TOTAL WEEKS | 35% CALCULATION | | 35% ROUNDED |
|---|---|---|---|---|
| 320 | 417 | 145.9 | 146 | 11 per week for 10<br>12 per week for 3 |
| 514 | 417 | 145.9 | 146 | 11 per week for 10<br>12 per week for 3 |
| 531 | 346 | 121.1 | 122 | 9 per week for 8<br>10 per week for 5 |

The remaining 65% of the department's vacation weeks will be equally distributed among the thirty-nine remaining weeks of the year. It is understood that day-at-a-time vacation allocations will not be affected by the above method of calculation.

## Section 6—Vacation Shutdown Schedule

(a)    If the Company offers work to employees during vacation shutdown periods, the following shall apply:

# ARTICLE IX - VACATION

(1)     When possible, the work shall be offered at least two weeks in advance of the shutdown. In case of emergency or break down of equipment, the notice may be shorter.

(2)     The work shall be offered on the basis of seniority in the following order:

    a)     employees in the classification where the work is sought

    b)     qualified employees who have insufficient vacation to cover the shutdown (this does not include any employee who has elected vacation outside of shutdown under Article IX, Section 3(b))

    c)     any qualified employee

    d)     within each of the above groups (a, b & c), in department before out of department and on shift shall be preferenced before off shift

(3)     The Company will not perform any production work during vacation shutdowns and may only perform maintenance and clean up work.

(4)     The Company may not offer work to more than ten percent (10%) of the bargaining unit without mutual agreement.

(b)     Employees who work any day(s) during the shutdown shall have a day of vacation restored for each day worked.

(c)     If the Company offers work to employees it will be in eight (8) hour increments during vacation shutdown periods. Employees will work on a volunteer basis only.

## Section 7—Half-Day Vacation

Employees may use day-at-a-time vacation in half-day increments for a maximum of ten (10) days allowed for day-at-a-time. The following rules would apply to usage of half-days of vacation:

(a)     Half-days would count the same as full days in the department allocations. Two matching half days would count as one allocation.

(b)     Half-days would be scheduled in same manner as day-at-a-time vacation per Article IX, Section 4.

(c)     Employees would not be allowed to match the half-day request if the two half-days would exceed the department allocation.

## ARTICLE IX - VACATION

(d)     All day-at-a-time vacation scheduling (full or half-day) must be considered in relation to production requirements.

(e)     If requests for the same day at the same time are made, preference would be given to a full day request over a request for half-day vacation.

(f)     Employees taking a half-day vacation may still sign and be scheduled for daily overtime.



FILED

AUGUST 21, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# Exhibit A

08 C 50185

# (Part II – Article XI to end)

## ARTICLE X - ENGINEERING MAINTENANCE

## ARTICLE X - ENGINEERING MAINTENANCE

**Section 1—Engineering Maintenance**

(a)    Employees in the Engineering Maintenance are placed in classifications as follows:  Electrician, Instrument Repair, Millwright, Machinist, Pipefitter Oiler, Painter, Tool Crib Attendant, Truck Mechanic, Utility Person, Heating, Ventilating and Air Conditioning Repair, Powerhouse Operator and Maintenance Labor Trainer.    The principle of maintenance men working within their classification is agreed to, however, work in other classifications will be assigned for efficient utilization of labor.

(b)    Because of the nature of maintenance work, the need to assign individuals to certain jobs because of experience, and situations of emergency, maintenance employees may be assigned accordingly, providing the opportunity for regular work and daily overtime are reasonably in balance by classification at the end of the calendar year.

The preceding paragraph will not be construed so as to allow the Company to move any employee to a shift other than his own, but will conform to Article VIII, Section 5.  However, when training employees for the purpose of operating or maintaining equipment, the Company will provide the training.  Employees may be moved, with their approval, to the shift on which the training is to be done for the duration of such training.

(c)    Maintenance job vacancies will be posted in the same manner as all jobs which are subject to the bidding procedure; however, maintenance job vacancies (excluding Utility Person) will not be subject to the job bid procedure as stipulated in Article VIII, Section 6.  Maintenance job vacancies will first be offered to qualified apprentices in the classification.  If there are no qualified apprentices, other employees in the plant will be considered if they have a URW or USW journeyman card or equivalent, or if they have successfully completed a properly approved apprenticeship program in the appropriate craft, or if they have four or more years of experience in the classification, or if they have qualifications comparable to a new hire applicant.  Qualified employees will be considered by seniority.

Employees desiring to be considered for job openings must submit records of qualifications, experience and/or schooling to the Employment Office, verified and furnished by former employers, agencies, schools, etc.  Such documentation must be on file prior to the job posting withdrawal date before the employee can be considered for the vacancy.

Vacancies in the Oiler classification will be filled in the following order:

## ARTICLE X - ENGINEERING MAINTENANCE

(1)     The senior active applicant judged to be qualified as the result of an interview.

(2)     The senior employee on layoff judged to be qualified as a result of an interview who submitted records of qualifications, experience and/or schooling to the Employment Office prior to the posting coming down.

(3)     New hire of a qualified candidate, if found within 60 days from date of first ad appearing.

(4)     The senior of the plant candidates.  Award of an Oiler position to an unqualified person will not prevent management from seeking qualified candidates under this procedure in the future.

(d)     Employees filing vacancies in the maintenance department will use plant-wide seniority for all items relative to seniority and in obtaining a production job in case of being surplus labor.

(e)     When there are employees from maintenance classifications on layoff, posted vacancies in those classifications will be awarded to the senior of:

(1)     Senior bidder in the plant with surplus rights to the vacancy classification.

(2)     Senior employee on regular layoff from the vacancy classification.

(3)     Senior employee on regular layoff with surplus rights to the vacancy classification.

If the above procedure does not result in the vacancy being filled, the low senior employee on optional layoff from the vacancy classification will be recalled.

The bidding procedure in Article X, Section 1(c) will be used once all employees from layoff have been recalled.

In case of permanent surplus of labor, the least senior employees of each classification where surplus exists will be declared surplus.  Such employees will be referred to the Employment Office and be placed in accordance with Article VIII, Section 10.

(f)     Maintenance employees are expected to furnish standard hand tools required to perform their daily tasks.  The Company will repair or replace broken tools, or tools worn out as a result of normal work performed for the Company, provided they are not broken due to carelessness and that the employee has been employed as a craftsman for at least one year.  Such repair or replacement must be approved by the Area Manager (or person designated) or the equivalent.

## ARTICLE X - ENGINEERING MAINTENANCE

(g)     The Powerhouse must be operated on a seven-day-a-week basis. Powerhouse employees will be scheduled so as to equalize work opportunities as near as practicable. The Powerhouse schedule discussed during negotiations will be put into effect and a copy given to the Union. This schedule may be changed by mutual agreement between the Union President and the Manager of Engineering.

(h)     Employees called in for emergency maintenance work on a holiday shall be guaranteed four (4) hours at their regular rate plus any premium benefits. If he is able to resolve the emergency prior to the four (4) hours, he will be permitted to go home and shall receive the guaranteed four (4) hours pay.

         If the employee works four (4) hours or more, they may within the following week, with management's approval, be allowed to take an optional day off from work without pay.

(i)     Maintenance employees shall be allowed ten (10) minutes at the end of the shift to clean up their tools and the work area assigned.

(j)     When job assignments are changed within the Maintenance Division, the change will be for reasons relating to production or maintenance requirements.

         An employee's ability and seniority will be considered when it is appropriate to recognize an employee's request for a job change.

         Employees that have a preference for a job assignment may place a card on file in the Maintenance Department indicating their preferred job assignment, which will be considered by management in making assignments. On-shift employee's job preference will be considered before the seniority of off-shift employees is recognized.

(k)     Maintenance contracts will not be let for work of a type normally performed by employees of the employer's maintenance department, provided the work can be done with available equipment, within the necessary time and at no greater expense. These provisions do not apply to building expansion programs. When expansion programs involving installations, modernization or relocation of equipment is planned, the Company will review with the Engineering Maintenance Division Committeeman the portion of the work that could be performed by local craft personnel.

         The Engineering Maintenance Division Committeeman will be notified in writing at least five (5) days in advance of letting contracts to utilize outside contractors. The notification will provide an explanation of the decision.

         In case of emergency, the advance written notification will not apply, with the committeeman being notified as soon as possible.

69

## ARTICLE X - ENGINEERING MAINTENANCE

(l)     The Skilled Trades Committee has compiled a list of work which would not require advanced notification. The work which would still require advanced notification will be described in more detail on the notification form.

(m)     For weekend overtime scheduling, Maintenance employees can cancel up to 11:00 a.m. on Friday without being charged for an absence and Management has until 3:00 p.m. Friday to schedule employees to work.

(n)     The duties of pipe covering and insulation shall be included in the classification of Pipefitter,

**Section 2—Outside Contracting**

(a)     Before the decision is made to use an outside contractor the Company will be assured that all skilled trades personnel in the affected classification(s) are not working less than the standard work day or standard work week, provided we have the proper equipment and skilled persons who can accomplish the work within the allotted time at no greater expense. Operating procedures will be generated by the Manager of Engineering to improve adherence to this commitment.

The Company does not intend to violate or evade any specific provisions of the Agreement, or to violate any spirit, intent, or purpose of the Agreement when using outside contractors. The Company will not alter past practices as far as offering Freeport Plant skilled trades employees Saturday, Sunday and Holiday work opportunities before utilizing outside contractors on those days.

The intent of this letter is to reaffirm to the Union Negotiating Committee the Company's intent to utilize outside contractors only when necessary and justified.

(b)     The parties established the following parameters for conducting Quarterly and Annual Review of outside contracting work performed in the plant that is specified in this Article:

(1)     The Quarterly meetings will be held during the second, third and fourth quarters of each calendar year.

(2)     The Annual meeting(s), which will also serve as the first quarter meeting, will be held before March 1st of each calendar year.

(3)     Standard information that will be provided by the Company to the Contracting Out Committee for the review meetings is as follows:

a)     Listing of all contracts that were let in the previous quarter, by date, to perform maintenance work that is traditionally performed by plant bargaining unit employees.

b)     Name of contracting company awarded each contract.

70

# ARTICLE X - ENGINEERING MAINTENANCE

c)      Nature of the work contracted and location, by Area or Department.

d)      Labor hours worked for each contract, actual hours if available, estimated hours if actual not available, total labor cost of contract if available.

e)      Total contracts let and total contractor hours worked for the previous calendar quarter and year.

(4)     In addition to discussing outside contracting, during the annual meeting the parties will discuss any events that have contributed to accomplishing the intent of Article X, Section 4, as well as future plans relative to fulfilling the obligations set forth in this Article.

**Section 3**

(a)     All maintenance bargaining-unit work will be performed by employees from within the bargaining unit. Such work will be contracted out only when necessary to assure efficient plant operations. Criteria for considering such decisions are availability of manpower with the necessary training, ability and skills, availability of necessary equipment, reasonably competitive cost, and purchase and performance guarantees at no additional cost to the Company.

(b)     Contracting Out Committee

The company agrees to make every reasonable effort to utilize personnel for maintenance work necessary for the plant's manufacturing process. The parties agree to establish person Contracting Out Committee at the local level, half of whom shall be members of the bargaining unit and designated by the Union President, and half will be management. This group should include where applicable the maintenance division chairman, and the appropriate management counterpart. The Committee shall consist of six (6) people and shall meet as required but not less than monthly to attempt to resolve problems in connection with contracting out at the plant.

(c)     Notice and Information

(1)     Prior to the Company entering into any agreement or arrangement to use outside contractors to perform maintenance bargaining unit work, the Company will, upon contemplating the use of an outside contractor, provide written Notice to the Contracting Out Committee. Such Notice to be given not less than five (5) days in advance of letting the contract. In the case of an emergency which prevents such advance Notice, the Union will be notified immediately upon the Company becoming aware of the emergency.

# ARTICLE X - ENGINEERING MAINTENANCE

(2)    Should the Union believe a meeting to be necessary, a written request shall be made within three (3) days (excluding Saturdays, Sundays and holidays) after receipt of such Notice. The meeting shall be held within two (2) days (excluding Saturdays, Sundays and holidays) thereafter. At such meeting, the parties shall review in detail the plans for the work to be performed and the reasons for using outside contractors. The Company will give good faith consideration to any suggestions by the Union members of the committee and to any alternate plan proposed by the Union members for the possible performance of the work by bargaining unit personnel.

(3)    Should the Company fail to give Notice as provided above, then not later than thirty (30) days from the later of the date of the commencement of the work or when the Union becomes aware of the work, a grievance relating to such matter may be filed.

(d)    Mutual Agreement

(1)    In the event the Contracting Out Committee resolves a matter in a fashion which in any way permits the use of outside contractors, such resolution shall be final and binding only as to the matter under consideration and shall not affect future determinations under this provision.

(2)    No agreement, whether or not reached pursuant to this provision, which directly or indirectly permits the use of outside contractors on an ongoing basis shall be valid or enforceable unless it is in writing and signed by the President of the affected Local Union.

(e)    Expedited Procedure

(1)    In the event either party requests an expedited resolution of any dispute arising under this Section, it shall be submitted to the Expedited Procedure in accordance with the following:

a)    In the event the parties cannot reach an agreement regarding the contracting out dispute, the Company may let the contract. Within three (3) days (excluding Saturdays, Sundays and holidays) either party may advise the other in writing they are invoking this Expedited Procedure.

b)    Procedures for expedited arbitration will be developed by the parties. At such hearing a Union member and a Company member of the Contracting Out Committee shall represent the respective parties.

## ARTICLE X - ENGINEERING MAINTENANCE

c)   The arbitrator shall render a decision within forty-eight (48) hours (excluding Saturdays, Sundays and holidays) of the conclusion of the hearing.

d)   Notwithstanding any other provision of this Agreement, any case heard in the Expedited Procedure before the work in dispute was performed may be reopened by the Union if such work, as actually performed, varied in any substantial respect from the description presented in arbitration.

(f)   Commitment

In addition to the other understandings described herein, the Company agrees that where total hours worked by employees of outside contractors in the plant on bargaining unit work reach or exceed the equivalent of one (1) full time employee, in a particular craft or classification, defined as forty (40) hours per week over a period of time sufficient to indicate that the work is full time, the work performed by outside contractors will be assigned to employees and the number of bargaining unit employees will be appropriately increased if necessary, unless the work cannot be performed by the addition of an employee(s), or that assignment of the work to employees would not be economically feasible.

(g)   Quarterly Review

(1)   Quarterly reviews will be held based on the provisions of Article X, Section 2(b) as appropriately revised.

(2)   During the quarterly review, the parties shall review the Company's compliance with the Commitment set forth above, including providing the Union all information necessary to evaluate said compliance. In the event the Union believes that the Company is not in compliance with the Commitment, the Union may enforce the Commitment through the grievance and arbitration provisions of the Agreement, irrespective of the Company's compliance with any other obligation in this provision or any other part of the Agreement. The arbitrator shall remedy the situation, which may include adding labor.

(h)   General Provisions

(1)   Special Remedies

a)   Where it is found that the Company (a) engaged in conduct which constitutes willful or repeated violations of this provision or (b) violated a cease and desist order previously issued by an arbitrator, the arbitrator shall fashion a remedy or penalty specifically designed to deter the Company's behavior.

73

# ARTICLE X - ENGINEERING MAINTENANCE

b)     With respect to any instance of the use of an outside contractor, where it is found that Notice or information was not provided as required under this provision, and that such failure was willful or repeated or deprived the Union of a reasonable opportunity to suggest and discuss practicable alternatives to the use of an outside contractor, the arbitrator shall fashion a remedy which includes earnings and benefits to bargaining unit employees who otherwise may have performed the work.

(i)     Outside Individuals Testifying in Arbitration

No testimony offered by an individual associated with an outside contractor may be considered in any proceeding unless the party calling the outsider provides the other party with a copy of each outside contractor document to be offered in connection with such testimony at least forty-eight (48) hours (excluding Saturdays, Sundays and holidays) before commencement of that hearing.

## Section 4

The Skilled Trades Representative at the Freeport plant will take on the role of advisor regarding the development and improvement of the programs and processes implemented to improve our competitive advantage. These activities include, but are not limited to, technical skills enhancement, education of safe work practices and procedures, project review, new employee indoctrination and productivity improvement.

Annually, during interim meetings, a joint review of the plant's plan will be made. Components of this review may include:

(a)     review of management's staffing analysis information including rates of attrition and future needs;

(b)     review entry requirements preferencing current employees who meet defined criteria; and

(c)     address upgrading skills, access for production associates, performance based training and basic skills remediation opportunities.

Whereas it is the desire of the parties to establish additional programs consistent with the above to further the skills and effectiveness of the skilled trades organization, the parties recognize the objectives stated herein are of mutual interest and can be accomplished through a joint cooperative effort.

74

# ARTICLE XI - MISCELLANEOUS CLAUSES

## ARTICLE XI - MISCELLANEOUS CLAUSES

**Section 1—Copies To Employees**

(a)     A copy of this Agreement shall be printed by a union printer and given, by the Company, as soon as they can be printed, to each employee working in and to new employees hiring into the bargaining unit.  Sufficient copies shall be furnished to the Union.

(b)     Copies of the Supplemental Unemployment Benefit Agreement and the Benefits Agreement will be given the employees and the Local Union.

**Section 2—Training Groups**

(a)     The Company may maintain a production, engineering, and staff training group for the purpose of training and preparing employees for more responsible positions.

(b)     Trainees may be assigned to fill in on temporary vacancies only after all qualified bargaining unit employees have been offered the available work.

(c)     No regular employee will be laid off or transferred because of trainee assignments.

(d)     Trainees will not balance work opportunities with regular employees.

(e)     No time studies will be made on any trainee.

**Section 3—Bulletin Boards**

(a)     Space on or adjacent to the factory bulletin boards shall be available to the Union for the purpose of posting notices throughout the plant.

(b)     Notices shall be restricted to the following types:
    (1)     Notices of the Union's recreational, educational, and social affairs.
    (2)     Notices of Union elections, appointments, and results of Union elections.
    (3)     Notices of Union meetings.
    (4)     Other informational notices.

(c)     The Union shall deliver all notices to the Human Resources Office for approval and prompt posting.  It will be the responsibility of the Human Resources office to remove such postings on a date mutually agreed to at the time the postings are delivered.

## ARTICLE XI - MISCELLANEOUS CLAUSES

### Section 4—Management Working

No supervisory personnel shall perform any work which would ordinarily be done by employees in the Bargaining Unit except for emergencies, inventory, trouble-shooting, and demonstrating methods or operations.

### Section 5—Address And Telephone

It is each employee's responsibility to keep his current address and telephone number (if any), on record with the Company. Notice of change must be made on proper form available for that purpose and may be made with the employee's Supervisor or at the Human Resources Office. Listed telephone numbers should be in the residence of the employee. When the occasion arises, an attempt will be made to call those who have listed other than a residence number, but the Company will not be responsible for failure to reach such employees.

### Section 6—Employee Payroll And Production Records

Whenever possible employees' payroll or production records will not be changed without first consulting the employee. Employees will be furnished with a copy of any adjustment or correction made by the Company to any payroll document which affects their earnings. When the change affects only the performance reported, the employee will be notified of the change that was made at the earliest practical opportunity.

### Section 7—Effect Of Agreement

The parties have entered into this Collective Bargaining Agreement, a Benefits Agreement and a Supplemental Unemployment Benefits Plan ("Agreements"). Those Agreements shall constitute the sole and entire Agreement between the parties and supersedes all prior Agreements. The language of these Agreements will prevail over any oral agreements, unless specifically adopted by the Company in writing after the effective date of these Agreements.

For any past Freeport arbitration decisions, Goodyear arbitration decisions on relevant Benefits Agreement or Supplemental Unemployment Benefits Plan language or under the SUB agreement, precedent setting grievance settlements, memorandums of agreement, administrative letters or Standard Practice Letters ("Claimed Precedent") to be considered as applicable, they must be presented by either party before the Company issues a final response at Step 3 or they will not be relevant or admissible in any subsequent step, including, but not limited to arbitration. The parties agree that either party has up to ten (10) days after the close of the third step meeting to present to the other side any relevant "Claimed Precedent" for consideration. If any "Claimed Precedent" is presented, the other party will have until the case is certified for arbitration to provide any countervailing "Claimed Precedent" for consideration. Nothing herein will prevent the parties from arguing why the "Claimed Precedent" is not controlling before an arbitrator.

## ARTICLE XI - MISCELLANEOUS CLAUSES

For any past arbitration decision at the facility, not disclosed as set forth above, the decision shall not be controlling, but may be introduced for argument in any subsequent arbitration. Nothing herein shall be deemed to limit submission of arbitration cases as argument in accordance with the arbitration protocol.

No oral modifications to the Agreements or oral representations with Goodyear regarding: (a) the Agreements, (b) grievance settlements or (c) past practices that occurred prior to the effective date of these Agreements will be binding on the Company, nor will they be admissible in arbitration proceedings, unless specifically adopted by the Company in writing after the effective date of these Agreements. By "specifically adopted by the Company in writing" includes items in this Agreement as well as those adopted by the following procedure:

    (1)    Within 60 days of the effective date, the Union must present a list of all oral modifications, grievance settlements or past practices to the Company for review.

    (2)    Within 30 days of the date of presentation of the list, the Company will investigate all oral modifications, grievance settlements or past practices at the facility. The Company will then meet with the union and either accepts the oral modifications, grievance settlements or past practices or ask that the items disputed be specially set before an arbitrator for resolution. The standard for the arbitrator will be whether the oral agreement existed at least one day prior to the effective date of the this Agreement.

    (3)    To the extent either party intends to introduce as evidence, refer to or discuss any oral modifications to the Agreements, oral grievance settlements or past practices that are attributed to Goodyear that are not established by this provision, the following will apply. Written notice of said intent must be given no later than 30 days before the arbitration. With said notice must be given the name of the persons who were parties to the agreement, the terms of the agreement and the approximate date of the agreement. Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

    (4)    In no event may either party introduce evidence of either Goodyear's "intent" or the Union's "intent" at the bargaining table prior to the 1997 negotiations. If either party intends to introduce evidence of "intent" the following will apply. Written notice of said intent must be given no later than 30 days before the arbitration. With said notice must be given the name of the person expressing the intent, the approximate date of the statements, copies of all notes regarding the statements. Nothing herein prevents either party from arguing any other legal basis from preventing this evidence to be received or considered.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(5)     Nothing in this provision will prohibit either party from introducing either parties' intent or any oral modifications, grievance settlements or past practices attributed to Titan Tire.

**Section 8—Gloves**

Gloves will be furnished in the first instance by the Company to employees who are regularly assigned to jobs which require usage of gloves, as determined by departmental management.

Replacements will be given only when the old gloves are unusable and turned in to the Company for exchange. Otherwise, the employees must sign a charge slip and have the price of the gloves deducted from his pay. An employee who has been furnished gloves by the Company and subsequently transfers to another job where gloves are not furnished, or who terminates his employment, must turn in his gloves to the Company or pay the price of the gloves.

**Section 9—Adoption Expenses**

It was agreed that an employee who, while accumulating continuous service during the term of this Agreement, wishes to adopt such a child (a child under age 18 not related to the employee by blood or marriage), will, at the time of court finalization of the adoption, be reimbursed for the following covered expenses:

(1)     Expenses for court costs and investigative, counseling and supervision fees charged by a recognized adoption agency which is licensed by appropriate State or County government authorities, not to exceed one thousand five hundred dollars ($1,500.00).

(2)     Legal fees associated with the adoption procedure, not to exceed five hundred dollars ($500.00).

**Section 10—Lubrication**

The responsibility for lubrication of all plant non-powered rolling equipment would be placed under the responsibility of production, the clean machinery and equipment classification.

**Section 11—Qualified Guidelines For Overtime And Short Work Week Scheduling**

The term "qualified" as it applies to overtime opportunities and Short Work Week scheduling shall be determined by the following guidelines.

(1)     A list will be maintained for each employee of the jobs they are qualified to perform.

78

## ARTICLE XI - MISCELLANEOUS CLAUSES

(2)    The list will be used for daily, Saturday, Sunday, Holiday overtime and for Short Work Weeks.

(3)    The employee and the Supervisor will be responsible for adding to and removing jobs from the list and recording the proper date of addition or deletion.

(4)    If there is question of "qualified" in a particular classification, the employee must demonstrate to that department their ability to perform the job prior to adding the job to the list.

(5)    Jobs added to the qualified list will be maintained until the employee removes the job from the list, unless removed through job disqualification. An employee removing their name may not reapply for a one (1) year period.

(6)    It is understood that the employee's current job classification will automatically be added to the list once they have satisfactorily completed the learning time.

(7)    In cases of job disqualification, the involved classification will be removed from the employee's list.

(8)    In cases where summer labor is involved, the qualified list for these employees will start over at the beginning of each summer. All jobs trained on will be added to the list. No jobs other than those trained on each summer will be added.

The above guidelines do not restrict the Company's right to use employees as available labor when needed. When making temporary assignments, the low senior employee in the identified available labor classification with the required classification on the qualified list will be moved prior to other qualified labor.

### Section 12—Lead Hands
(a)    Lead Hands:

Lead Hands will be utilized at the Freeport Plant in accordance with the attached Letter 6.

(b)    Implementation Guidelines:

(1)    The selection criteria will be established jointly with minimum standards set for attendance and work history. The application of bargaining unit service will be the determining factor only when all other selection criteria are considered equal.

(2)    In addition to a Lead Hand's regularly assigned job, specific job duties will be determined jointly at the local level and may include but not limited to such duties as the direction of work as required, alignment of labor, canvassing for overtime, various administrative duties including payroll

# ARTICLE XI - MISCELLANEOUS CLAUSES

within their respective work areas, ordering stock and requisitioning items from stores.

(3)    The rate of the job will be established at the local level and will be no less than an additional ten (10) percent above the rate of the job of their assigned job classification.

(4)    The lead hand will not be permitted to administer discipline.

(c)    The parties agreed that while ultimate authority for certain tasks and duties reside with departmental management, Lead Hands may perform these tasks administratively without conflict with the following CBA provisions:

Article V, Section 4(c) – daily overtime scheduling
Article VII, Section 16(a) – jury duty notification
Article VII, Section 18(c) – funeral leave pay
Article VIII, Section 4(a) – reporting absences
Article IX, Section 4(e) – day-at-a-time vacation
Article XI, Section 5 – address and telephone change notification
Article XI, Section 11 – Qualified list, with the exception of certifying additions to the list
Article XI, Section 15 – home base assignments
Article XI, Section 16 – job preference

The above list may not cover all areas of potential conflicts and may be modified by the parties with mutual agreement.

(d)    The parties agree that a joint oversight committee will be established to monitor implementation of this concept and periodically discuss any issues that may arise out of this process.

## Section 13–PAC

In accordance with Federal Election Commission guidelines, the Company will agree to weekly PAC deductions from earnings for each active union member, provided they sign a USW/PAC authorization form.

In consideration, the Union agrees to:

(1)    Provide to the Company a duly executed authorization form signed by the individual employees who wish to have contributions deducted from their earnings.

(2)    Indemnify, defend and save harmless the Company from any claims, suits, judgments, fines, penalties, attachments and from any other form of liability as a result of implementation of this Agreement.

80

# ARTICLE XI - MISCELLANEOUS CLAUSES

The pay from which the deduction and the date on which the remittance check is to be delivered to the Union shall be determined by the parties once the deduction system is available.

### Section 14—Combining Jobs For Scheduling

For combining jobs for reduced schedule, daily overtime, Saturday, Sunday, Holiday and startup and shut down, the following is a guideline for all departments to follow.

When the sign-up sheets are posted and there are known jobs that will be combined, the sign-up sheets for the combined jobs will be posted on one sheet.

It is recognized there may be cases where the combined jobs are not known until after the normal posting of sign-up sheets.

In either case above, the most senior qualified employee will be scheduled to perform the work on the combined job.

### Section 15—Home Base Assignments

(a)     In Department 320 for "Home Base machine assignment." Each Banbury Operator will be assigned a home base Banbury. Reassignment will be done only when a vacancy occurs or due to a machine breakdown or production requirement changes. As a vacancy occurs, preference will be given to the most senior operator on the shift which the vacancy occurred.

Only two machine moves per opening will be permitted for each Banbury opening.

Department 320 – Overtime with respect to Home Base Machine

Banbury operators working overtime in Department 320 will be assigned to their home base machine, if open, without regard to seniority. After home base machine assignments were made, further openings would be filled by seniority choice. The intent of this provision is that this principle be applied on-shift before offering the preferred machine assignment to an off-shift employee.

(b)     The following guidelines will be implemented in Departments 511 and 531 for "Home base tire machine assignment." Each builder will be assigned a home base machine and reassignment will be done only as is required by ticket changes. These changes will be made for ticket requirements that are for periods of time of more than one week, and most often will be for a long-range time span.

81

# ARTICLE XI - MISCELLANEOUS CLAUSES

GUIDELINES TO BE FOLLOWED

Whenever a preferenced tire machine is needed on a shift and that machine is not manned, the following guidelines will be used:

(1)    Production Control will identify which machine is least preferenced and that builder will be reassigned to the preferenced machine.  If there are two or more moves to be made, the offering of preferenced machines will be made in seniority order of the individuals to be moved.

(2)    If a builder's former home base again becomes a preferenced machine he will be offered the opportunity to return to that machine or retain his current home base.  These moves will be recorded on the "machine assignment" sheet, which will be retained in the builder's personnel folder.  Any errors made in reassignment will be corrected at the earliest opportunity.

(3)    A new employee or an employee coming to a different shift because of a shift preference opening will be assigned to a home base as is described in paragraph No. I. above.  However, builders on the shift where the open machine is located may request to be reassigned to that position.  These requests should be in writing and given to the responsible Supervisor.  Requests will be considered on a seniority basis and only two machine moves per opening will be allowed. Notification of a preferenced machine opening will be posted on the department bulletin board one week in advance of the machine assignment being made.  This will allow the on-shift builders to know which machine is being preferenced and give them an opportunity to request a machine change, if so desired.

(4)    Requests by two builders on the same shift to trade home base machines will be considered only after both builders have been on their assigned machines for three (3) months.

(5)    If realignment of shifts becomes necessary because of a surplus, the following criteria will be followed:

    a)    A builder reassigned to another shift may retain his/her home base tire machine if his/her seniority is greater than the person already assigned on that shift.

    b)    If a reassigned builder does not have seniority to claim their home base, he/she will be assigned to a new home base using the language in paragraph No. 3 of this provision.

    c)    If there are two or more builders being reassigned at a time, seniority among those involved will be used in allowing a selection of their new home base.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(6)     When multiple units go down, the senior builder will be given the option to build tires or be reassigned.

### Section 16—Openings Or Preferences Within Job Classifications

A preference within a job classification will be filled by one (1) senior employee on the shift where the opening exists prior to allowing an employee to move to that shift from another shift, classification or department. Only two preferences will be allowed for each vacancy filled within the production organization. This system would not apply to maintenance vacancies.

### Section 17—New Hire Orientation

Involvement of both management and the Union is of value to the orientation process for new employees. The parties recognize the importance of proper new employee orientation and that it is imperative that new employees receive necessary information about the Company and the Union. The Company will pay up to a maximum of eight (8) hours of time lost during the employee's regular shift for this orientation. The logistics of the meeting(s) will be handled by the parties at each plant.

The parties agreed that employees who are hired as part of the bargaining unit will be allowed to meet with local union leadership during their orientation period.

The Company will reimburse employees, who successfully complete their probationary period, for the cost of prescription safety glasses and a vision exam if required. This reimbursement will equal the amount(s) stated in the employee's benefit package.

### Section 18—Dental Plan

The current Dental Expense Benefit Plan will continue until notice is issued by the Union to discontinue the Plan. Any increase in the premium for such Dental Expense Benefit Plan shall be borne out of the Cost-of-Living Allowance adjustments and future general wage increases which arise out of the 2006 labor agreement. If the increase in contribution rate for the Plan exceeds the amount of Cost-of-Living Allowance adjustment or general wage increase payable at the time of the increase, the amount which exceeds the increase will be borne by a reduction in basis wage rates.

In the event, however, that the Dental Expense Benefits Plan is discontinued at any time, the amount previously deducted from Cost-of-Living Allowances and general wage increases otherwise payable will be restored to all pay rates effective immediately upon discontinuance of the Plan, or in the event of a deficit in the Plan fund, when the deficit has been repaid. In the event of a surplus in the fund at the time of discontinuance of the Plan, the parties will meet to agree to the method of returning the surplus to the employees.

The roll up on the Cost-of-Living Allowances or general wage increases arising out of the Basic Labor Agreement which is withheld to provide for the Dental Expense Benefit Plan

# ARTICLE XI - MISCELLANEOUS CLAUSES

will be applied as a credit to reduce the Cost-of-Living Allowance or general wage increase that would otherwise be withheld.

The Company also agrees to reduce the amount of the Cost-of-Living Allowances or general wage increases that will be withheld during the term of the Dental Agreement effective November 1, 2004, and any subsequent Dental Agreement, to provide for the Dental Expense Benefit Plan, by the amount of roll up. Roll up for the term of the 2004 dental renewal will be based on roll up for the year of 2003. Roll up for the term of any dental renewal beyond the term of the 2004 Dental Agreement will be based on the actual roll up for the year previous to the beginning of the new Dental Agreement period.

The Company will maintain a record of all hours for which employees receive pay and multiply that number by the credit based on roll up. The resulting number will be accounted for on the Company's books as set forth in the "agreed to" administrative letters concerning the Dental Expense Benefit Plan. A report of this information will be provided to the Union on a monthly basis.

Prior to the scheduled expiration of any implemented Dental Agreement, the Company commits to facilitate the solicitation of interested vendors capable of providing the administrative services necessary to accomplish the objectives of the Plan for the renewal period. Contract discussions will be held with invited firms and appropriate Company and Union representatives for the purpose of negotiating the terms of a renewal agreement. The Company further commits to provide any necessary information and pay the reasonable costs associated with these renewal activities.

### Section 19—Notice On Labor Placements
The Company will give notice to the Union when labor placements are to be made under Article VIII, Sections 8 (Disqualifications), 9 (Medically Restricted Placements) and 10 (Surplus Labor and Layoffs). With such notice, the Union may participate in such placements when they are scheduled to occur.

### Section 20—Temporary Assignments Outside Bargaining Unit
To facilitate communication on such assignments:

(1)     All temporary assignments outside the bargaining unit must receive written pre-approval from the Human Resources Manager.

(2)     The Human Resources Manager will forward a copy of such written pre-approval to the Union President.

(3)     The pre-approval will include the starting time/date and the ending time/date of the assignment. This will be posted in the department as notice.

## ARTICLE XI - MISCELLANEOUS CLAUSES

(4)     The Company will make management aware of this requirement.

(5)     The Union will make bargaining unit employees aware of this requirement.

(6)     The Company will notify the Union and the employee when the employee has reached 75 cumulative days outside the bargaining unit.

85

# ARTICLE XII - SAFETY AND HEALTH

# ARTICLE XII - SAFETY AND HEALTH

**Section 1**

(a)     The Freeport plant health and safety program will continue to be of equal importance with product quality and production. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment and will provide competent first aid personnel and furnish protective devices and protective equipment where necessary, and protective clothing on work which is recognized to be abnormally hazardous. When needed, the employer shall provide transportation for injured employees to the hospital. The plant medical personnel, plant safety management or their designee shall determine the best available mode of transportation. The Employer shall provide necessary shower baths, lockers and other facilities for maintaining sanitary conditions throughout the plant. Unique personal protective equipment requirements for documented needs beyond standard and customary shall be addressed on a case-by-case basis.

Boots will be made available to employees required to perform assignments that involve standing in water. Rainwear will be made available when employees are assigned to outside work in inclement weather.

(b)     A Joint Safety and Health Committee ("JSHC") shall be appointed consisting of not more than four representatives of the Company and not more than four representatives of the Union to facilitate the promotion of safe working practices, including ergonomic considerations, and the elimination of unsanitary or unhealthful working conditions within the plant. The JSHC shall be furnished passes for the purpose of entering the plant and investigating safety conditions within the plant. Members of the safety committee shall perform a comprehensive safety and health audit of the entire plant not less than annually. The audit is intended to augment the existing health and safety inspections and tours already in place. The audit process shall be developed at the local plant level, and shall include a process by which priorities are set and action plans developed. When entering the plant for this purpose, the Committee shall notify the Safety Manager on day shift, and appropriate Supervisor on later shifts, of reason for the visit and their destination.

Effective January 1, 2006, the employer shall provide the union safety committee with a weekly allocation of hours to be utilized for committee business based on the following. The allocation will not be accumulated from week to week. These representatives shall work with the employer safety and health department, but under the direction of the union co-chair of the safety committee and the local union president. The employer may agree to the appointment of additional full or part-time union safety reps in addition to those provided by the hours below, to be compensated by the employer. These representatives shall be chosen exclusively by the union.

86

## ARTICLE XII - SAFETY AND HEALTH

| | |
|---|---|
| - 1-50 active bargaining unit employees | 10-hours/week |
| - 51-200 active bargaining unit employees | 20-hours/week |
| - 201-750 active bargaining unit employees | 40-hours/week |
| - 751-1500 active bargaining unit employees | 60-hours/week |
| - 1501-2000 active bargaining unit employees | 80-hours/week |
| - 2001+ active bargaining unit employees | 120-hours/week |

The preceding provision is inclusive of the existing hours paid currently at each facility. If a facility is currently exceeding the above allocation it will not be reduced below their current level.

(c)     No employee shall be disciplined or discriminated against in any way for suffering an injury or illness, or for reporting an accident in a timely manner. The employer shall not establish any incentive program that discourages employees from reporting accidents, injuries, or illnesses in the plant. Any existing incentive programs shall be evaluated by the plant safety committee with the assistance of the corporate health and safety department and the international union health, safety and environment department.

(d)     Right to Refuse Unsafe Work:

   (1)     No employee shall be required or permitted to work under conditions which may be or tend to be unsafe or injurious to his health or safety and the safety of others.

   (2)     No employee who in good faith exercises his or her rights under this Article shall be disciplined, or suffer any loss of pay or benefits, even if it is later determined that the alleged unsafe condition did not exist.

   (3)     If an employee is concerned about the safety of a specific job or task, the employee will notify a member of management immediately. The member of management will then request a risk assessment to be conducted utilizing the local plant's existing risk assessment procedures.

   (4)     No employee or group of employees shall be required to work on a job or machine while it is considered unsafe by a representative of the joint labor management safety committee. During such time the employee or group of employees shall receive their normal hourly rate.

(e)     The JSHC shall meet not less than once per month for the purpose of discussing safety problems, and will tour the plant periodically to verify that adopted safety recommendations have been complied with. The JSHC may make investigations following serious accidents to determine causes and to explore preventive measures against recurrence. The members shall secure approval from their Supervisor before leaving their jobs for this purpose.

## ARTICLE XII - SAFETY AND HEALTH

Union members of the JSHC shall be paid in accordance with Article VII, Section 13.

(f)    Data concerning disabling injuries will be made available to the JSHC upon their request. An employee who signs an accident report will be given a copy of the report at that time.

(g)    When an employee supplies satisfactory evidence that he sustained damage to his eye glasses, hearing aid, or artificial limb while performing the duties of his assigned work with due caution and without interference by other employees, the Company will reimburse the employee for the cost of necessary repairs or replacement. The cost of an examination or prescription will be borne by the employee. The employee must supply evidence that the breakage was done on the job and in the line of duty.

(h)    The Company Chairman of the JSHC shall notify the Committee of recommendations resulting from plant inspections by State or Federal Safety Inspectors. A copy of such recommendations will be provided upon request.

An employee who is requested by a safety inspector from the Office of Occupational Safety and Health administration and is designated by the Union President to accompany the inspector on an inspection tour, will be paid his current hourly rate for the time lost from his regular shift as a result of such plant inspection.

(i)    The Company will pay full travel and hotel expenses, within the limits of established Company policy, for four Union members of the JSHC to attend an annual State Safety Conference. If the State does not have a suitable conference, arrangements will be made to attend the National Safety Conference or the parties may mutually agree to an alternate safety conference.

(j)    In any area where raw materials of known toxicity are being used, the Company will make available to qualified professional testing representatives the formulation of the material in question upon the request of a physician. In all such cases, where the Company has caused blood tests or skin tests to be made of employees, the result of such tests will be furnished to the employee upon his request. Upon request of the Joint Safety and Health Committee, the Company will make skin or blood tests on any employee exposed to toxic material, subject to the employee's approval. The employer shall maintain an Industrial Hygiene monitoring program in each plant. Upon request, representatives from the Joint Safety Committee may be present when such monitoring takes place and such representative will be entitled to copies of such test or monitoring results. All Industrial Hygiene samples will be analyzed by a laboratory meeting the standards of the current laboratory to be selected in accordance with Titan's Insurance carriers.

## ARTICLE XII - SAFETY AND HEALTH

(k)    When evidence exists that indicates an employee's illness may have been caused by the materials to which he is exposed while working, the Company will make tests in an effort to determine the cause and nature of the illness. A copy of the results of such tests shall be furnished the employee upon request.

       An employee who must lose time from his regular shift because of such tests will be paid his current hourly rate for the time lost from that shift.

(l)    No employee shall be required to work on any job in the plant with which he is unfamiliar until he has received adequate safety instructions in the performance of the operation.

(m)    An employee who is injured in the factory must promptly report each injury that occurs with the facts and one who suffers from an occupational illness must report promptly upon becoming aware of the existence of such illness. Should the employee require surgery or hospital confinement or require treatment over an extended period for the occupational injury or illness, may receive treatment by the Company's physician, or such other physician chosen by the employee. In the event any dispute arises concerning any treatment or disability of the employee, the employee may be examined by a physician designated by the employer. If the dispute is not resolved by this examination such dispute will be resolved through the State Industrial Commission.

(n)    The employer will furnish safety prescription lenses and frames to employees that must wear prescription glasses when such employees are permanently assigned to operations where mandatory eye protection is continuously required. This clause does not apply where special or extra eye protection is required and where regular frame safety glasses are not sufficient to meet protection requirements.

       Glasses furnished by the company will have side shields permanently affixed so as to provide adequate protection to the employee.

(o)    It is the intention of the Company to continue every effort to improve the safety performance of the plant and improve the safety environment for each employee.

       The Company will continue the practice of having weekly meetings with the JSHC. In addition, hygiene monitoring test data will be reviewed in these meetings.

       Training of JSHC members will continue to be an important aspect of enhanced safety performance. The Company will continue to review training opportunities that will expand current safety expertise of JSHC members.

       The Company will commit to sending at least 2 members, 1 hourly and 1 salary, to the Union/Management Safety Symposium annually throughout the Agreement.

## ARTICLE XII - SAFETY AND HEALTH

(p)     Two (2) members of the Safety Committee shall be named to the Ergonomics Steering Committee; one hourly and one salary associate. The additional hourly member will be selected by the Union President and approval by the Human Resource Manager. The Human Resource Manager and Union President will be members of the Ergonomics Steering Committee.

(q)     Personal Protective Equipment

    (1)     The Company will provide $65.00 credit for safety shoes purchased as a result the mandatory PPE shoe requirement. Additional $65.00 credit for replacement safety shoes is limited to a minimum 18-month interval between purchases during the life of this Agreement.

    (2)     Employees moved out of classification as available labor would be provided coveralls and shoe coverings, if requested.

# ARTICLE XIII - COOPERATIVE EFFORTS

# ARTICLE XIII - COOPERATIVE EFFORTS

## Section 1

The parties recognize that the intent of cooperative efforts is to provide value for employees, customers and shareholders.

The parties acknowledge that this Memorandum will evolve throughout the life of the contract as business and competitive conditions change. However, the principles outlined in this memorandum should remain constant into the future.

Principles

This memorandum reflects the mutual commitment of the Company and Union and is based on the following principles:

1. Cooperative efforts are long term processes and require ongoing efforts to maintain

2. The parties recognize that these processes are built on a foundation of trust and respect that must exist between all parties, the Company, the Union and the employees.

3. It is not the intent of these cooperative processes to undermine the strength of either party nor compromise the legal collective bargaining process

4. It is recognized that these cooperative processes are not an end in themselves, but rather a means to increase Company and Union viability by providing heightened value to our customers, and an improved quality of working life for our employees.

5. Employees, the Union and the Company should be provided with appropriate information in a timely manner to support effective decision making.

6. The Company and the Union will work together and participate in various community forums where it is appropriate for both parties.

Cooperative Structure

The parties recognize that a cooperative process requires the establishment of an appropriate organizational structure. Such a structure must include defined roles for the parties at each level of the organization.

The parties recognize that the plant has the flexibility to design a cooperative structure that fits the organization's needs and circumstances. Further, where such a structure currently exists, it may be in the best interest of the Company and Union to retain such a structure so long as it meets the objectives and principles of this Memorandum.

# ARTICLE XIII - COOPERATIVE EFFORTS

The Freeport plant is committed either to maintaining its current cooperative structure or entering into a new cooperative process which promotes the principles of this Memorandum.

The parties will establish a plant steering committee for the purpose of promoting and developing cooperative processes at the plant level. This core group must include top management representatives, as well as top Union officials. This committee will have a minimum of four members. This committee will review the plant's business plan and discuss opportunities under the cooperative process to address business issues and needs and appropriate employee concerns.

The steering committee will meet as often as necessary, but no less than twice a year in order to ensure that this memorandum is effectively implemented and consistently administered.

It is recognized that in order for this committee to function effectively, information must be shared in a timely manner. This information will be focused on the Manufacturing Business Plans for the plant. In conjunction with the business plan review process the parties will discuss staffing requirements for bargaining unit employees. Where a substantial number of layoffs are anticipated, the parties will discuss options that could potentially minimize the impact of layoffs on employees.

The plant cooperative structures will be compatible with the plant's existing or future organizational needs and structure.

Process Components

The parties recognize that the following process components are necessary in order to achieve a successful cooperative process:

Skills Assessment

The parties are committed to developing and maintaining a highly skilled workforce needed to meet the demands of the ever-changing competitive environment. To that end, the local parties will:

1.  Identify skills needed to effectively operate the plant;

2.  Assess current skills;

3.  Develop training programs to close gaps between required skills and current skill levels;

92

## ARTICLE XIII - COOPERATIVE EFFORTS

4.  Assess future skill level requirements

Education/Training

The parties are committed to upgrading employee training and educational programs with the objectives of enhancing occupational skills, communication skills, and providing opportunities for personal development.

Toward this end, during the term of this Agreement, the steering committee will be charged with the responsibility of developing and determining the resources necessary to meet the cooperative education and training needs of the organization.

It is appropriate for the parties to evaluate and determine the need for, and the structure of, a joint educational process.

A review of the status of the cooperative education and training process will be discussed at the Interim Meetings.

Technological Change

The parties recognize the importance of technological change if the Company is to remain competitive and viable in world markets.

It is further recognized that a competitive and viable manufacturing environment provides meaningful, substantial job opportunities for present and future employees.

For this reason, the local Union will be notified of projected technological changes that will have an impact on employees.  The parties will continue to work together to minimize that impact.

In addition,  the parties will discuss technological change in advance of its implementation at the plant.  It is recognized that the involvement and input of the appropriate management and union personnel can result in more informed decisions, as well as the effective and efficient implementation of technological changes at the plant floor level.

Problem Solving Process

The parties recognize and support the utilization of a systematic problem solving process for the purpose of identifying and resolving issues.  It is understood that in order to effectively utilize this problem solving process employees and management need to receive appropriate education and training.

Interim meetings will be a forum to review and discuss problems arising out of this provision as well as the other Agreements.

Work Redesign

93

# ARTICLE XIII - COOPERATIVE EFFORTS

The Plant Steering Committee may investigate and implement work redesign consistent with the principles of this Agreement. Work redesign may include the establishment of operating work teams or self-directed work teams and/or the implementation of other new and improved ways of performing work. Additionally, any work redesign will be aimed at increasing employee responsibility, more effective utilization of people, materials and equipment along with a heightened level of job satisfaction and security resulting from increased employee contributions to the decisions and initiatives that have an impact on the workplace.

<u>Safeguards and Resources</u>

    (1)    The selection of a consultant, if required, to assist in the development and implementation of the cooperative process will be mutual.

    (2)    The cooperative process will not conflict with the traditional role of the Union, such as processing grievances.

    (3)    Problems arising out of this provision can be referred to the steering committee for review and are not subject to work interruptions or the grievance procedure, unless they were previously under the jurisdiction of the grievance procedure prior to the effective date of this Agreement.

    (4)    The Company and the Union are committed to no employee being laid off as a result of improvements made under this cooperative processes.

    (5)    The Company and Union leadership are committed to entering into a cooperative process which promotes the principles outlined in this provision. Employee participation in this process is voluntary and employees will not be disciplined as a result of their decision.

    (6)    Information shared under administration of this provision will be provided subject to the execution of an appropriate confidentiality agreement between the parties.

In summary, the Company and the Union are strongly committed to this provision as a means of developing the labor management relationship and union/management leadership necessary for creating a workplace environment that will benefit the employee, the Union and the Company

# ARTICLE XIII - COOPERATIVE EFFORTS

**Section 2—Capital Investments**

The extent of the Company's future capital investments in the Freeport plant will depend on the competitive position of the plant in areas such as productivity, quality, company profitability and costs as well as the availability of capital funds.

The Company agrees to meet and discuss with the Union, no less than annually, its allocations for future capital projects.

**Section 3—Workforce Training**

(1)    Commitments

   The parties are committed to:

   (a)    the Company's workforce being sufficiently skilled so that all bargaining unit work can be performed in accordance with this Agreement by employees; and

   (b)    Employees receiving sufficient training to allow for all reasonable opportunities to progress within the Bargaining Unit where practical and maximize their skills to the greatest extent possible.

(2)    Plant Training Committees

   (a)    Appointment and Composition

      The parties shall establish a Plant Training Committee. The Committee shall be composed of not less than four (4) and not more than six (6) representatives, half of whom shall be Union representatives and half of whom shall be Company representatives. The Company members of the Committee shall be selected and serve at the pleasure of the Company. The Union members of the Committee shall be selected and serve at the pleasure of the Local Union President.

   (b)    Staff

      Effective January 1, 2006, the Plant Training Committee shall have one (1) full time Training Coordinator who will be responsible for coordination and oversight of the Training Program for bargaining unit employees. The Training Coordinator will be an employee selected by and serving at the pleasure of the Chair of the Union Negotiating Committee, in consultation with the Local Union President, subject to the reasonable approval of the Company. The Training Coordinator shall be compensated in accordance with standard local plant understandings his currently hourly rate for all hours.

(3)    Study of Workforce Training Needs

## ARTICLE XIII - COOPERATIVE EFFORTS

Within six (6) months of the Effective Date, the Plant Training Committee shall complete a report (Report) of the expected training needs of the workforce over the term of the Agreement, given the Commitments outlined in Paragraph 1 above.  Such Report shall include Findings and Recommendations as described below.

(a)    Findings

    (1)    an age and service profile and the anticipated attrition rates of the workforce over the short term and long term future, it being understood that the study is performed solely for the purpose of determining attrition rates.

    (2)    an assessment of the current skill requirements (both competencies and force levels) of the plant, the availability of such skill requirements within the existing workforce and any training necessary to bring the competencies and/or force levels of the current workforce into prompt conformity with the plant's current skill requirements;

    (3)    an evaluation of the appropriateness of existing training and the necessity of developing additional training, giving due consideration to emerging and changing patterns and trends in technology and future skill needs;

    (4)    an examination of current overtime levels and an assessment of whether employees in certain positions are working excessive overtime;

    (5)    an examination of methods by which productivity can be improved through additional training of employees;

    (6)    an examination of the plant's business plan, including projected capital spending, planned or potential new technology or technological change and other relevant factors over the term of the Agreement; and

    (7)    an assessment of the work practices and the training practices at the plant.

(b)    Recommendations

Based on its Findings, the Plant Training Committee shall develop a comprehensive training program, including a detailed implementation plan and all necessary resources for administration, implementation, delivery

## ARTICLE XIII - COOPERATIVE EFFORTS

and evaluation (Training Program) designed to, on a practical and timely basis, meet the commitments outlined in Paragraph 1 above.

    (c)    Update

Each year the Plant Training Committee shall prepare an Update that reviews the Findings and modifies them based on changed circumstances, measures the success of the Training Program against its objectives and modifies the Training Program accordingly.

    (d)    Separate Statements

The Report and each Update will include separate statements by the parties with respect to any Finding or Recommendation as to which they disagree.

(4)    Action by the Union President

    (a)    Within thirty (30) days of receipt of the Report or an Update, the Union President and the Plant Manager shall approve a Training Program or Update (including modifications upon which they can agree) or submit those matters on which they do not agree to Arbitration, pursuant to procedures to be agreed upon by the parties.

    (b)    The dispute will be resolved expeditiously on the basis of a final offer submission by the parties at a hearing. The arbitrator will determine which of the submissions best meets the Commitments outlined in Paragraph 1 above, in light of the Findings referred to in Paragraph 3(a) above. The arbitrator shall have the power to determine the procedures pursuant to which the hearing is conducted.

(5)    Administration and Union Role

The Plant Training Committee shall jointly oversee the administration and delivery of its Training Program, the expenditure of training funds necessary for its operation, and an annual audit of such activity.

    (a)    With respect to any aspect of the administration, delivery or implementation of the Plant Training Program, the Union members of the Plant Training Committee shall be free to propose that the Union or its designee take any or all responsibility for such administration, delivery or implementation, subject to the approval of the Company members.

    (b)    In the event the Union does take such approved responsibility, the Company shall fully cooperate with the Union or its designee with the

## ARTICLE XIII - COOPERATIVE EFFORTS

resources required for any administration, implementation or delivery for which the Union receives approved responsibility.

(6)     Safeguards and Resources

(a)     The Company shall provide the members of the Plant Training Committee and the Training Coordinator with such training as is necessary to enable them to perform their responsibilities under this Section. Employee participation in the Plant Training Committee shall normally occur during normal work hours. All meeting time and necessary and reasonable expenses of the Plant Training Committee shall be paid for by the Company and Employees attending such meetings shall be compensated in accordance with standard local plant understandings.

(b)     Union members of the Plant Training Committee shall be entitled to reasonable opportunity on Company time to caucus for purposes of study, preparation, consultation and review, and shall be compensated in the same manner as set forth in Paragraph (a) above. Requests for caucus time shall be made to the appropriate Company representative and shall be held within two working days of the request, unless mutually agreed otherwise.

(c)     To the extent that Company facilities are available and appropriate for Training Program activities, they will be made available.

(7)     Dispute Resolution

In addition to the matters covered by the dispute resolution procedure described in Paragraph 4 above, in the event that the Plant Training Committee is unable to reach agreement on any matter involving the Training Program, the Plant Training Committee shall appoint the arbitrator referred to in Paragraph 4(a) to resolve such dispute. Further details of this procedure shall be as agreed to by the Plant Training Committee unless they are unable to reach such agreement, in which case they shall be determined by the arbitrator.

### Section 4—Employment Security

(1)     Layoff Minimization Plan

The Company agrees that, prior to implementing any layoffs, it shall review and discuss with the Union:

(a)     documentation of the business need for the layoffs (Need);

## ARTICLE XIII - COOPERATIVE EFFORTS

(b)　　the impact of the layoffs on the bargaining unit, including the number of employees to be laid off and the duration of the layoffs (Impact); and ,

(c)　　a plan designed to reduce the need for and level of layoffs in the affected classifications (a Layoff Minimization Plan) which shall contain at least the following elements:

　　(1)　　a substantial reduction in the use of outside contractors in the affected classifications;

　　(2)　　the absolute minimal use of daily overtime in the affected classifications;

　　(3)　　any strategy to purchase products or services that would normally be provided by bargaining unit employees;

　　(4)　　a program of optional layoffs as provided in Article VIII, Section 10(b);

　　(5)　　the use of alternate work assignments for affected individuals;

　　(6)　　a meaningful program of shared sacrifice by management.

(2)　　Employee Protections

Reference to the elements of a Layoff Minimization Plan in Paragraph 1 above shall not be construed to impair in any way any protection afforded to Employees under other provisions of this Agreement.

(3)　　Union Response

The Union shall be provided with sufficient information to reach its own judgment on whether there is a Need, the appropriate Impact and to develop its own proposed Layoff Minimization Plan.

(4)　　Dispute Resolution

(a)　　In the event the Parties cannot reach agreement on whether there is a Need, the appropriate Impact and the terms of a Layoff Minimization Plan, the Company may implement its plan and the Union may submit their dispute to an expedited final offer arbitration under the procedures to be developed by the Parties. If the Company lays off Employees in violation of this Article, such Employees shall be made whole.

(b)　　The arbitrator's ruling shall address whether the Company demonstrated a Need, and if it did, whose proposed Impact and Layoff Minimization Plan

99

## ARTICLE XIII - COOPERATIVE EFFORTS

was more reasonable, given all the circumstances and the objectives of the Parties.

### Section 5—Plant Closing

In the event a full plant closure occurs during the life of this Agreement:

(1)     The Company will notify the Local and International Union at least six months prior to the cessation of production operations.

(2)     Following such notification, the Local and International Union will have the right to discuss and explore with the Company any possible means of averting the closure.

(3)     If attempts to avert the plant closure are not successful, Company and Union representatives will meet to negotiate the manner in which the closure is carried out.

### Section 6—Executive Compensation

The Company agrees that:

(1)     The average base salaries of the executive officers as a group will not exceed the average salaries of similarly situated executives at comparably sized industrial companies.

(2)     All future (including the amendment of existing plans) stock purchase, stock option, stock appreciation or other similar programs (Stock Programs) shall:

  (a)     reward only long-term appreciation in the value of the Company's stock and

  (b)     not, once granted, directly or indirectly be "re-priced" or similarly adjusted, subject to the New York Stock Exchange definition of "re-pricing".

### Section 7—Wellness

A cooperative Titan Tire/Local USW Wellness Program will be maintained at the Freeport plant.

This voluntary program will consist of periodic health screening examinations, seat belt usage campaigns, smoking cessation clinics, and stress reduction programs to encourage employees to establish home and work habits that will help them lead healthier, more fulfilling lives. The cost of these programs will be supported by the Company.

# ARTICLE XIII - COOPERATIVE EFFORTS

In addition to the above, a weight management program, approved by management, will be sponsored by the Company as follows. Upon completing a program with at least 75% attendance, the Company will reimburse the employee 50% of the program cost.

The continuance of these programs will be reviewed by an Advisory Committee consisting of two (2) representatives from the Local Union and two (2) representatives from the Company. The medical portion of the program will be administered by the plant Medical Director including the type and frequency of screening tests.

Active employees will be eligible to participate in the program. At the beginning of the program, eligible employees will be scheduled for an initial health screening examination. After the initial examination, employees will be scheduled for periodic examinations on or about their birthday anniversary. During the course of the 1998 negotiations, it was agreed that a prostate screen (PSA) be added to the Wellness program screening examination.

To the extent possible, the examinations will be scheduled in the plant dispensary during the regular dispensary hours. Employees will be scheduled for examination prior to their regular work shift; however, some employees may have to be scheduled at other times. Other local medical service resources may be utilized when necessary.

The results of the examination will be reviewed by the local plant physician. The participant will be informed of the results and the recommendations, if any, for further medical evaluation. A copy of the examination will be provided the participant if requested in writing by the participant.

On written request of the Local President, available statistical summaries of examination data, with identifiers removed, regarding health problems in the work force will be provided.

All examination results will be considered as privileged and confidential information and will not be released to anyone except on written authorization of the employee and, no information received by the Company pursuant to this program shall be used to discriminate or retaliate against any employee for any purpose.

Such information shall not be used in making employment-related decisions unless the health of the employee so requires. Individual test results, health history profiles, risk analysis profiles, and physical recommendations transmitted to the plant physician shall be treated as confidential medical records and filed only within the plant medical department.

The Company may use its health insurance carrier to implement the terms of this provision.

## Section 8—USW/Titan Tire Institute For Career Development

(1)     Establishment

101

## ARTICLE XIII - COOPERATIVE EFFORTS

Effective July 1, 2007 the Union and the Company hereby establish the USW/Titan Tire Institute for Career Development (the Institute) which, in conjunction with similar programs negotiated by the Union with various other employers, will be administered under the rules and procedures of the Institute for Career Development (ICD).

(2)     Purpose

        The purpose of the Institute is to provide resources and support services for the education, training and personal development of the Employees of the Company, including upgrading their basic skills and educational levels.

(3)     Guiding Principles

        The Institute and ICD shall be administered in a manner consistent with the following principles:

        (a)     workers must play a significant role in the design and development of their jobs, their training and education and their working environment;

        (b)     workers should be capable of reacting to change, challenge and opportunity and this requires ongoing training, education and growth; and

        (c)     worker growth and development can only succeed in an atmosphere of voluntary participation in self-designed and self-directed training and education.

(4)     Financing

        The Institute will be financed by a contribution of $.10 (ten cents) for each hour worked in the Freeport plant.

        The parties will also seek and use funds from federal, state and local governmental agencies.

(5)     Administration

        (a)     The Institute will be administered jointly by the Company and the Union in accordance with procedures, rules, regulations and policies agreed to by the parties.

        (b)     Training is separately provided for in the Agreement. The Company may, however, contract with the Institute to provide services and resources in support of such training.

# ARTICLE XIII - COOPERATIVE EFFORTS

(c)    The Company agrees to participate fully as a member of ICD in accordance with policies, rules and regulations established by the ICD. The Company's financial contributions to the Institute will continue to be separately tracked. ICD will continue to be under the joint supervision of the Union and participating employers with a Governing Board consisting of an equal number of Union and employer appointees.

(6)    Reporting, Auditing, Accountability and Oversight

The following minimum requirements shall govern reporting, auditing, accountability and oversight of the funds provided for in Paragraph 4.

(a)    Reporting

(1)    For each calendar year quarter, and within thirty (30) days of the close of such quarter, the Company shall account to the Institute, the ICD, the International Union President and the Chair of the Union Negotiating Committee for all changes in the financial condition of the Institute.    Such reports shall be on form(s) developed by the Institute broken down by plant and shall include at least the following information:

(a)    The Company's contribution, an explanation thereof and the cumulative balance; and

(b)    a detailed breakdown of actual expenditures related to approved program activities during said quarter.

(2)    The Union Co-Chairs of each of the Local Joint Committees shall receive a report with the same information for their plant or Local Union, as the case may be.

(b)    Auditing

The Company or the Union may, for good reason, request an audit of the Company reports described in Paragraph 6(a) above and of the underlying Institute activities made in accordance with the following: (1) the Company and the Union shall jointly select an independent outside auditor; (2) the reasonable fees and expenses of the auditor shall be paid from ICD funds and (3) the scope of audits may be Company-wide, plant-specific, or on any other reasonable basis.

(c)    Approval and Oversight

Each year, the Local Joint ICD Committees shall submit a proposed training/education plan to the Chairs of the Union and Company Negotiating Committees or their designees.    Upon their approval, said

103

## ARTICLE XIII - COOPERATIVE EFFORTS

plans shall be submitted to the Institute. The Institute must approve the plan before any expenditure in connection with any activities may be charged against the funds provided for in this Agreement. An expenditure shall not be charged against such funds until such expenditure is actually made.

(7)     Dispute Resolution Mechanism

Any dispute regarding the administration of the Institute at the Company or plant level shall be subject to expedited resolution by the Chairs of the Union and Company Negotiating Committees and the Executive Director of ICD who shall apply the policies, rules and regulations of the Governing Board and the provisions of this Section in ruling on any such dispute. Rulings of the Executive Director may be appealed to the Governing Board, but shall become and remain effective unless stayed or reversed by the Governing Board.

# ARTICLE XIV - COST OF LIVING

## ARTICLE XIV - COST OF LIVING

**Cost-Of-Living Allowance**

(1)     The Cost-of-Living Allowance, if any, will be determined in accordance with changes in the Consumer Price Index--United States City Average, for Urban Wage Earners and Clerical Workers (1967 = 100) Revised Series as amended for the month of January, 1987 and subsequent months published by the Bureau of Labor Statistics, hereinafter referred to as the CPI-W.

(2)     Cost-of-Living Allowances will be the average CPI-W for the months of March, April, and May 2005.

Cost-Of-Living Allowances will be made at the following times:

| | |
|---|---|
| January 1, 2006 | September, October, November 2005 |
| April 3, 2006 | December 2005, January, February 2006 |
| July 3, 2006 | March, April, May 2006 |

The April 3, 2006 adjustment will be increased $.23 for restoration of previously deferred COLA adjustments.

Effective January 1, 2006, current Cost-of-Living Allowance will be considered to have been rolled into the Job Grade wage rates detailed in Schedule B. The amount of the Cost-of Living Allowance payable on each Effective Date of Adjustment will be determined by comparing the three-month average CPI-W for the adjustment period to the Base. $.01 per hour for each full .26 of a point change that the three-month average CPI-W for the adjustment period exceeds the Base will be added to Job Grade wage rates effective January 1, 2006.

(3)     In determining the Base and the three-month average of the CPI-W for a specified period, the computed average shall be rounded to the nearest 0.1 Index Point using the Engineering Method of Rounding.

(4)     In the event the Bureau of Labor Statistics does not issue the appropriate CPI-W on or before the Effective Date of Adjustment, the Cost-of-Living Allowance required by such appropriate Index shall be effective at the beginning of the first pay period after receipt of the Index and paid retroactively to the Effective Date of Adjustment.

(5)     No adjustment, retroactive or otherwise, shall be made in pay or benefits as a result of any revision which later may be made in the published figures for the Index for any month on the basis of which the cost-of-living calculation shall have been determined.

105

# ARTICLE XIV - COST OF LIVING

(6)     In no event will a decline in the CPI-W be cause to reduce any Cost-of-Living Allowances that have been made prior to such decline.

(7)     The Cost-of-Living Allowances are dependent upon the availability of the BLS CPI-W in its present form and calculated on the same basis as the Index for February 1991. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W or is unable or fails to make said CPI-W available, the parties shall negotiate on the adoption of an appropriate substitute CPI-W that most accurately reflects the spending habits of the affected employees.

In the event the BLS discontinues the publication of the CPI-W on the 1967 = 100 base, the parties shall change the Cost-of-Living Allowance (COLA) calculation set forth above to maintain the same cents-per-hour COLA payment as would result by using the 1967=100 base and \$.01/.26 point formula.

Failing agreement in such negotiations, the parties shall submit the issue of what shall constitute an appropriate substitute CPI-W to final and binding arbitration.

This Cost-of-Living Allowance Agreement shall become effective under the same terms as those upon which the Collective Bargaining Agreement becomes effective as outlined in Article XV, Effective Date, Amendment and Termination.

The final Cost-of-Living allowance adjustment will be made July 3, 2006 and no further Cost-of-Living Allowance adjustments will be made. Thereafter, wages will be set as set forth in Schedule B and Letter 2 and will be posted annually by the Company.

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

(1)     This Agreement shall become effective at the time the local Agreement is completed, by ratification of the Local Union and approval of the International Union.  Except as provided in the No Strike, No Lockout Provision, it shall continue in effect until and including November 19, 2010 at 11:00 P.M. Central Time and thereafter it shall renew itself for yearly periods unless written notice is given by either party not less than sixty (60) days, but not more than seventy-five (75) days prior to the expiration date, that it is desired to amend or terminate this agreement.  In the event notice of a desire to amend or terminate this agreement is given, the representatives of the Local Union and the representatives of the Company shall meet as soon as possible but in no event later than thirty days (30) prior to expiration to begin negotiations.  Such negotiations shall have duration of at least thirty (30) days, unless otherwise mutually agreed.  At the opening of such negotiations, both parties shall present to each other in writing their proposed changes in said Agreement.   If negotiations are not completed prior to the expiration date of this Agreement, said Agreement shall terminate unless extended by mutual agreement.

(2)     Amendments to this Agreement may be made by mutual consent.

(3)     The effective date of this Agreement is dependent on ratification by the Local Union and approval of the International Union.

(4)     In Witness Hereof, the duly chosen representatives of the parties hereto affix their hand this 1st day of January 2006.

### LOCAL UNION #745L, UNITED STEELWORKERS

(Sgd.) Steve Vanderheyden                    _____

(Sgd.) Dan Kreeger                                 _____

(Sgd.) Jim Jamison                                 _____

(Sgd.) John Fuller                                  _____

(Sgd.) Frank Wool                                 _____

(Sgd.) Kevin Kirk                                  _____

(Sgd.) Ed Bell (USW Staff Representative)    _____

107

## ARTICLE XV - EFFECTIVE DATE AND TERMINATION

**TITAN TIRE CORPORATION OF FREEPORT**

(Sgd.)  William Campbell, President          _____

# SCHEDULE A

## SCHEDULE A – JOB DEPARTMENTS, CLASSIFICATIONS AND GRADES

This schedule A identifies the job classifications and corresponding Pay Grades established during the contract negotiations between the parties for the 2006 Agreement. It is understood that the standard job evaluation practice referred to in Article VII, Section 1 (a) will apply to any changes in job content of any classification.

For a period of six months from the effective date of the Agreement, the Company will not change the job descriptions or combine jobs of any current job classification without agreement of the union.

(1)       Six months from the effective date, prior to making any changes in current job descriptions the parties will discuss the reason for the changes and proposals for implementing the change in job descriptions. If the parties do not agree on the change the Company may make the change only: (a) if it is the result of, and only to the extent necessary to implement a capital investment and/or process of improved automation directly affecting the involved classification, or (b) if it is the result of and only to the extent necessary to implement a process change necessary for manufacturing.

(2)       Six months from the effective date, any Company proposal to combine current job classifications will be discussed with the Union. The Company will discuss the reasons for the change and proposal for implementing the proposed change. Should the parties be unable to reach mutual agreement on the change and its implementation, the Company's sole remaining option will be to surplus the necessary members of the affected classifications and establish a new classification to be filled through the filling of vacancy procedures of article VIII, Section 6.

Minor changes of job duties that do not result in a change in the assessment of the job will not result in a change in job grade, even if the numeric total would ordinarily result in a different job grade.

This is not intended to restrict overtime distribution properly scheduled under the terms of Article XI, Section 14.

### Grade and Classification

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 119 | 359 | Tool Crib Attendant | 2 |
| 119 | 479 | Utility Person | 1 |
| 119 | 570 | Painter | 4 |
| 200 | 701 | Waste & Scrap Pickup | 1 |
| 200 | 723 | Trucker & Checker - Receiving | 2 |
| 210 | 402 | Store Attendant | 2 |
| 320 | 396 | Operate Pigment Blender | 2 |

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 320 | 459 | Lay Down Stock - Wig Wag | 1 |
| 320 | 512 | Clean machinery & Equipment | 1 |
| 320 | 553 | Clean Shakers & Misc Service | 1 |
| 320 | 559 | Resample & Process Control | 2 |
| 410 | 441 | Reroll & Repair Liners - Misc Service | 1 |
| 410 | 577 | Service Back End | 2 |
| 410 | 707 | Truck Stock & Place in Tire Room | 2 |
| 412 | 500 | Production Service | 2 |
| 412 | 569 | Roll Changer - 60" Gum Calender | 2 |
| 412 | 598 | Truck Stock - Misc Service | 2 |
| 420 | 555 | Wrap Beads and Service | 1 |
| 430 | 500 | Production Service | 2 |
| 430 | 508 | Cement Tread Ends - 10-10 tuber | 1 |
| 430 | 512 | Clean machinery & Equipment | 1 |
| 430 | 561 | Cushion Mill & Tread Check | 3 |
| 440 | 621 | Truck and Stock Farm Tires | 1 |
| 441 | 461 | Assemble, Prepare & Truck Orders | 1 |
| 441 | 607 | S&L Tube-In-Case, Truck & Load Farm Tires | 1 |
| 442 | 431 | Sort and label | 2 |
| 511 | 422 | Repair tires/stock & clean equip | 2 |
| 511 | 500 | Production Service | 2 |
| 514 | 512 | Clean Machinery & Equipment | 1 |
| 514 | 620 | Service, Spray and Truck Green Tires | 2 |
| 531 | 512 | Clean machinery & Equipment | 1 |
| 531 | 518 | Service - Helper | 2 |
| 534 | 500 | Production Service | 2 |
| 534 | 512 | Clean machinery & Equipment | 1 |
| 535 | 576 | Buff and Repair - Farm Tires | 3 |
| 535 | 622 | LRF Runout Inspection | 3 |
| 911 | 491 | Janitor | 1 |
| 021 | 421 | Section and Step Down tires | 3 |
| 330 | 397 | Operate Windup - 66" Calender | 3 |
| 330 | 575 | Operate Let-Off - 66" Calender | 3 |
| 410 | 451 | Roll changer - Plain Ply Units | 2 |
| 410 | 524 | Roll Changer - 4-Roll Calender | 2 |
| 420 | 550 | Flap, Apex and Service | 2 |
| 430 | 412 | Book Treads - 10-10 Tubers | 2 |
| 514 | 438 | Paint and Line Green Tires | 2 |
| 515 | 500 | Production Service | 2 |
| 119 | 548 | Oiler | 3 |
| 320 | 389 | Attend Banburys - Roller Die | 3 |
| 320 | 395 | Banbury Operator | 4 |
| 320 | 462 | Batch-Off Millman | 3 |
| 320 | 514 | Banbury Operator Helper - Batch builder | 3 |
| 320 | 544 | Truck Gondolas - Pellets | 3 |
| 330 | 386 | Millman - 66" & 4-Roll Calender | 3 |
| 410 | 386 | Millman - 66" and 4-Roll Calender | 3 |

| Dept | Code | Job | Grade |
|------|------|-----|-------|
| 410 | 394 | Banner Bias Oper - Splicer | 3 |
| 412 | 530 | Cut, Pick, Splice, Squeegee and Back End | 4 |
| 412 | 532 | Build Bands - RJS Unit | 4 |
| 412 | 666 | Low-Angle Bias Cutter Operator | 3 |
| 420 | 399 | Build and Wrap Beads | 3 |
| 430 | 388 | Millman - 10-10 Tuber | 3 |
| 511 | 734 | Build Tires - Passenger | 4 |
| 514 | 725 | Cure Tires - Service BOM Presses | 3 |
| 514 | 726 | Chg Molds & Bladders - Clean Molds | 3 |
| 515 | 406 | Inspect & Vent Tires - Trim Beads & Vents | 3 |
| 515 | 415 | Classify & Disposition Passenger Tires | 4 |
| 515 | 526 | Trim Tires - Attend Paint Machine | 3 |
| 530 | 519 | Laminator Operator | 3 |
| 531 | 464 | Build Tires - Farm | 4 |
| 534 | 471 | Inspect, Repair, Jam and Paint & Line | 3 |
| 534 | 509 | Tend Presses - Farm | 3 |
| 534 | 568 | Chg Molds & Bladders - Clean Molds | 3 |
| 535 | 571 | Trim and Final Inspect - Farm Tires | 3 |
| 535 | 578 | Farm Tire Press Operator/Inspector (A row) | 3 |
| 054 | 485 | Labor Trainer - RSP | 4 |
| 054 | 495 | Labor Trainer - RFS | 4 |
| 119 | 301 | Machinist | 5 |
| 119 | 307 | Pipefitter | 5 |
| 119 | 310 | Millwright | 5 |
| 119 | 345 | Heating, Vent and Air Cond Repair | 5 |
| 119 | 350 | Maintenance Labor Trainer | 5 |
| 119 | 588 | Truck Mechanic | 5 |
| 330 | 370 | Calender Operator - 66" Calender | 4 |
| 410 | 496 | Calender Operator - 4-Roll Calender | 4 |
| 412 | 521 | Calender Operator - 60" Gum Calender | 4 |
| 430 | 385 | Tuber Operator | 4 |
| 530 | 671 | Service & Operate FMSL | 4 |
| 532 | 669 | Service & Operate RFSL | 4 |
| 119 | 323 | Instrument Repairman | 5 |
| 053 | 534 | RSP Balance Production | 4 |
| 053 | 536 | RFS Balance Production | 4 |
| 053 | 546 | Warehouse Balance Production | 3 |
| 119 | 304 | Electrician | 5 |
| 160 | 330 | Powerhouse Operator | 5 |

## SCHEDULE B – PAY GRADES

A.    Titan Tire Wage Scale

1.    Effective January 1, 2006, for those employees hired before January 1, 2006, Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $21.93 | $22.03 | $ 22.29 | $23.06 | $23.81 |

2.    Employees Hired after January 1, 2006, the Wage Rates shall be as follows:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|------|---------|---------|---------|---------|---------|
| 1/01/06 | $13.50 | $15.00 | $ 22.29 | $23.06 | $23.81 |

For employees in Grades 1 & 2, the new hire starting wage rates will be $1.50 below the above wage rate. Each employee in Grade 1 & 2 will get a $.50 increase at 12 months, 18 months and 30 months of employment.

For Employees in Grades 3 and Grade 4, their new hire starting wage rate will be 70% of the above wage rate. Increases shall based upon the following chart.

| | Start Rate | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|
| % of Pay Grade of Classification | 70% | 76% | 82% | 88% | 94% | 100% |

For maintenance employees in Grade 5 (except Electricians and Powerhouse Employees), their new hire starting wage rate will be 85% of the above wage rate. Increases shall be based upon the following chart.

| Date | Start Rate | 1st Year Anniversary | 2nd Year Anniversary | 3rd Year Anniversary |
|---|---|---|---|---|
| % of Pay Grade of Classification | 85% | 90% | 95% | 100% |

The company may, on a non-discriminatory basis, move employees upward through the wage scale irrespective of service time based upon performance and company needs.

112

COLA adjustments made between January 2, 2006 and July 3, 2006 (inclusive) will be applied to all wage rates. Each year Titan will post the current wage rate and progressions.

Letter #1



January 1, 2006

Mr. Ron Hoover, Executive Vice-President (R/PIC)
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Hoover and Mr. Vanderheyden:

      This letter is to confirm our agreement that in the event of a default by Titan Tire of Freeport of its financial obligations under the 2006 Agreement between Titan Tire of Freeport and the USW on behalf of itself and its Local No. 745, Titan Tire Corporation will guarantee the financial obligations of said 2006 Agreement. If Titan Tire Corporation should default under its guarantee of financial obligations to the 2006 Agreement, then Titan International Inc. will guarantee the financial obligations of Titan Tire Corporation under the 2006 Agreement referenced above.

      The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to this letter.

Sincerely Yours,


Maurice M. Taylor
Chairman and CEO, Titan International

_____
Steve Vanderheyden, President
USW Local 745L


_____
Ron Hoover, Executive Vice President

114

Letter #2



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

      In accordance with the agreement between the parties, COLA increases will be added to the wage rate set forth in the Collective Bargaining Agreement through the COLA increase on July 3, 2006.  After that date, with the end of future COLA adjustments, the following General Wage Increases will be added to the existing hourly wage rates.

      For all employees hired on or before January 1, 2006:

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|---|---|---|---|---|---|
| 7/23/07 | $0.25 | $0.25 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.25 | $0.25 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.25 | $0.25 | $0.45 | $0.44 | $0.51 |
| 7/19/10 | $0.25 | $0.25 | $0.45 | $0.45 | $0.53 |

**For all employees hired after January 1, 2006:**

| Date | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
|---|---|---|---|---|---|
| 7/23/07 | $0.40 | $0.40 | $0.40 | $0.42 | $0.49 |
| 7/21/08 | $0.40 | $0.40 | $0.40 | $0.43 | $0.50 |
| 7/20/09 | $0.40 | $0.40 | $0.45 | $0.44 | $0.51 |

| 7/19/10 | $0.40 | $0.40 | $0.45 | $0.45 | $0.53 |
|---------|-------|-------|-------|-------|-------|

Annually, upon application of these wage increases, Titan will post the current wage for each  pay grade as well as a chart showing starting wages for those employees on a progression.

Sincerely,


William Campbell, President
Titan Tire Corporation

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

Letter #3

# **⊕TITAN**

January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA  15222

     RE:   Neutrality

Dear Mr. Hoover:

The following will confirm our understanding on the above captioned matter.

    1.    Introduction

The Company and the Union are attempting to develop a constructive relationship built on trust, integrity and mutual respect and the parties place a high value on development of that relationship.

    2.    Neutrality

        a.    To underscore the Company's commitment in this matter, it agrees to adopt a position of Neutrality regarding the unionization of its employees at any and all of its factories involved in producing or distributing tire or rubber products  ("Covered Employees").

        b.    Neutrality means that, except as explicitly provided herein, the Company will not in any way, directly or indirectly, involve itself in any matter which involves the unionization of its Covered Employees, including but not limited to efforts by the Union to represent the Company's employees or efforts by its employees to investigate or pursue unionization.

117

      c.     The Company's commitment to remain neutral as defined above may only cease upon the Company demonstrating to the arbitrator under Paragraph 6 below that in connection with an Organizing Campaign (as defined in Paragraphs 3(a) through 3(c) below) the Union is: materially misrepresenting to the employees the facts surrounding their employment; is unfairly demeaning the integrity or character of the Company or its representatives; or is threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

3.     Organizing Procedures

      a.     Prior to the Union distributing authorization cards to non-represented employees, the Union shall provide the Company with written notification (Written Notification) that an organizing campaign (Organizing Campaign) will begin. The Written Notification will include a description of the proposed bargaining unit.

      b.     The Organizing Campaign shall begin immediately upon provision of Written Notification and continue until the earliest of: (1) the Union gaining recognition under Paragraph 3(d)(5) below; (2) written notification by the Union that it wishes to discontinue the Organizing Campaign; or (3) ninety (90) days from provision of Written Notification to the Company.

      c.     There shall be no more than one (1) Organizing Campaign in any particular factory in any twelve (12) month period.

      d.     Upon Written Notification the following shall occur:

(1)     Notice Posting

The Company shall post a notice on all bulletin boards of the facility where notices are customarily posted as soon as the Unit Determination Procedure in Paragraph 3(d)(3) below is completed. This notice shall read as follows:

"NOTICE TO EMPLOYEES

We have been formally advised that the United Steelworkers is conducting an organizing campaign among certain of our employees. This is to advise you that:

      1.     The Company does not oppose collective bargaining or the unionization of our employees.

      2.     The choice of whether or not to be represented by a union is yours alone to make.

3.    We will not interfere in any way with your exercise of that choice.

4.    The Union will conduct its organizing effort over the next ninety (90) days.

5.    In their conduct of the organizing effort, the Union and its representatives are prohibited from: misrepresenting the facts surrounding your employment; unfairly demeaning the integrity or character of the Company or its representatives; and threatening, intimidating, coercing or harassing any person to secure signed authorization cards.

6.    If the Union secures a simple majority of individual authorization cards of the employees in [insert description of bargaining unit provided by the Union] the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

7.    Each authorization card must unambiguously state that the signing employee desires to designate the Union as his/her exclusive representative.

8.    Employee signatures on the authorization cards will be confidentially verified by a neutral third party chosen by the Company and the Union."

Following receipt of Written Notification, the Company may only communicate to its employees on subjects which directly or indirectly concern unionization on the issues covered in the Notice set forth above or raised by other terms of this Neutrality Section and consistent with this Section and its spirit and intent.

(2)    Employee Lists

Within five (5) days following Written Notification, the Company shall provide the Union with a complete list of all of its employees in the proposed bargaining unit who are eligible for Union representation. Such list shall include each employee's full name, home address, job title and work location. Upon the completion of the Unit Determination Procedure described in Paragraph 3(d)(3) below, an amended list will be provided if the proposed unit is changed as a result of such Unit Determination Procedure. Thereafter during the Organizing Campaign, the Company will provide the Union with updated lists monthly.

119

(3)    Determination of Appropriate Unit

As soon as practicable following Written Notification, the parties will meet to attempt to reach an agreement on the unit appropriate for bargaining. In the event that the parties are unable to agree on an appropriate unit, either party may refer the matter to the Dispute Resolution Procedure contained in Paragraph 6 below. In resolving any dispute over the scope of the unit, the arbitrator shall apply the principles used by the National Labor Relations Board.

(4)    Access to Company Facilities

During the Organizing Campaign the Company, upon written request, shall grant reasonable access to a well-traveled non-work location to the Union for the purpose of distributing literature and meeting with unrepresented Company employees. The exact times and location shall be determined in joint discussions between the parties. Distribution of Union literature shall not compromise safety or production or unreasonably disrupt ingress or egress or the normal business of the facility. Distribution of Union literature and meetings with employees shall be limited to non-work areas during non-work time.

(5)    Card Check/Union Recognition

    (a)    If, at any time during an Organizing Campaign which follows the existence of a substantial and representative complement of employees in any unit appropriate for collective bargaining, the Union demands recognition, the parties will request that a mutually acceptable neutral (or an arbitrator from the American Arbitration Association if no agreement on a mutually acceptable neutral can be reached) conduct a card check within five (5) days of the making of the request.

    (b)    The neutral shall confidentially compare the authorization cards submitted by the Union against original handwriting exemplars of the entire bargaining unit furnished by the Company. If the neutral determines that a simple majority of eligible employees has signed cards which unambiguously state that the signing employees desire to designate the Union as their exclusive representative for collective bargaining purposes, and that cards were signed and dated during the Organizing Campaign, then the Company shall recognize the Union as the exclusive representative of such employees without a secret ballot election conducted by the National Labor Relations Board.

    (c)    The list of eligible employees submitted to the neutral shall be jointly prepared by the Union and the Company.

120

4.    Hiring

    a.    Laid-off employees described in Article VIII of the Agreement may apply for employment at plants not covered by the Agreement. A laid-off employee must make written application for employment at a specific plant of interest. Upon such request, the laid-off employee will receive priority consideration in the plant's hiring selection process and will be required to satisfy the normal selection process requirements at the respective plant in order to attain status.

    b.    In determining whether to hire any applicant (whether or not such applicant is an Employee covered by the Agreement), the Company shall refrain from using any selection procedure which, directly or indirectly, evaluates applicants based on their attitudes or behavior toward unions or collective bargaining.

5.    Definitions and Scope of this Agreement

    a.    Rules with Respect to Affiliates

        (1)    For purposes of this Section, the Company includes (in addition to the Company) any entity which is an Affiliate of the Company.

        (2)    An Affiliate shall mean any business enterprise that Controls, is under the Control of, or is under common Control with Titan Tire.

            Control of a business enterprise shall mean possession, directly or indirectly, of either:

            (a)    fifty percent (50%) of the equity of the enterprise; or

            (b)    the power to direct the management and policies of said enterprise.

    b.    Rules With Respect to Existing Affiliates

        The Company agrees to cause all of its existing Affiliates to become a party to this Section and to achieve compliance with its provisions.

121

c.     Rules with Respect to New Affiliates

The Company agrees that it will not consummate a transaction which would result in the Company having or creating an Affiliate without ensuring that the New Affiliate agrees to and becomes bound by this Section.

6.     Dispute Resolution

a.     Any alleged violation or dispute involving the terms of this Section may be brought to a joint committee of one (1) representative each from the Company and the Union. If the alleged violation or dispute cannot be satisfactorily resolved by the parties, either party may submit such dispute to the arbitrator. A hearing shall be held within ten (10) days following such submission and the arbitrator shall issue a decision within five (5) days thereafter. Such decision shall be in writing and need only succinctly explain the basis for the findings. All decisions by the arbitrator pursuant to this article shall be based on the terms of this Section and the applicable provisions of the law. The arbitrator's remedial authority shall include the power to issue an order requiring the Company to recognize the Union where, in all the circumstances, such an order would be appropriate.

b.     The arbitrator's award shall be final and binding on the parties and all employees covered by this Section. Each party expressly waives the right to seek judicial review of said award; however, each party retains the right to seek judicial enforcement of said award.

c.     For any dispute under this Section and the interest arbitration procedure described in Paragraph 6 above, the parties shall choose the arbitrator from the list of arbitrators described in the grievance procedure of the Collective Bargaining Agreement, contacting them in the order listed, and retaining the first to indicate an ability to honor the time table set forth above for the hearing and the decision.

7.     Nothing in this Section shall be construed so as to include as "Covered Employees" Titan Wheel employees working at a plant that does not manufacture tires or rubber products, provided that the Company does not transfer work to Titan Wheel employees that is performed, as of the date of Titan's acquisition of Freeport, by either Des Moines or Freeport employees.

Sincerely yours,

122

Maurice M. Taylor, Jr.
Chairman and Chief Executive Officer
Titan Tire Corporation
Titan International, Inc.


Agreed:


_____
Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #4



January 1, 2006

Mr. Leo W. Gerard,
President United
Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Re: Job Security

Dear Mr. Gerard:

The following will confirm our understanding on the above-captioned matter.

1.  The Company agrees that the Freeport and Des Moines facilities shall be designated as Protected Facilities and that the commitments below shall apply to them.

2.  The Company agrees that no plant closure will occur at either of the Protected Facilities during the life of the 2006 Agreements.

3.  The Company agrees that the Freeport facility shall for two years following the Effective Date, maintain 100% of the regular full-time bargaining unit enrollment as of the effective date. It is understood that the 100% of the regular full-time bargaining unit enrollment as of the effective date shall mean the total Freeport active enrollment as of the effective date less the number of individuals who have taken the Goodyear "buyout." Thereafter, the company shall at all times maintain a minimum of 90% of the regular full-time bargaining unit enrollment and 95% of the total maintenance workforce, as of the effective date; it being understood that the base from which the 90% and 95% is measured may be adjusted to reflect efficiency improvements.

4.  In the event work provided to Goodyear is terminated or reduced, the Company will be permitted to reduce the obligation under #3 above accordingly, provided that Titan has made every effort to retain that work.

5.  The Company agrees that the Des Moines facility shall at all times maintain a minimum of 425 regular full-time bargaining unit jobs.

124

6.    The Company agrees that it shall not directly or indirectly produce, distribute, market, or sell any product, which currently is or historically was made at a Protected Facility unless that product is produced at a Protected Facility. For the Freeport facility, "historically" is limited to the past five years.

7.    The Company agrees to make the necessary capital expenditures required to maintain and improve the competitive status of the Protected Facilities.

8.    The Commitments set forth in this letter shall remain in effect for the life of the 2006 Agreements, unless compliance in part or in whole becomes no longer feasible due to an act of God. Otherwise, these provisions shall remain applicable regardless of any reported business loss by the Company or any division or subsidiary or plant thereof.

9.    For purposes of this letter of agreement and its accompanying clarification, "the Company" shall be understood to mean Titan Tire International and its present and future affiliates.

Upon request, the Company shall provide the Union with a report documenting its compliance with this job security agreement and shall, upon request, provide the Union with any information reasonably requested that allows the Union to monitor such compliance with this job security agreement. The requests will be made no more often than semi-annually. The parties further agree that this letter does not make Titan International a party to the 2006 Agreement. On behalf of Titan International Inc., the undersigned represents that he has the authority to bind Titan International to the this letter.

Sincerely Yours,


Maurice M. Taylor
Chairman and CEO, Titan International



Agreed:


_____
Leo W. Gerard, President United Steelworkers

Letter #5

# **⊕TITAN**

January 1, 2006

Mr. Ron Hoover
Executive Vice President, R/PIC
United Steelworkers
Five Gateway Center
Pittsburgh, PA  15222

      RE: Successorship

Dear Mr. Hoover:

1.  The Company agrees that it will not sell, convey, assign or otherwise transfer (any of the foregoing, a Sale) any plant, operation or significant part thereof covered by a collective bargaining agreement between the Company and the United Steelworkers to any other party (Buyer) unless the following conditions have been satisfied prior to the closing date of the Sale:

    (a) the Buyer shall have entered into an agreement with the Union recognizing it as the bargaining representative for the employees within the existing bargaining unit.

    (b) the Buyer shall have entered into an agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date.

2.  This provision is not intended to apply to any transactions solely between the Company and any of its Affiliates.

3.  For the purpose of this agreement the Company shall be defined as it is in our agreement regarding Neutrality.

                Sincerely yours,

                /s/Maurice M. Taylor, Jr.
            Chairman and Chief Executive Officer
                Titan International

Agreed:

_____
Ron Hoover
Executive Vice President, R/PIC
United Steelworkers

Letter #6



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

During the course of negotiations for the 2006 Agreement the parties discussed the Lead Hands program in place. Because of Titan's uncertainty over use of Lead Hands, the parties have agreed to certain assurances from Titan regarding the Lead Hand program.

Titan agrees that it will not change any position designated as a Lead Hand for six (6) months from the effective date of the Agreement without mutual agreement of the parties. After six (6) months, other than mutual agreement, Titan may reduce the number of process or scheduling Lead Hands if Titan can demonstrate that a decrease in the number is necessary in order to increase production efficiency and reduce overall costs, because an increase in supervision is deemed necessary to address a lack of management oversight in the area or because of an overall reduction in manning in the facility. Before any changes can be made in the number of process or scheduling Lead Hands, Management will sit down with the Lead Hand Driver Committee and express its concerns and permit the Committee a thirty (30) day period to address those concerns. Any work performed by Lead Hands where the position was eliminated, the work can be performed by supervisors.

Further, after six (6) months if any General Lead Hand resigns as a Lead Hand or leaves the area for any reason, Titan will determine whether or not to replace the General Lead Hand. Should the decision be made that the General Lead Hand Position be eliminated, all Lead Hands of any type will be eliminated and the Administrative work of the Lead Hand will be performed by supervision.

Sincerely yours

William Campbell, President
Titan Tire Corporation

128

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

Letter #7



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

Titan will increase general wages by $.12 on November 1, 2010.

Sincerely yours


William Campbell, President
Titan Tire Corporation

Agreed:


_____

Steve Vanderheyden, President
USW Local 745L

130

Letter #8



January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

For interpreting the provisions of the CBA, Benefits Agreement and SUB Agreement, the parties agree that wherever necessary and appropriate, the parties utilize the language of Article VIII, Section 1 for determination of length of service.

Sincerely yours

William Campbell, President
Titan Tire Corporation

Agreed:

_____

Steve Vanderheyden, President
USW Local 745L

131

Letter #9

# ✪*TITAN*™

January 1, 2006

Mr. Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

During the bargaining for the 2006 Agreement, the parties discussed the fact that the vacation canvas would take place prior to the effective date of the Agreement and one change in the Agreement is the manner in which vacation is scheduled. Goodyear has announced that it will post a one-week shutdown around the July 4th Weekend. Titan will honor that commitment and will further commit that under the terms of the Agreement, it will also have a shutdown during Christmas.

Titan will honor the vacation requests made during the Goodyear Canvas in December of 2005 based upon the language in the 2003 Agreement. Further, in the event of individuals who have made plans for vacations, Titan will adhere to the language in Article IX, Section 3(b) and permit those affected employees to take vacations as planned.

Employees who have scheduled all of their eligible vacation will be asked to take two days from their scheduled vacation for use during the Christmas shutdown. For those who have not scheduled all of their eligible vacation, they will be asked to take two days from either their scheduled vacation or their vacation eligibility for use during the Christmas shutdown. Should employees take the days without pay, they will be covered by Article IX, Section 3(b).

Titan also understands that there will be weeks of vacation that will be "available" as people retire from the Freeport facility. Those weeks will be posted in accordance with Article IX, Section 3(f).

Finally, for purposes of the vacation payment set forth in Article IX, Section 2(a), Titan will recognize the pay at Goodyear for determining the basis of the payment.

Sincerely yours

William Campbell, President
Titan Tire Corporation

Agreed:

_____
Steve Vanderheyden, President
USW Local 745L

Letter #10



January 1, 2006

Mr Steve Vanderheyden
United Steelworkers Local 745L
2496 East Maize Road
Freeport, IL 61032

Dear Mr. Vanderheyden:

Titan will establish on its books a Special Account for accumulating contributions once the SUB Plan reaches the $1,000 funding level. The Special Account shall be operated as follows:

    (a)    Once the SUB fund achieves a funding level of $1,000 (as calculated in a manner consistent with Article VI of the SUB plan) Titan shall accrue on its books and monthly transfer to a Special Bank Account during the term of the current Collective Bargaining Agreement between Titan and the USW $.05 for each hour worked. Said contributions to the Special Bank Account shall only continue when the SUB fund maintains a funding level of $1,000. Said Special Bank Account shall bear the same interest rate as the SUB plan with said interest inuring to the benefit of the employees.

    (b)    As of the first pay period ending in November in any year during the term of the current Collective Bargaining Agreement there shall be determined an amount per Employee (and a pro rata share thereof for eligible Retirees) which shall be calculated by dividing the balance in the Special Bank Account at the end of such pay period by the total number of eligible Employees and the appropriate number of pro rata shares for eligible Retirees.

    (c)    An eligible Employee is one who, during the pay period for which the calculation in paragraph (b) is made, has at least two years of seniority in the plant and the Employee is currently covered by the SUB Agreement, and who is actively at work or on sick leave or leave of absence which has not exceeded 90 days or leave of absence as an officer, representative or employee of the local union.

134

(d)    An eligible Retiree is one who was an Employee hereunder but who, prior to the pay period for which the calculation in paragraph (b) is made but after the pay period for the immediately preceding annual calculation, retires form the employ of the Company is eligible for a monthly Pension under the Steelworkers Pension Trust.  (For purposes of determining the pro rata share of the distribution to which an eligible Retiree shall be entitled, the Company shall divide the one year between annual calculations into 12 equal periods (approximately corresponding with calendar months) and shall award twelfths of a full distribution on the basis of the number of periods worked prior to retirement of the nearest full period).

(e)    If the per employee distribution for each eligible Employee determined for any year as provided in paragraph (b) is $25 or more, payment of such amount up to a maximum of $100 to the nearest lower dollar shall be paid to each eligible Employee and the appropriate pro rata share thereof to each eligible Retiree on the first pay day in December in that year or on the last pay before June 1 of the following year.

(f)    If the per employee amount determined as provided in paragraph (b) is less than $25, no distribution of the Special Account shall be made in the current year and the amount in the Special Bank Account shall be carried over and taken into account in determining the distribution, if any, to be made in the succeeding year or years.

(g)    Any amount in excess of $100 for each eligible Employee shall also be carried over and taken into account in determining the distribution, if any, to be made in the following year or years.

(h)    No distribution shall be made prior to receipt by Titan of:  (1) a ruling satisfactory to it from the Administrator, Wage and Hour and Public Contracts Division, Department of Labor, holding that the payments are not to be included in the regular rate of the Employee for purposes of the Fair Labor Standards Act of 1938, as Amended, and (2) a ruling satisfactory to Titan from the Internal Revenue Service that the payment shall constitute currently deductible expense to the Company under the Internal Revenue Code for the taxable year in which the distribution is made.

(i)    If such rulings are not obtained by December 31, 2007, other disposition of the balance in the Special Account shall be negotiated promptly.

(j)    In the event an employee or retiree entitled to a distribution (or pro rata share thereof) hereunder shall be deceased or cannot be located with reasonable ease by the Company, then the Company at its option may

135

make payment of such distribution or pro rata share thereof to the estate, spouse, surviving spouse, children or surviving children of such Employee or Retiree as the Company shall determine to be appropriate.  If, for any reason, payment of the distribution cannot be conveniently effected by the Company within 18 months following the date upon which the distribution was to be made, the net amount thereof remaining after appropriate deductions shall be added to the Special Bank Account by the Company and shall be taken into account in determining distributions for later years.

(k)     Grievances concerning these arrangements shall be subject to the grievance procedure of the Basic Labor Agreement.


Sincerely yours


William Campbell, President
Titan Tire Corporation


Agreed: _____
        (sgd)Steve Vanderheyden

136

Insert 2007 calendar

Insert 2008 Calendar

Insert 2009 calendar

Insert 2010 calendar



# Unions at Titan Tire

FILED

AUGUST 21, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# Exhibit B

08 C 50185

```
---------------------------------------------     )
In the Matter of Arbitration Between:            )        ARBITRATION AWARD
                                                 )
TITAN TIRE CORPORATION OF FREEPORT               )        GRIEVANCE CONCERNING
                                                 )
And                                              )        FIRE BRIGADE AND
                                                 )        EMT TRAINING
UNITED STEELWORKERS OF AMERICA                   )
LOCAL NO. 745                                    )
                                                 )
ARBITRATION CASE NO. 07-11                       )
---------------------------------------------     )
```

## ALAN J. COOK
## IMPARTIAL ARBITRATOR

**APPEARANCES**

    For the Employer ("Titan")

        Gene R. La Suer, Attorney At Law

    For the Union

        Dale Sandell, Vice President of Local No. 745

## STATEMENT

The parties were not able to reach a mutually satisfactory settlement of certain grievances and therefore submitted the matters to arbitration in accordance with the terms of their Collective Bargaining Agreement. Alan J. Cook was selected to serve as Impartial Arbitrator. The parties agreed these grievances are properly before the Arbitrator for resolution. They also agree there are no issues of arbitrability for these grievances.

A hearing was held in Freeport, Illinois on February 14, 2008. At this hearing the parties were afforded an opportunity to present oral and written evidence, to examine and cross-examine witnesses, and to make such arguments as were deemed pertinent The hearing was closed on February 14, 2008 upon the conclusion of oral testimony and arguments.

## BACKGROUND STATEMENT

Titan purchased the Freeport facility from the Goodyear Tire and Rubber Company ("Goodyear") on January 1, 2006. The purchase was preceded by many months of negotiation between Titan and Goodyear. In addition, Titan negotiated a Collective Bargaining Agreement ("Agreement" or "Contract") with the Union which expires in November of 2010. This Contract contains many provisions that are very similar to terms in the earlier 2004 Agreement between Goodyear and the Union ("Goodyear Agreement"). New language was negotiated to establish certain provisions that did not appear in the Goodyear contract. In addition, the parties agreed to the terms of the document labeled "Understandings Outside the Agreement" ("Understandings"). At the Freeport plant, the Company manufactures tires for construction, farming and off the road purposes.

The evidence shows since the 1970's there has been an emergency response team at the plant that was called the fire brigade. Over time, its duties have included providing emergency responses, giving first aid services and responding to fire calls. Volunteer fire brigade members have been given extensive amounts of training, and the fire brigade has accumulated various pieces of equipment, including two electric fire trucks. The fire truck equipment included self contained breathing apparatus ("SCBA") units. Up to three members have been provided annual training to maintain qualifications as emergency medical technicians ("EMT"). Other fire brigade members are trained by the EMTs and maintain a qualified First Responder status. Fire brigade members attend monthly meetings and participate in periodic training sessions. The fire brigade operation has been in existence at the plant for almost thirty years.

During negotiations for the 2006 Collective Bargaining Agreement, Titan and the Union agreed to a provision to preserve important oral agreements and past practices that had been

2

established during Goodyear's operation of the plant. **This agreement was included in the** **language of Article XI, Section 7 of the Contract. This term** provided a process for oral agreements and past practices to be "specifically adopted by the Company in writing." The Union was to provide a list of these items within 60 days, and the Company was to accept them or designate them for arbitration within 30 days. The Union timely submitted its list of oral agreements/past practices, and ten of the items referred to matters associated with the fire brigade. These items were numbers 32 and 64-72 which read as follows:

32.    The Company will continue to send plant Fire Brigade Emergency Medical Technician personnel to a qualifying annual training session at company expense.

64.    The Company will provide the equipment and resources for monthly training sessions for Fire Brigade members.

65.    The Company will conduct annual CPR training and re-certification for Fire Brigade members.

66.    The Company will provide for an annual medical physical examination for Fire Brigade members.

67.    The Company will provide a Spill Response Team as part of the Fire Brigade, and will provide the necessary resources for regular, scheduled training sessions (not less than quarterly) for Spill Response Team members.

68.    The Company will provide "First Responder" re-certification for Fire Brigade every 3 years.

69.    Fire Brigade members will be considered to be previously released from other regular duties as a result of notice of any plant emergency.

70.    The Company will replace at its expense, damaged clothing for Fire Brigade members including footwear, if damaged while performing Fire Brigade duties.

71    The Company to supply emergency response equipment and supplies, including plant ambulance with gurney, defibrillator and all appropriate medical supplies.

72.    The Company to supply turnout gear, SCBA, fire fighting equipment and supplies, and spill containment equipment and supplies.

On March 28, 2006, the Company submitted its reply and agreed to item 32. **Later, the** Company failed to follow through with item 32, and the Union responded by filing grievance number G 06-103 on May 5, 2006 to protest the Company's position. **Titan also agreed to** continue items 65, 66 and 69, but it rejected the remaining items: No. 64, 67, 68, 70, 71, and 72

In May 2007, the Union discussed SCBA equipment on fire trucks with management. Titan informed the Union it would remove SCBAs from service. On May 18, 2007, the Union

3

filed grievance number G 07-228 to protest the Company's decision to remove SCBAs from the fire brigade. At this time, OSHA conducted an inspection of the Company's operations. Titan reported to OSHA that the fire brigade had been disbanded by management so there was no longer any need to provide SCBAs on fire trucks. On June 28, 2007 Titan posted a notice that the fire brigade had been disbanded. This decision also discontinued the matters in items 65, 66 and 69. The Union responded by filing grievance number G 07-143 on June 28, 2007 to protest the Company's decision to eliminate the fire brigade.

Thereafter, Titan gave notice to fire brigade members that it would discontinue providing uniform service. The requirement to pay for uniforms was contained in the Understandings agreement between the parties. On September 7, 2007 the Union filed grievance number G 07-200 to protest the Company's decision to stop paying for uniforms.

The four grievances were processed through the grievance procedure without reaching agreement, and they are before the Arbitrator for resolution.

## ISSUES

Did the Company violate the Contract when it disbanded the plant's fire brigade (Grievance No. G 07-143)?

2.  Did the Company violate the Contract when it stopped paying for uniforms for fire brigade members (Grievance No. G 07-200)?

3   Did the Company violate the Contract when it removed SCBAs from use by the fire brigade (Grievance No. 07-228)?

4.  Did the Company violate the Contract when it stopped providing annual training to the plant's EMTs (Grievance No. 06-103)?

## RELEVANT CONTRACTUAL PROVISIONS

### ARTICLE II

Section 1 – Management Clause

The management of the business and the operation of the plant and the authority to execute all its various duties, functions and responsibilities incident thereto is vested in the Company, except as such authority is limited by the conditions of this Agreement.

### ARTICLE XI

Section 7 – Effect of Agreement

No oral modification to the Agreements or oral representations with Goodyear regarding:
(a) the Agreements …(c) past practices that occurred prior to the effective date of the Agreements will be binding on the Company, nor will they be admissible in arbitration proceedings, unless specifically adopted by the Company in writing after the effective date of these Agreements. By "specifically adopted by the Company in writing" includes items in this Agreement as well as those adopted by the following procedure:

   (1) Within 60 days of the effective date, the Union must present a list of all oral modifications, grievance settlements or past practices to the Company for review.
   (2) Within 30 days of the date of presentation of the list, the Company will investigate all oral modifications, grievance settlements or past practices at the facility. The Company will then meet with the Union and either accept the oral modifications, grievance settlements or past practices or ask that the items disputed be specifically set before an arbitrator for resolution. The standard for the arbitrator will be whether the oral agreement existed at least one day prior to the effective date of this Agreement.

### ARTICLE XII

Section 1

   (a) The Freeport plant health and safety program will continue to be of equal importance with product quality and production. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment and will provide competent first aid personnel and furnish protective devices and protective equipment where necessary, and protective clothing on work which is recognized to be abnormally hazardous. When needed, the employer shall provide transportation for injured employees to the hospital. The plant medical personnel, plant safety management or their designee shall determine the best

5

available mode of transportation...

(o) It is the intention of the Company to continue every effort to improve the safety performance of the plant and improve the safety environment for each employee.

## UNDERSTANDINGS OUTSIDE THE AGREEMENT

In addition to the provisions of the Collective Bargaining Agreement, the parties have agreed to the following items. The terms of the following items shall have the same force and affect as provisions that are included in the Collective Bargaining Agreement.

**Fire Brigade Uniforms**

The Company will pay for a uniform service to provide a distinctive uniform for the fire brigade. The Company would pay for five (5) changes per week of 100% cotton uniform. This plan will cover up to fifty (50) fire brigade members for the life of this agreement only.

## POSITIONS OF THE PARTIES

**Union:**

The Union believes a fundamental issue is the Company's decision to discontinue using SCBAs This action led to management's decision to disband the fire brigade around the time of OSHA's inspection. The elimination of the fire brigade led to the dispute over supplying uniforms to members of the fire brigade  The other main issue concerns the training provided to EMTs and First Responders

The Union argues its position is supported by relevant contractual language. It claims it has complied with the provisions of Article XI, Section 7, and it points out the sustaining of an oral agreement or past practice is dependent upon proof the oral agreement or past practice existed at least one day prior to the effective date of the agreement, January 1, 2006. The Union believes decisions in Arbitration cases 07-05 and 07-08 support its position. In No. 07-05, the Company was directed to continue paying the Union's Vice-President four hours of pay each

working day. In No. 07-08, the Company was directed to continue the United Way campaign that had previously existed at the plant.

The Union also points to the language in Article XII, Section 1 (a) of the Contract that provides "The Company shall continue to make reasonable provisions for the safety and health of its employees..." The Union contends the words "shall continue" means the Company must maintain the fire brigade in providing for the safety and health of the employees. Likewise, the Union refers to the language of paragraph (o) of this Article and Section which refers to continuing efforts to "improve the safety environment for each employee." In addition, the Union believes the reference in the Understandings to the Company providing uniform service to fire brigade members supports its position that there should continue to be a fire brigade.

As a final point, the Union notes OSHA declared there is no requirement to have a fire brigade. However, the Union emphasizes its position that there is a contractual and past practice requirement for the Company to maintain the fire brigade.

**Company:**

The Company believes its decision to eliminate the fire brigade is authorized by the rights it possesses under the Management Rights Clause (Article II, Section I) of the Contract. Titan argues this decision is a change in method of operations and direction of the work force. It contends these areas are prerogatives of management, and Titan maintains it possesses the unilateral right to make changes in the way it conducts its business.

The Company claims it has the right to disband the fire brigade. Titan points out there is no contract term that requires it to have a fire brigade, and it contends no past practice obliges it to maintain a fire brigade. Titan explains it made the decision to eliminate the fire brigade for two reasons. First, it wants to enhance employee safety by not exposing employees to the

hazards of fighting fires. It wants employees to evacuate the premises whenever there are fires and let professional fire fighters from the Freeport Rural and City Fire Departments contend with the fires. The only exception to this policy is that employees can use fire extinguishers to fight incipient, beginning stage fires.

Titan points out it has developed an Emergency Action Plan ("EAP") which contains a detailed evacuation procedure that is to be followed during a fire emergency. The Company asserts it provides training to its workers on evacuation procedures for the EAP. Titan emphasizes it does not want employees to fight fires even though this policy could result in significant damage to its property and equipment.

Titan acknowledges that its change in firefighting policy occurred in May/June 2007 when the certification of its SCBA equipment expired. At that time, it decided to no longer have SCBAs or the fire brigade. It was also at that time that OSHA was conducting an inspection of the facility, and Titan points out OSHA did not find SCBAs were required. The Company further claims SCBAs are not needed for confined space rescue operations because it has either eliminated these hazards, or when that is not possible, it has given this work to outside contractors.

The second reason for Titan's decision to eliminate the fire brigade is its effect on the Company's insurance program. The Company's corporate risk manager testified the existence of a fire brigade would not reduce Titan's property insurance premium. Therefore, the training and equipment expense of a fire brigade would not be offset by a reduction in insurance premiums. The manager also expressed concern over whether all actions by fire brigade members in fighting fires would be covered by its insurance company. The manager further suggested a fire brigade program could cause an increase in workers' compensation costs.

In the same vein, Titan believes it engaged in an exercise of management rights when it

decided to change the way EMTs and First Responders are trained.  It believes it had the right to

not maintain the system whereby three individuals  were provided EMT training and then these

individuals were responsible for training First Responders.  Titan contends it made the

appropriate managerial decision to provide state certified training to all First Responders and not

pay for EMT training.


## DISCUSSION AND DECISION

The central issue in this case involves the existence of the fire brigade.  The evidence

shows the parties have cooperated in the maintenance of a fire brigade program for almost thirty

years.  After Titan purchased the facility, the fire brigade continued to operate from January 1,

2006 to at least June 28, 2007.  This was a program that operated outside the scope of the

Collective Bargaining Agreement.  However, the record shows both parties participated in the

successful operation of the fire brigade program.  The Union maintains the fire brigade operation

was a past practice that was continued by the parties in their contractual relationship.

Elkouri and Elkouri in their excellent volume, How Arbitration Works (6th ed., 2003) at

608 list the parameters of a past practice as the following:

> (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a
> reasonable period of time as a fixed, and established practice accepted by both parties.
> (Citations omitted).

The fire brigade program meets these criteria and qualifies as a past practice between the parties.

As a past practice, it is subject to change through negotiations or failure to reach agreement on its

continued application.

However, Titan takes the position that the subject matter of this practice intrudes on

management's unbridled discretion to make decisions about its operating methods.  Titan is

9

correct that it has wide authority to make decisions regarding operation methods and matters essential to the functions of management. In these matters management can make unilateral decisions on how the facility should operate. Management must have freedom of action to ensure progressive operation of the business for the best interest of employees and the Company. Management needs to determine the elements of production, equipment, material and prices. It has to keep up with technological change and modern innovations in order to remain competitive in the market place.

However, in this case the central issue involves the safety program. The parties agreed on a way for fighting fires that involved Union and management participation. This program was by design and deliberation over several decades. It was not in defiance of technological change or efficiency since it incorporated changes promoted in periodic training programs. parties implemented and operated the fire brigade over the course of several Collective Bargaining Agreements. This program did not intrude on the Company's exercise of essential management functions as described above or operate in derogation of a specific power reserved to management.

There was mutual agreement on the operation of a fire brigade program. It qualifies as a past practice and is not in conflict with any contractual term. It is noteworthy that the Understandings agreement provides for uniforms for fire brigade members, and the preamble to this document states its terms have the same force and effect as Contractual terms. provision recognizes the operation of the fire brigade program.

Arbitrators recognize that past practices can be terminated when conditions giving rise to the practice are no longer present. This principle was acknowledged by Arbitrator Ellen Alexander in the case of United Steelworkers Local 745L and Titan Tire Corporation of Freeport. However, in the present case there is no evidence that conditions which led to the

creation and implementation of the fire brigade have changed to the extent that merits the disbanding of the fire brigade. The Company has expressed proper concern for the safety of its employees. This is a concern that can be voiced at the bargaining table if Titan wants to change or end the fire brigade program. The Company also refers to concerns about its property and workers' compensation premiums. However, the record contains little credible evidence that the fire brigade program negatively affects the premiums for these coverages.

The fire brigade program is a working condition that is part of the "whole" agreement between the Company and the Union. It qualifies as a past practice since the fire brigade program is an understood and accepted way of fighting fires that existed over an extended period of time. It was established through a bilateral meeting of the minds and should not be changed by unilateral action of management.

The record shows the Union took appropriate action to comply with the requirements of Article XI, Section 7 to show this past practice was "specifically adopted by the Company in writing." The evidence shows the Union gave proper notice to the Company. The Arbitrator finds the evidence in the record meets the contractual standard for the Arbitrator of "whether the oral agreement existed at least one day prior to the effective date of this Agreement." The Arbitrator finds this past practice is controlling on the parties.

This decision upholds grievance No. G 07-143. The remedy is to reinstate the operation of the fire brigade. This decision grants grievance No. G 07-200. The remedy is to pay for uniforms for fire brigade members as stated in the Understandings. This decision upholds grievance G 07-228. The remedy is to provide SCBAs on fire truck equipment as required by OSHA. However, this decision has no application to the Company's confined space entry or rescue program which is a matter outside the purview of this grievance.

This decision grants grievance No. G 06-103. The issue of EMT training is part of the

fire brigade program   EMT training is part of the past practice and is not subject to unilateral change.   The Company can pursue changes in the training of EMTs and First Responders through negotiations with the Union.   The remedy is to reinstate the EMT and First Responder training that was in place prior to May, 2006.

## AWARD

Grievances G 07-143, G 07-200, G 07-228 and G 06-103 are granted.   The Company is directed to provide the remedies for these grievances as stated above.   This Award applies to the parties for the duration of the current Collective Bargaining Agreement.

_____
ALAN J. COOK
Impartial Arbitrator

Dated at Chicago, Illinois

This 22nd day of April, 2008.